UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- X
CALVIN BUARI,

                             Plaintiff,

                    - against -

THE CITY OF NEW YORK; New York City Police
Department Detectives ANDREW DIETZ, FNU TRACY,
VINCENT PRICE, EUGENE GOTTWIN, JOSEPH
NEENAN, CHRISTINE FORTUNE; Bronx County District
Attorney's Office Investigators JOHN WALL, FNU
SCHIFFMAN, FRANK VIGGIANO; Bronx County District
Attorney's Office Assistant District Attorneys ALLEN
KAREN, FELICITY LUNG, PETER CODDINGTON, GINA
MIGNOLA; and "JOHN and/or JANE DOES" # 1-10 who
are currently unknown members of the New York Police
Department; and "RICHARD and/or RACHEL ROES # 1-
10" who are currently unknown members of the Bronx
County District Attorney's Office, all of whom are being sued
in their individual capacities,

                         Defendants.
-------------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

       Plaintiff Calvin Buari, by and through his attorneys, the undersigned, states as follows:

## PRELIMINARY STATEMENT

       1.       This is a civil rights action against the City of New York based on and arising out

of wrongful acts and omissions of the New York City Police Department and the Bronx County

District Attorney's Office and certain of the employees and agents of these offices, and against

named individual employees and agents of these offices, in which the Plaintiff, Mr. Calvin Buari,

seeks relief for the violation of his rights secured by the Fourth, Fifth, Sixth, and Fourteenth

Amendment to the United States Constitution, and of his rights secured under the laws and

Constitution of the United States as well as the laws and Constitution of the State of New York..

2.      Mr. Buari seeks damages, both compensatory and punitive, an award of costs and attorney's fees, and such other and further relief as this court deems just and proper, for having spent over two decades in prison for crimes he did not commit. Although he consistently maintained his innocence at trial and throughout his numerous years in prison, Mr. Buari was branded as a murderer and was egregiously restricted in his ability to clear his name.

3.      The tragic events that underlie this litigation arose on September 10, 1992, with the shooting deaths of Salhaddin and Elijah Harris on the south side of 213th Street near its intersection with Bronxwood Avenue in the Bronx, New York. The pressure on the police to solve this crime was immense as the burgeoning crack-cocaine epidemic brought a record-setting number of murders to this neighborhood. Yet, New York City Police Department detectives of the 47th Precinct were unsuccessful in finding any significant leads towards identifying the shooter.

4.      Months after these murders, officers from the 47th precinct remained bereft of any leads pointing to the murderer or murderers of the Harris brothers. To close the case, members of the Police Department focused their attention on implicating Plaintiff for those murders as he was already known to the 47th Precinct. Without probable cause, or even reasonable suspicion, to believe he had any connection to the murder of the Harris brothers, police focused their attention on implicating Plaintiff Calvin Buari for that crime.

5.      The police arrested Mr. Buari for the murder of the Harris brothers based on false and coerced statements from Alrick Griffiths, a now-deceased, known drug dealer whom they had arrested for possessing drugs and a gun. Neither the New York City Police Department nor the Bronx County District Attorney's Office did not attempt to corroborate the coerced testimony of this compromised witness.  Mr. Buari was indicted and arraigned for these grievous crimes,

but the dishonest case against him soon fell apart when Mr. Griffiths fled to Jamaica to avoid further police coercion.  Mr. Buari's trial was adjourned for years due to the Bronx District Attorney's Office's inability to present a case against him. Members of the office routinely, however, falsely advised the trial court that their office was "ready for trial."

6.      In and about August of 1995, nearly three years after Mr. Buari was arrested, the Bronx County District Attorney's Office and the 47th Precinct's renewed their conspiracy to falsely convict Mr. Buari by using coercion and inducement to cause another local drug dealer, Dwight Robinson, to implicate Mr. Buari.  Dwight Robinson had been a protégé of Alrick Griffiths and responsible for numerous deaths in the Bronxwood area. Dwight Robinson was the actual murderer of the Harris brothers.

7.      The prosecution knew they could rely on Mr. Robinson to falsely implicate Mr. Buari for murdering the Harris brothers because police had initially been investigating Mr. Robinson for attempting to shoot and kill Mr. Buari. With the backing of Detective Vincent Price and prosecutor Allen Karen, Mr. Robinson used coercion and impermissible suggestion to induce several of his drug-dealing associates to falsely bolster Mr. Robinson's false claims against Mr. Buari. The prosecution also offered deals to the various cooperators in exchange for their false testimony against Mr. Buari.

8.      Mr. Buari's trial lasted from October 11, 1995, through October 30, 1995.  The only evidence against Mr. Buari was the testimony of Dwight Robinson and his drug dealing associates – testimony that the police and prosecutors knew to be false.  Based on that false evidence, Mr. Buari was convicted of two counts of murder in the second degree and sentenced to consecutive indeterminate terms of imprisonment from twenty-five years to life.

9.      Dwight Robinson was rewarded for his role in causing Mr. Buari's conviction by being allowed to operate his drug trade without any "heat" from the police.  His dynasty was short-lived, though, because his murderous disposition caused him to commit another heinous murder in a strikingly similar fashion to his murder of the Harris brothers.  Mr. Robinson was arrested for the murder of Leroy McLennon on June 20, 1997 and was eventually sentenced to 25 years to life imprisonment.

10.     On December 29, 2003, while incarcerated, Mr. Robinson confessed to murdering the Harris brothers.  Around this same time, another trial witness, Kintu Effort, confessed to falsely implicating Mr. Buari due to the police and prosecution's coercive tactics. Yet and still, members of the Bronx District Attorney's Office continued to thwart the fact of Mr. Buari's innocence from being known: Mr. Robinson withdrew his confession due to intimidation from the prosecution and police, particularly including Detective Frank Viggiano's unlawful, coercive tactics. On April 10, 2006, Mr. Buari's 440 motion based on the Robinson confession and Effort recantation was denied and he remained incarcerated for another eleven (11) years.

11.     In 2015, new eyewitnesses came forward to testify to Mr. Buari's innocence and Mr. Robinson's guilt.  Members of the Bronx District Attorney's Office again resorted to coercion and intimidation to uphold their false conviction.  Under the guise of an unbiased investigation by its newly formed Conviction Integrity Unit, Bronx County District Attorney's Office prosecutors and investigators sought out and berated Mr. Buari's newly discovered witnesses; disrupted their familial relationships; and prolonged their "investigation" to frustrate and prevent Mr. Buari's exoneration. Despite their efforts, several witnesses remained undeterred from telling the truth and Mr. Buari was eventually exonerated on May 5, 2017.

12.     After spending twenty-one years in prison, Mr. Buari was finally released on May 8, 2017. The Bronx County District Attorney's Office initially appealed the trial court's decision to vacate the conviction but ultimately dismissed the indictment on March 21, 2018.

13.     The grounds for this action arise out the wrongful, unlawful, and improper acts of these defendants, including, without limitation, creation and perpetuation of false evidence and conspiracy to create and perpetuate false evidence; suppression and concealment of exculpatory evidence and conspiracy to suppress and conceal exculpatory evidence in violation of Mr. Buari's civil rights; false arrest; malicious prosecution; and intentional infliction of emotional distress. Plaintiff further seeks monetary damages against the City of New York pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) for the deliberate indifference of policymakers at the New York City Police Department and the Bronx District Attorney's Office to other earlier examples of such constitutional violations as Mr. Buari faced herein. That indifference was a substantial cause of the harm inflicted upon Mr. Buari

## JURISDICTION

14.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1988, and the Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and pursuant to Article 1 §§ 1, 6, and 12 of the Constitution of the State of New York.

15.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

16.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

**VENUE**

17.     Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

**JURY DEMAND**

18.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

19.     Plaintiff Calvin Buari is a citizen of the United States and was at all times relevant to this Complaint a resident of the State of New York.

20.     Defendant City Of New York ("City") is a municipal corporation created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department and does maintain the New York City Police Department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

21.     Defendant Detective Andrew Dietz ("Det. Dietz") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

22.     Defendant Detective FNU Tracy ("Det. Tracy") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

23.     Defendant Detective Vincent Price ("Det. Price") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

24.     Defendant Detective Eugene Gottwin ("Det. Gottwin") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

25.     Defendant Detective Joseph Neenan ("Det. Neenan") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of

New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

26.    Defendant Detective Christine Fortune ("Det. Fortune") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

27.    Defendant Does # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those other officers, detectives, supervisors, and/or other agents, and employees of the NYPD, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein.  They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  They are sued in their individual capacities.

28.    The Bronx County District Attorney's Office ("BCDAO") was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Bronx County of the City of New York. It is an agency of Bronx County, a constituent county of the City of New York.  The District Attorney; Assistant District Attorneys; and Bronx District Attorney's investigators are deemed employees of both the County of the Bronx and the City of New York.

29.     Defendant BCDAO Assistant District Attorney Allen Karen ("ADA Karen") was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

30.     Defendant BCDAO Assistant District Attorney Felicity Lung ("ADA Lung") was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of New York and the State of New York. She is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  She is being sued in her individual capacity.

31.     Defendant BCDAO Assistant District Attorney Peter Coddington ("ADA Coddington") was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

32.     Defendant BCDAO Assistant District Attorney Gina Mignola ("ADA Mignola") was at all times relevant to this Complaint a duly appointed and acting Assistant District

Attorney of the BCDAO, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City of New York and the State of New York. She is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. She is being sued in her individual capacity.

33.     Defendant Roes # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "Richard Roe" and "Rachel Roe," represent those other investigators, agents, and employees of the BCDAO, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual capacities.

## STATEMENT OF FACTS

### Calvin Buari and the Night of the Murders

34.     In September of 1992, Calvin Buari was twenty-one-years-old and lived in the Wakefield section of the Bronx, New York on 211th Street between Bronxwood Avenue and Paulding Avenue.

35.     On the night of September 10, 1992, at approximately 9:00 p.m., Mr. Buari returned to the Wakefield neighborhood after having spent the day in Manhattan.

36.     Mr. Buari was going to visit his friend, John Parris, who lived on 213th Street between Bronxwood Avenue and Paulding Avenue.

37.     Mr. Buari walked through the intersection of 213th Street and Bronxwood Avenue, where lots of people were about.

38.     Although the sun had gone down, the intersection was well lit by street lights.

39.     Mr. Buari noticed two brothers, Dwight Robinson and Peter Robinson, on the southwest corner of 213th Street and Bronxwood Avenue sitting on milk crates just outside Frank's Soup Bowl restaurant.

40.     Dwight and Peter Robinson appeared to be smoking marijuana and drinking beer.

41.     As Mr. Buari proceeded down 213th Street towards Paulding Avenue, he noticed a person named Kintu Effort playing basketball on the street.

42.     Mr. Buari met John Parris on 213th Street approximately halfway between Bronxwood Avenue and Paulding Avenue, where they engaged in conversation.

43.     As Mr. Buari was talking with John Parris, an older woman stopped and asked Mr. Buari if she could use Mr. Buari's cigarette lighter.

44.     Mr. Buari recognized the woman as someone from the neighborhood but did not know her personally.

45.     Mr. Buari lent the woman his lighter.

46.     Seconds after giving the woman his lighter, Mr. Buari heard gunshots ring out from the intersection of 213th Street and Bronxwood Avenue.

47.     Mr. Buari and Mr. Parris immediately ran down 213th Street towards Paulding Avenue.

48.     The woman who had just borrowed Mr. Buari's lighter immediately ran into the building that she, Mr. Buari, and Mr. Parris had been standing in front of.

49.     Sometime later, Mr. Buari and Mr. Parris walked to the corner of 213th Street and Bronxwood Avenue to see what had happened.

50.     A large crowd had gathered at the intersection.

51.     Among the people in the crowd of onlookers was Dwight Robinson.

52.     Numerous police cars and police officers were also present.

53.     Mr. Buari learned that two males, the Harris brothers, had been shot and killed as they sat inside a white BMW parked near the corner of 213th Street and Bronxwood Avenue in front of Frank's Soup Bowl.

54.     Mr. Buari had never seen the Harris brothers before and did not know who they were or why they had been killed.

55.     Unbeknownst to Mr. Buari, Dwight Robinson was the person who had shot and killed the Harris brothers.

## INVESTIGATION AND FABRICATION OF EVIDENCE

### Initial Investigation

56.     Police officers quickly responded to the shooting and found the Harris brothers dead upon their arrival.

57.     Police officers secured the crime scene and recovered approximately 13 nine-millimeter spent shell casings.

58.     Although numerous people had been on the street at the time the shooting occurred, police officers failed to discover any eyewitnesses to the shooting.

59.     Upon information and belief, if the police had conducted a minimally adequate investigation by speaking with witnesses and persons in the neighborhood, they would have

discovered that Dwight Robinson was the person who had murdered the Harris brothers.  This evidence emerged during the post-conviction investigation regarding Mr. Buari's conviction.

60.     Police officers did locate a witness who claimed to have observed two individuals running away from the crime scene after shots had been fired.

61.     The witness was shown mugshot photos at the 47th Precinct and identified Kintu Effort as one of the individuals he had seen running.

62.     On November 4th, 1992, Det. Dietz interviewed Mr. Effort as part of his investigation of the Harris brothers' murder.

63.     During this interview, Mr. Effort stated that he was in the general area with a person named "John" at the time of the shooting on September 10, 1992.

64.     Mr. Effort stated that he did not see who did the shooting and that he ran to the residence of a friend when the shots were fired.

65.     Upon information and belief, Det. Dietz and other members of the 47th Precinct did not investigate him or his story further regarding the murder of the Harris brothers.

**Fabrication of Evidence from Alrick Griffiths**

66.     On or about January 29, 1993, detectives arrested Alrick Griffiths for criminally possessing drugs and a loaded Barretta nine-millimeter handgun.

67.     Alrick Griffiths was a Jamaican drug dealer who operated on the corner of 213th Street and Bronxwood Avenue.

68.     Dwight Robinson was a drug-dealing associate of Mr. Griffiths.

69.     Detective Dietz and other members of the 47th Precinct suspected that Mr. Griffith might be connected to the murder of the Harris brothers and attempted to find evidence linking him to that crime.

70.     Upon information and belief, when Detective Dietz and members of the 47th Precinct were unable to obtain evidence linking Mr. Griffith to the murder of the Harris brothers, they used impermissible suggestion and/or pressure and/or coercion to induce Mr. Griffiths to implicate someone else for that crime.

71.     Upon information and belief, as part of their effort to induce Mr. Griffiths to implicate someone else for the murder of the Harris brothers, Detective Dietz and members of the 47th Precinct spread a rumor that Mr. Griffith's was a "snitch" and had "talked to the police."

72.     As a result of the rumor Mr. Griffiths was talking to the police, Mr. Griffiths' girlfriend, Elaine Salmon, went to the 47th Precinct on or about February 27, 1993, where she spoke to Det. Dietz.

73.     Ms. Salmon informed Det. Dietz that Mr. Griffiths had told her that he had been on 213th Street and Bronxwood Avenue and witnessed one of the "Yankee guys that deal crack shoot two guys in the head who were sitting in a pretty white BMW."

74.     Dwight Robinson was a "Yankee guy" who dealt crack at 213th Street and Bronxwood Avenue.

75.     On or about March 22, 1993, members of the 47th Precinct arrested Mr. Buari for allegedly possessing a small amount of marijuana.

76.     Mr. Buari was issued a summons for the alleged marijuana and taken to the 47th Precinct to be questioned by detectives.

77.     Detectives, including Det. Tracy, attempted to elicit a statement from Mr. Buari implicating himself or someone else for recent criminal activity that had occurred in the confines of the 47th Precinct.

78.     Det. Tracy and the other detectives became enraged when Mr. Buari did not cooperate with their attempts to solicit information from him.

79.     Upon information and belief, detectives in the 47th Precinct knew that Mr. Buari lived in the vicinity of where Alrick Griffith dealt drugs and where the Harris brothers had been murdered.

80.     Upon information and belief, detectives from the 47th Precinct, including Det. Dietz and Det. Tracy, used impermissible suggestion and/or pressure and/or coercion to induce Alrick Griffiths into falsely stating that Mr. Buari had murdered the Harris brothers.

81.     Upon information and belief, the detectives promised Mr. Griffith favorable treatment, leniency, and release from custody in exchange for these false statements.

82.     As a result of the false statements Dietz, Tracy and other 47th Precinct Detectives had caused Mr. Griffiths to make, Mr. Buari was arrested for murdering the Harris brothers on March 22, 1993.

83.     The 47th precinct detectives had no physical evidence to corroborate Alrick Griffiths' account of the murder.

84.     Mr. Griffith's knowingly false and coerced testimony was the only evidence members of the 47th precinct used as probable cause to arrest Mr. Buari for the Harris brothers' murder.

85.     Mr. Buari maintained that he was innocent of that crime.


**Mr. Buari's Indictment, Arraignment and Release on Bail**

86.      The BCDAO went forward in prosecuting Mr. Buari for the shooting deaths of the Harris brothers based solely on Mr. Griffiths' false statements.

87.     On March 26, 1993, the prosecution convened a grand jury to hear their case against Mr. Buari.

88.     Upon information and belief, the only evidence that the prosecution presented at the grand jury proceedings was the false testimony of Alrick Griffiths.

89.     Mr. Buari was indicted on charges of Murder in the Second Degree (four counts), Manslaughter in the First Degree (two counts), Criminal use of a Firearm in the First Degree, and Criminal Possession of a Weapon in the Second and Third Degrees, indictment number 2111/93. He was arraigned on these charges and pled not guilty.

90.     Mr. Buari was remanded in custody.

91.     Upon information and belief, Alrick Griffiths was rewarded for falsely testifying against Mr. Buari by being released from custody.

92.     After being released from custody, Mr. Griffiths fled to Jamaica, upon information and belief, to avoid further police coercion and imprisonment.

93.     Mr. Buari retained attorney Kenneth Schreiber to defend him on the charges and prove his innocence.

94.     Through his investigation of Mr. Buari's case, Mr. Schreiber learned of several witnesses to the shooting deaths of the Harris brothers, including Dwight Robinson, Kintu Effort, Clarence Lamont Seabrook, Jerry Connor, and Stephan Robinson.

95.     Mr. Schreiber met with these witnesses, who advised him that Mr. Buari had not murdered the Harris brothers and that they would testify on Mr. Buari's behalf.

96.     The BCDAO eventually offered Mr. Buari a plea bargain of three-year imprisonment for the double homicide charge.

97.     Upon information and belief, the prosecution was fully aware that their case against Mr. Buari had no merit.

98.     The BCDAO did not have any evidence against Mr. Buari since their only witness had fled the country.

99.     Mr. Buari did not accept the plea deal because he was innocent of the crime.

100.    Mr. Buari eventually made bail and was released from custody.

**Detectives from the 47th Precinct Make a Deal with Dwight Robinson**

101.     In and about June 1995, almost three-years after the Harris brothers were murdered, drug violence in the 47th Precinct was raging out of control.

102.    The 47th Precinct was said to have the "corner on blood," as rival drug dealers violently vied for control of the territory.

103.    From late June into July 1995, at least five people were shot and killed in the Wakefield neighborhood, with several others being seriously injured.

104.    One of the many people murdered in the 47th Precinct around this time was Dwight Robinson's brother, Peter.

105.    Upon information and belief, Dwight Robinson believed Mr. Buari was somehow connected to Peter Robinson's murder.

106.    Mr. Buari was in no way responsible for or connected to Peter Robinson's murder.

107.    In August of 1995, Mr. Robinson attempted to kill Mr. Buari and Mr. Buari's friend, John Parris, by shooting them numerous times while they sat in a car.

108.    Mr. Buari and Mr. Parris were seriously injured but survived the attack.

109.    Shortly thereafter, detectives from the 47th Precinct took Dwight Robinson into custody.

110.    Det. Vincent Price, Eugene Gottwin, Joseph Neenan, and Christine Fortune and other detectives from the 47th Precinct met with Mr. Robinson to discuss the violence that was taking place in their precinct, including the attempted murder of Mr. Buari and Mr. Parris.

111.    The detectives from the 47th Precinct were aware that Dwight Robinson was a drug dealer who was vying for control over territory in their precinct.

112.    The detectives from the 47th Precinct were aware that the case against Mr. Buari for the shooting deaths of the Harris brothers was coming up for trial and that the prosecution did not have any evidence against Mr. Buari.

113.    Upon information and belief, Det. Price, Gottwin, Neenan, Fortune, and other members of the 47th precinct proposed allowing Mr. Robinson to operate his drug trade in the Wakefield neighborhood without "heat" from the police if Mr. Robinson helped stem the violence that was going on there.

114.    Upon information and belief, Det. Price, Gottwin, Neenan, Fortune, and other members of the 47th precinct also demanded that Mr. Robinson provide evidence implicating Mr. Buari for the shooting deaths of the Harris brothers.

115.    Upon information and belief, Dwight Robinson accepted the detectives' offer and agreed to falsely testify that Calvin Buari was responsible for murdering the Harris brothers – the crime that he, himself, had committed.

116.    Upon information and belief, Detectives Price, Gottwin, Neenan, Fortune, and other members of the 47th precinct made their arrangement with Dwight Robinson known to

members of the Bronx District Attorney's office, including the Assistant District Attorney

prosecuting Mr. Buari's case, Assistant District Attorney Allen Karen ("ADA Karen").

117.    Together, Detectives Price, Gottwin, Neenan, Fortune, ADA Karen, and Mr.

Robinson used impermissible suggestion and/or coercion and/or improper inducements to

compel others to falsely implicate Mr. Buari for the shooting deaths of the Harris brothers,

including witnesses who had intended to testify for Mr. Buari.

118.    Those witnesses included Jerry Connor and Clarence Lamont Seabrook, as well as

Brian Johnson, and Kenya Holder.

119.    Upon information and belief, Detective Price, Gottwin, Neenan, Fortune, and

ADA Karen were fully aware that these four witnesses were drug-dealing associates of Mr.

Robinson, and that they would financially benefit if Mr. Robinson gained control over the

neighborhood drug trade.

120.    The prosecution also offered Mr. Connor, Mr. Seabrook, and Mr. Holder

recommendations for leniency for open drug and/or gun charges in exchange for their false

statements.

121.    As a result of the coercion and suggestion exerted against them by Detective

Price, Gottwin, Neenan, Fortune, ADA Karen, and Dwight Robinson, and in consideration of

favorable treatment and unlawful inducement promised by ADA Karen and the detectives, these

witnesses agreed to falsely implicate Mr. Buari.

122.    Members of the BCDAO were fully aware of Mr. Robinson's and Det. Price's

improper and unlawful tactics to elicit false statements against Calvin Buari.

123.    ADA Karen referred Dwight Robinson's newfound cooperation with the police

and prosecution to convict Mr. Buari as "a gift."

124.    Detective Price, Gottwin, Neenan, Fortune, and ADA Karen additionally used impermissible suggestion and/or pressure and/or coercion to cause Kintu Effort to falsely implicate Mr. Buari for the shooting deaths of the Harris brothers.

125.    Upon information and belief, although detectives had thoroughly investigated Mr. Effort shortly after the September 10, 1992 murders and found him to be credible when he claimed no knowledge of those murders, Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen now threatened to charge Mr. Effort as an accessory to Mr. Buari's murder of the Harris brothers if he did not cooperate with them by testifying against Mr. Buari.

126.    Upon information and belief, Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen threatened to charge Mr. Effort as an accessory to the murder of the Harris brothers.

127.    Upon information and belief, Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen threatened that Dwight Robinson and his drug-dealing associates testify that Mr. Effort helped Mr. Buari murder the Harris brothers.

128.    The prosecution additionally offered to recommend leniency for a four to eight-year prison Mr. Effort was then serving for a drug-related crime if Mr. Effort testified against Mr. Buari.

129.    As a result of the coercion exerted by Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen, and the promise of favorable treatment, Mr. Effort agreed to falsely testify that Mr. Buari had murdered the Harris brothers.

### Mr. Buari's Trial and Conviction

130.    At a *Wade* hearing held on October 3rd and 6th, 1995, before Judge Joseph Cerbone, Detectives Price, Fortune and Neenan falsely testified that Mr. Buari became a suspect

for the Harris brothers' murder after an unrelated criminal investigation led them to interview Dwight Robinson, who informed them that Mr. Buari had murdered the Harris brothers.

131.   Detectives Price, Fortune and Neenan falsely testified that Dwight Robinson was in fear for his life because he believed Mr. Buari was trying to kill him.

132.   Mr. Buari has never tried to harm Dwight Robinson.

133.   Detectives Price, Fortune and Neenan did not inform the Court that they had taken Mr. Robinson into custody to question him about his attempted murder of Mr. Buari and Mr. Parris.

134.   Detectives Price, Fortune and Neenan did not inform the Court of the arrangements that they and ADA Karen had made with Mr. Robinson and his drug-dealing associates to secure false testimony against Mr. Buari.

135.   Judge Cerbone denied Mr. Buari's motions to suppress Dwight Robinson's identification of him as the murderer of the Harris brothers.

136.   Mr. Buari was subsequently tried before a jury.

137.   The trial lasted from October 11, 1995 through October 30, 1995.

138.   At trial, the only evidence linking Mr. Buari to the murder of the Harris brothers was the false testimony of Dwight Robinson and his drug-dealing associates, Clarence Lamont Seabrook, Kenya Holder, Jerry Connor, Brian Johnson, and Kintu Effort.

139.   ADA Karen importuned, suborned and allowed Mr. Seabrook, Mr. Connor, and Mr. Holder to falsely testify to witnessing Mr. Buari shoot the Harris brothers on September 10, 1992 in front Frank's Soup Bowl Restaurant.

140.    In reward for their false testimony, the BCDAO provided Mr. Seabrook, Mr. Connor, and Mr. Holder a recommendation of leniency from prosecution for their open drug/gun cases.

141.    ADA Karen also importuned suborned and allowed Kintu Effort to falsely testify that he handed Mr. Buari the murder weapon and witnessed Mr. Buari shoot the Harris brothers on September 10, 1992.

142.    In reward for his false testimony, the BCDAO provided Mr. Effort with a recommendation of leniency regarding his prison sentence for a drug-related crime.

143.    ADA Karen did not disclose that he had threatened to prosecute Mr. Effort as an accessory to the murder of the Harris brothers if he did not testify.

144.    ADA Karen importuned, suborned and allowed Mr. Robinson to falsely testify that he had witnessed Mr. Buari shoot the Harris brothers.

145.    ADA Karen importuned, suborned and allowed Mr. Robinson to falsely claim his testimony was being given without suggestion or coercion from members of the 47th precinct or the BCDAO.

146.    ADA Karen importuned, suborned and allowed Mr. Robinson to falsely deny that he, with the assistance of members of the police and ADA Karen, had caused Mr. Seabrook, Mr. Connor, and Mr. Holder to falsely testify against Mr. Buari.

147.    The jury convicted Mr. Buari of two counts of murder in the second degree.  Mr. Buari was sentenced to consecutive indeterminate terms of imprisonment from twenty-five years to life.

**Dwight Robinson's Conviction**

148.     On June 20, 1997, Dwight Robinson murdered Leroy McClennon in virtually the

same manner in which he had murdered the Harris brothers:

    a.  He shot Mr. McClennon several times with a 9-millimeter handgun;

    b.  He murdered McClennon on the corner of 213th Street and Bronxwood
        Avenue;

    c.  Numerous people were present while he committed the crime; and

    d.  Mr. Robinson fled the scene of the crime and returned shortly thereafter
        and attempted to mix in with the crowd that had formed.

149.     Two of the detectives assigned to investigating the murder of Leroy McClennon

were Joseph Neenan and Christine Fortune –detectives that had helped coerce and/or induce Mr.

Robinson to testify against Mr. Buari.

150.     Upon information and belief, Detectives Neenan and Fortune recognized the

striking similarities between Mr. McClennon's murder and the murder of the Harris brothers.

151.     Mr. Robinson was arrested shortly after the McLennon murder by members of the

47th precinct after a witness alerted them that Mr. Robinson was the perpetrator.

152.     After his arrest, Mr. Robinson confessed to murdering Mr. McClennon over a

drug dispute.  Mr. Robinson was eventually sentenced to twenty-five years to life.

**Mr. Buari's First C.P.L. § 440 Motion**

153.     In or about March 8, 2002, the Appellate Division, First Department, assigned the

Office of the Appellate Defender including Risa Gerson and Brian Stull to represent Calvin

Buari on his appeal of the December 5, 1995 judgment of conviction entered against him.

154.     Appellate counsel contacted Kintu Effort. During their interview with him, Mr.

Effort recanted his trial testimony.

155.    Mr. Effort stated that (1) he had not actually seen Mr. Buari shoot the Harris brothers and that (2) he gave this false testimony because prosecutors had threatened to charge him as an accessory to the murder if he did not cooperate with them.

156.    On September 19, 2002, Mr. Effort provided Mr. Buari's appellate counsel with an affidavit recanting his testimony at Mr. Buari's criminal trial and explaining why he had testified falsely.

157.    On November 23, 2002, appellate counsel visited Dwight Robinson at Upstate Correctional Facility. At that meeting, Mr. Robinson refused to say anything specific about the murder of the Harris brothers but did not renew his allegation that Calvin Buari was the killer. Instead, he stated that only he knew what happened on that date.

158.    On June 26, 2003, Mr. Buari and his appellate counsel moved pursuant to New York Criminal Procedure Law ("N.Y.C.P.L.") § 440.10 to vacate his conviction, alleging that (1) he was denied his constitutional right to a fair and impartial jury; (2) the prosecution violated *Brady v. Maryland*, 373 US 83 (1963) by failing to relinquish impeachment evidence concerning the prosecution's witnesses; and (3) that prosecution's witness Dwight Robinson's conviction for a murder occurring at the same manner and location as the Harris brothers' murder was "newly discovered" evidence that would have resulted in a more favorable verdict.  The BCDAO, including ADA Karen, opposed Mr. Buari's motion.

159.    On December 5, 2003, appellate counsel met with Dwight Robinson at Clinton Correctional Facility.  At this meeting, Mr. Robinson told appellate counsel that he had falsely accused Calvin Buari of the Harris Brothers' murders and that he had gotten his associates to give similar, false testimonies against Mr. Buari.

160.    On December 14, 2003, Dwight Robinson sent a handwritten letter to Buari's appellate counsel expressing his desire to make a full confession to his murder of the Harris brothers.

161.    On December 29, 2003, Dwight Robinson confessed to appellate counsel that he had murdered the Harris brothers.  The following day, Mr. Robinson executed an affidavit confessing to having murdered the Harris brothers.

162.    At or about this time, Mr. Robinson spoke to John Parris on a prisoner telephone using another inmate's calling card.  During this conversation, Mr. Robinson apologized to Mr. Parris for having almost killed him and confessed to having murdered the Harris brothers.

163.    Upon information and belief, the BCDAO, including ADA Karen and BCDAO Investigators Viggiano, Schiffman and Wall, were aware of and possessed a recording of this telephone call.

164.    On or about January 23, 2004, Mr. Buari supplemented his original N.Y.C.P.L. § 440.10 motion with additional "newly discovered" evidence consisting of Dwight Robinson's confession to murdering the Harris brothers and the affidavit they had obtained from Kintu Effort.

165.    Upon learning of Mr. Buari's new evidence regarding Kintu Effort and Dwight Robinson, members of the BCDAO, including ADA Karen, sent out BCDAO investigators, including Viggiano, Schiffman, and Wall, to inquire about those claims and to attempt to obtain withdrawals of their new recantation testimony in any way possible.

166.    Upon information and belief, BCDAO investigators, including Viggiano, Schiffman, and Wall, made visits to Kintu Effort and also visited members of Mr. Effort's family.

167.    Upon information BCDAO investigators, including Viggiano, Schiffman, and Wall, used undue suggestion and coercion against Mr. Effort and his family members in an attempt to cause Mr. Effort to withdraw the recantation of his trial testimony.

168.    Members of the BCDAO investigators, including Viggiano, Schiffman, and Wall, visited Dwight Robinson and also visited members of Mr. Robinson's family.

169.    Upon information and belief, BCDAO investigators, including Viggiano, Schiffman, and Wall, used undue suggestion and coercion against Mr. Robinson and his family members in an attempt to cause Mr. Robinson to recant his confession to murdering the Harris brothers.

170.    BCDAO investigators, including Viggiano, Schiffman, and Wall, threatened Mr. Robinson he would spend the rest of his life in jail if he did not recant his confession to murdering the Harris brothers.

171.    BCDAO investigators, including Viggiano, Schiffman, and Wall, told Mr. Robinson that any application he ever made for parole would be rejected if he did not recant his confession to murdering the Harris brothers.

172.    BCDAO investigators, including Viggiano, Schiffman, and Wall, also intentionally manipulated and strained Mr. Robinson's relationship with his mother to pressure Robinson to retract his confession.

173.    As a result of the coercion and/or impermissible suggestion and/or improper inducements exerted by BCDAO investigators, including Viggiano, Schiffman, and Wall, Dwight Robinson agreed to recant his confession to murdering the Harris brothers.

174.    A hearing was held in the Supreme Court, Bronx County, before the Honorable Dominic Massaro on November 17, 2004.

175. At that hearing, Dwight Robinson recanted his confession that he had murdered the Harris brothers.

176. Mr. Robinson falsely testified that he had only cooperated with Mr. Buari's appellate counsel because he thought his life would be in danger if he did not do so.

177. Neither Mr. Buari nor anyone on his behalf has ever tried to harm Mr. Robinson or his family or threaten to do so.

178. Mr. Robinson insisted that he neither committed the Harris brothers' murders nor the Leroy McLennon murder for which he was serving time.

179. Kintu Effort testified that his initial recantation was accurate, and that Mr. Buari did not murder the Harris brothers.

180. In a decision dated April 10, 2006, Judge Massaro denied Mr. Buari's 440 motion.  Judge Massaro found Dwight Robinson's testimony to be credible and Kintu Effort's testimony incredible.

181. In an order dated August 17, 2006, Judge Nardelli granted Mr. Buari leave to appeal the denial of his 440 motion.  Mr. Buari's appeal was denied.

**Newly Discovered Evidence Leads to Mr. Buari's Exoneration**

182. After his appeal was denied, Mr. Buari's family engaged in a social media and publicity campaign in an effort to raise awareness of Mr. Buari's wrongful conviction and to find new evidence of his innocence.

183. Towards that end, Mr. Buari also sought out and hired private investigators.  In 2012, he hired a private investigator named Joseph Barry ("Mr. Barry").

184.     Mr. Barry obtained evidence from a woman named Kimberlia Clarke ("Kimberlia") who had occupied a second-floor apartment in the building next to Frank's Soup Bowl restaurant at and about the time the Harris brothers were murdered.

185.     On September 10, 1992, at approximately 9:00 p.m., Kimberlia had just finished bathing her children when she heard gunshots.

186.     She immediately looked out of her window onto the intersection of 213th Street and Bronxwood Avenue where she saw Dwight Robinson firing a gun into a car.

187.     Kimberlia knew Dwight Robinson as someone who sold drugs on her block.

188.     Kimberlia ran to her apartment door and screamed for her sister, Nakia, to come inside.

189.     Kimberlia moved out of the neighborhood a short time after this event.

190.     Kimberlia did not learn that Mr. Buari had been convicted for the crime she witnessed Dwight Robinson commit until 2014, when she was revisiting her old neighborhood and saw a flyer with Mr. Buari's picture on it and describing his case.

191.     Kimberlia called a telephone number listed on the flyer, which put her in touch with Mr. Barry.

192.     Mr. Barry also obtained evidence from Nakia Clarke ("Nakia"), who was staying with Kimberlia, her sister, at the time the Harris brothers were murdered.

193.     On September 10, 1992, at approximately 9:00 p.m., Nakia was sitting on the stoop of her sister's apartment building right next to Frank's Soup Bowl, when she saw a person walk towards a white car containing two males parked near the corner and start shooting a gun into it.  She saw the bodies of the two men jerked about as the shots were fired.

194.     Nakia recognized the shooter as Dwight Robinson, who sold drugs on the block.

195.    Nakia was horrified by what she saw and ran into her sister's apartment.

196.    Nakia did not learn that Mr. Buari had been convicted of the murder she had witnessed Dwight Robinson commit until 2014.  She had never talked to anyone about what she had seen until Kimberlia brought up the flyer she had come across that described Mr. Buari's case.

197.    Initially, Nakia was scared and did not want to tell anyone what she had witnessed, but she eventually decided to talk to Mr. Barry after deciding it was the right thing to do.

198.    Mr. Barry also obtained evidence from Caroline Brown ("Ms. Brown") who occupied an apartment at 908 East 213th Street, a few houses down from Frank's Soup Bowl towards Paulding Avenue, at the time of the Harris brothers' murders.

199.    On the night of September 10, 1992, Ms. Brown was returning from a friend's house when she ran into Mr. Buari and a friend who were talking outside her apartment building.

200.    Ms. Brown stopped and asked Mr. Buari for his cigarette lighter, which Mr. Buari gave to her.

201.    Ms. Brown then heard gunshots ring out from the direction of Bronxwood Avenue.

202.    Ms. Brown recalled Mr. Buari and his friend run towards Paulding Avenue while she ran into her building.

203.    A short while later, Ms. Brown learned that two men had been shot and killed while sitting in a car outside of Frank's Soup Bowl.

204.    Ms. Brown moved out of the neighborhood shortly after this event.

205.    Ms. Brown did not learn that Mr. Buari had been convicted of the September 10, 1992 murders until years later when she and a friend came across a Buzzfeed article on Mr. Buari's case on the internet.  She then called a telephone number listed in the article to provide her information.

206.    On or about October 15, 2015, Mr. Buari submitted this and other new evidence in support of a new motion for vacatur of his conviction pursuant to N.Y.C.P.L. § 440.10(1)(g) and based upon his actual innocence.  The motion was assigned to the Hon. Eugene Oliver, Justice of the Supreme Court of the State of New York, Bronx County.

**Bronx County District Attorney's Conviction Integrity Unit's Investigation**

207.    Rather than proceed to a hearing on his October 15, 2015 N.Y.C.P.L. § 440.10 motion, the BCDAO requested that Mr. Buari consent to allowing their Conviction Integrity Unit to investigate his claim of innocence.

208.    Members of the BCDAO promised and assured Mr. Buari that the investigation would be fair, open-minded and not adversarial.

209.    Based on the assurances made by the BCDAO, Mr. Buari and his attorneys agreed to hold his N.Y.C.P.L. § 440.10 motion in abeyance while they investigated his claims.

210.    ADA Lung and ADA Coddington were assigned to lead the investigation on behalf of the BCDAO Conviction Integrity Unit overseen by ADA Mignola.

211.    In October 2015, ADA Coddington contacted Mr. Buari's counsel, Myron Beldock ("Mr. Beldock") and informed him that he intended to have investigators go out and interview Mr. Buari's newly discovered witnesses.

212.    Mr. Beldock expressed concern that homicide detectives would be interested in maintaining Mr. Buari's conviction and be adversarial to Mr. Buari's witnesses.

213.    ADA Coddington assured Mr. Beldock that he was going to conduct a "straight up reinvestigation" and said that the BCDAO had "no love for Dwight Robinson."

214.    Mr. Beldock wrote each of Mr. Buari's witnesses and advised them that investigators from the BCDAO might try to contact them regarding information they had.  Mr. Beldock further advised them that they could agree to talk to the investigators, refuse to talk to the investigators, or agree to only talk to the investigators with an attorney present.

215.    Kimberlia Clarke, Nakia Clarke, Caroline Brown, and other witnesses for Mr. Buari advised Mr. Beldock that they would only want to talk to the BCDAO investigators with an attorney present.

216.    In November 2015, Mr. Beldock provided ADA Coddington and ADA Lung with up-to-date contact information for Kimberlia Clarke, Nakia Clarke, Caroline Brown, Brown, and other witnesses for Mr. Buari and advised ADA Coddington that each of those witnesses would only agree to be interviewed by Bronx County District Attorney investigators with an attorney present.

217.    In or about August 2016, BCDAO investigators began showing up at the homes and places of work of Mr. Buari's witnesses.

218.    BCDAO investigators would arrive unannounced, show their law enforcement badges to friends and co-workers of Mr. Buari's witnesses, and state they were investigating a double homicide.

219.    Contrary to ADA Coddington's representations to Mr. Beldock, BCDAO investigators were adversarial and intimidating towards Mr. Buari's witnesses.

220.    Mr. Buari's witnesses were greatly upset by their treatment by the BCDAO investigators.

221.    BCDAO investigators dissuaded witness Patricia Damm from testifying on Mr. Buari's behalf.

222.    Caroline Brown was greatly distressed and felt the experience was harmful to her health.

223.    As a result of the Bronx County District Attorney's Office investigators' conduct, Nakia Clarke was kicked out of the battered women's shelter she was staying at and lost her job.

224.    Judge Oliver noted that the treatment of Mr. Buari's witnesses by the BCDAO investigators was "unconscionable."

225.    After BCDAO investigators had thoroughly interrogated Mr. Buari's witnesses, ADA Lung requested that Kimberlia Clarke, Nakia Clarke, and Ms. Brown be brought to the BCDAO so that she could assess their credibility in person.

226.    Mr. Buari's counsel arranged for Kimberlia Clarke, Nakia Clarke, and Caroline Brown to be brought to the BCDAO to be examined by Ms. Lung.

227.    Because the mistreatment these witnesses had suffered at the hands of the BCDAO investigators, they requested to be represented by counsel during Ms. Lung's examination.

228.    Kimberlia Clarke, Nakia Clarke, and Caroline Brown were represented by independent counsel, Rita Dave ("Ms. Dave"), during Ms. Lung's examination.

229.    ADA Lung was unnecessarily adversarial and combative while examining Mr. Buari's witnesses.

230.    While examining Nakia Clarke, ADA Lung took an opportunity when Ms. Dave stepped outside to improperly solicit Ms. Clarke speak to her without her lawyer present.

231.    ADA Lung implied, in sum and substance, that Ms. Clarke would not need to be represented by a lawyer if she was innocent and had nothing to hide.

232.    This false and disturbing innuendo was repeated throughout the BCDAO investigation of Mr. Buari's case and during the N.Y.C.P.L. § 440.10 hearing by ADA Lung and ADA Mignola, the head of the Wrongful Conviction Unit. ADA Mignola even stated that she would be "hard-pressed to understand" why an eyewitness to a murder would feel the need to be represented by counsel.

233.    Judge Oliver rebuked this position of the BCDAO in his November 29, 2017 decision by stating, "Ms. Clarke is a United States Citizen, and has every right to have an attorney present during questioning."

234.    On January 13, 2017, ADA Mignola advised Mr. Buari's counsel that the Bronx County District Attorney's Office stated that the "credible evidence" did not establish that Mr. Buari was innocent or that the conviction was wrongfully obtained."

235.    Mr. Buari's counsel subsequently requested that the Court proceed with a hearing on Mr. Buari's N.Y.C.P.L. § 440 motion.

236.    With Mr. Buari's litigation revived and active, the Bronx County District Attorney's Office Conviction Integrity Unit ceased its investigation.

**Mr. Buari's Exoneration**

237.    A N.Y.C.P.L. § 440 hearing was held in the Supreme Court, Bronx County beginning on March 27, 2017, and concluding on April 7, 2017.

238.    Mr. Buari's case consisted of testimony from himself, Kimberlia Clarke, Nakia Clarke, Caroline Brown, and Joseph Barry.

239.    Cross-examination of Mr. Buari and his witnesses by ADA Lung provided no basis to doubt the veracity of their testimony.

240.    The BCDAO represented that they were going to have Dwight Robinson testify as their only witness but informed the Court that they would not call Mr. Robinson at the last minute.  Upon information and belief, in fact the BCDAO never intended to have Mr. Robinson testify and had not ever arranged for his testimony or sough to prepare him for his potential testimony.

241.    For example, when the BCDAO first informed Judge Oliver of their intention to produce Mr. Robinson, both the Court and Mr. Buari's counsel advised the BCDAO of their obligation to inform Mr. Robinson of his Fifth Amendment right against self-incrimination and to remain silent. The BCDAO had not previously so informed Mr. Robinson and the Court suggested that the BCDAO provide an attorney for Mr. Robinson.

242.    The BCDAO requested that the Court take Judicial notice of Mr. Buari's prior 440 hearing, all prior motions, all previously rendered decisions, and the criminal trial transcript.

243.    On May 5, 2017, after the hearing, the Court, from the bench, issued an oral decision, vacating the conviction of Mr. Buari based upon N.Y.C.P.L. 440.10(1)(g) and ordered a new trial.  In his oral decision, the Court stated that it found Mr. Buari's witnesses credible. The Court released Mr. Buari on his own recognizance despite ADA Lung's insistence that the Court set bail in the amount of $500,000.00. The court set July 17, 2017 as the date for the re-trial of Mr. Buari on the indictment.

244.    Mr. Buari was released from custody on May 8, 2017.

245.    On May 24, 2017, The BCDAO filed a Notice of Appeal of the oral decision.

246.     On June 19, 2017, Mr. Buari's counsel received an email from ADA Lung that read "I am writing to inform you that I received a call today from an individual #1 who indicated that shortly [sic] the homicide an individual #2 told individual #1 that the defendant Calvin Buari was not the shooter; rather Calvin Buari was present and ordered the shooting."

247.     On June 20, 2017, Mr. Buari's counsel sent an email to ADA Lung requesting documentation and information regarding the above conversation.

248.     On June 26, 2017, Mr. Buari's counsel sent a letter to DA Darcel Clark, ADA Lung and ADA Coddington requesting documentation and information regarding the above conversation. The letter also asked DA Clark:

> whether [the BCDAO] intends to re-try Mr. Buari on July 17, 2017, or whether you intend to pursue the appeal or both or neither. Of course, I would be remiss if I did not repeat my drum-beated plea to put some finality to this case.  Appealing a credibility determination, made by a Supreme Court Judge after a full hearing, is a futile endeavor. Retrying this case would be equally useless because your witnesses, weak to begin with, have only become more damaged over time and you cannot refute the newly discovered evidence.

249.     Neither DA Clark, nor ADAs Lung or Coddington ever replied to the letter and none of them ever provided the information requested which constituted *Brady* material.

250.     In fact, repeated demands to DA Clark, ADA Mignola, ADA Lung and ADA Coddington for the above material; for withdrawal of the appeal; and dismissal of the charges went unanswered and were ignored.

251.     At subsequent court appearances, ADA Lung and ADA Coddington advised the Court that they intended to re-try Mr. Buari for the Harris brother murders.

252.     They asked for the re-trial to be adjourned so that they could see and review Judge Oliver's written decision of his vacatur of the conviction.

253.    In his subsequent written decision, dated November 9, 2017,  Judge Oliver also

specifically found:  (a) the evidence presented by the Mr. Buari was "overwhelming"; (b) the

"abundance" of the new evidence was never presented in the original 440 hearing; (c)  Mr.

Buari's witnesses were "completely credible" and "direct"; (d)  the hostility and negativity

directed at them by the BCDAO and ADA Lung was "unnecessary and unprofessional"; (e) the

BCDAO and its representatives were "unnecessarily hostile" to Nakia Clarke; (f)  the BCDAO

and its representatives' treatment of Nakia Clarke during the reinvestigation was

"unconscionable"; (g)  Nakia Clarke's testimony was brave and powerful; (h)   the BCDAO and

its representatives arguments as to Mr. Buari's witness Caroline Brown were "offensive"; (i) Mr.

Buari, in his testimony gave direct responses and did not appear to be evasive (j)  the testimony

of the Mr. Buari's witnesses was "overwhelming" and "credible;" and (k) the court noted the

serious issues with Dwight Robinson's credibility and that "Despite repeated assertions to the

contrary, the People did not call Dwight Robinson as a witness."

254.    Mr. Buari's counsel again wrote the BCDAO on and requested that they re-

consider their decision to either appeal the case or have a new trial. The office continued the

prosecution despite having no good-faith basis to do so.

255.    Instead, despite the strong rebuke of the BCDAO's behavior in this matter,

despite the overwhelming evidence of Mr. Buari's innocence, and despite the legal futility of

appealing a Supreme Court Justice's credibility determinations after a testimonial hearing, the

BCDAO continued the prosecution of Mr. Buari by filing a Notice of Appeal of the written

decision.

256.     On November 29, 2017, the parties appeared before Bronx Supreme Court Justice Ralph Fabrizio. ADA Lung again re-iterated the office's intention to retry the case and pursue the appeal of the oral and written decisions of Judge Oliver.  ADA Lung also falsely told Judge Fabrizio that the defense "blocked the re-investigation at every turn."

257.     ADA Lung had repeatedly made this false and spurious claim both on and off the record numerous times. Judge Fabrizio set March 21, 2018, for a status conference.

258.     On December 1, 2017, Mr. Buari's counsel again implored DA Darcel Clark to withdraw the appeals and dismiss the indictment.  The letter was ignored and went unanswered.

259.     The indictment was finally dismissed on motion of the BCDAO on March 21, 2018.

**The Defendants' Unconstitutional Efforts to Elicit False Testimonies Implicating Mr. Buari**

260.     As the specific facts alleged above show, the defendant police officers, detectives district attorneys and district attorney investigators concealed from Mr. Buari, his defense counsel, and from the public as well, that they had elicited false statements from each of the prosecution's witnesses at the trial which implicated Mr. Buari in murdering the Harris brothers and during Mr. Buari's post-conviction proceedings.

261.     All of these facts were known, or should have been known, to the defendants at the time they were investigating and reinvestigating the murder of the Harris brothers.

262.     The defendants deliberately concealed Dwight Robinson's guilt, perpetuated falsehoods pertaining to Mr. Buari, and failed to disclose these facts, favoring instead their collective predetermined attributions of guilt and the expedient accusation that it was Mr. Buari who had murdered the Harris brothers.

263.     Instead of investigating readily available evidence which connected Dwight Robinson to the murder of the Harris brothers, the defendant police officers, detectives, district attorneys and district attorney investigators who were responsible for investigating, prosecuting, and reinvestigating Mr. Buari, deliberately elicited false testimonies and abandoned any reasonable effort to legitimately investigate the crime, resulting in the malicious prosecution of Mr. Buari, his subsequent wrongful conviction, and his wrongful imprisonment for more than twenty-one years.

264.     As shown through the complaint, the testimonies and statements at Mr. Buari's October 1995 trial elicited from Jerry Connor, Clarence Lamont Seabrook, Kintu Effort, Dwight Robinson, Brian Johnson, and Kenya Holder were inaccurate, false and fabricated.

265.     As shown through the complaint, the prosecution's efforts to elicit false testimony from Dwight Robinson simultaneously concealed striking evidence of Dwight Robinson's bias towards Mr. Buari, including Mr. Robinson's attempted murder of Mr. Buari.

266.     The defendants' failure to conduct a constitutionally adequate investigation and use of coercion to elicit false testimony against Mr. Buari put the public at great risk and deprived Mr. Buari of a fair trial.  Defendants additionally deprived Mr. Buari of the fair opportunity to challenge the false case put forward by their compromised witnesses and the police officers and detectives who testified at his criminal trial.

267.     Similarly, despite the evidence demonstrating Mr. Robinson's guilt, which corroborated and established Mr. Buari's innocence, certain defendants, including but not limited to BCDAO investigator Viggiano and ADA Lung have continued to perpetuate their false narrative against Mr. Buari by publicly asserting that Mr. Buari killed the Harris brothers.

**Defendants' Unconstitutional Efforts to Deprive Mr. Buari of Compulsory Process**

268.    As specific facts alleged above show, defendant detectives Dietz, Tracy, Price

Gottwin, Neenan, and Fortune, along with ADA Karen, deliberately and substantially interfered

with Mr. Buari's ability to call witnesses in his own defense by unlawfully compelling Kintu

Effort, Clarence Lamont Peterson, Brian Johnson, Kenya Holder, Jerry Connor, and Dwight

Robinson to give false testimonies implicating Mr. Buari as the murderer of the Harris brothers.

All of these witnesses succumbed to the detectives' and District Attorneys' tactics of suggestion

and coercion, and in exchange for leniency regarding criminal charges.

269.    The defendant police officers, detectives, district attorneys, and/or district

attorney's investigators deliberately obstructed Mr. Buari's constitutionally-protected access to

freedom and exoneration when they acted to suppress Kintu Effort's recantation of his false trial

testimony and when they successfully caused Dwight Robinson, the actual murderer, to recant

his confession.

270.    In suppressing newly-found evidence and provoking Dwight Robinson's false

testimony during Mr. Buari post-conviction hearing, defendants deprived plaintiff's access to

compulsory process, subjected him to continued imprisonment, restricted his access to familial

connections, and denied him any opportunity to repair his reputation in the view of the public for

more than a decade.

271.    In contrast to Dwight Robinson's false testimonies in court, his honest confession

contained details of his murder of the Harris brothers and the reasoning behind his silence.

272.    Mr. Robinson's confession was strikingly corroborated by the fact that his *modus

operandi* in the Harris brothers case matched that of the McClennon case in which he was

convicted and in the Buari and Parrish shooting.

273.    The veracity of Mr. Robinson's confession was further corroborated by Kintu Effort's recantation of his trial testimony and his account of coercion by the prosecution.

274.    It is self-evident that the confession of a self-admitted murderer, corroborated by evidence of his *modus operandi* and supporting recantation of the purported immediate accessory to the crime, should have resulted in the acquittal of Mr. Buari during his initial hearing for post-conviction relief.

275.    An honest appraisal of this evidence would have resulted in vacatur of Mr. Buari's conviction and his subsequent release from prison and exoneration.

276.    When newly found evidence in the form of statements from Nakia Clarke, Kimberlia Clarke, Caroline Brown, and other witnesses further corroborated Mr. Buari's innocence and Dwight Robinson's guilt, defendants ADAs Lung and Coddington interfered with Mr. Buari's ability to call witnesses by harassing and intimidating the Clarke sisters, Ms. Brown, and other witnesses, and by otherwise attempting to dissuade those witnesses from testifying on Mr. Buari's behalf

277.    In spite of the evidence demonstrating Mr. Buari's innocence and Mr. Robinson's guilt, the City and individual NYPD and BCDAO defendants attempted to continue to suppress the truth about what happened on September 10, 1992, by using the Bronx County District Attorney's Conviction Integrity Unit to sabotage Mr. Buari's efforts to seek post-conviction relief.

**Defendants' Failure to Conduct a Constitutionally-Adequate Investigation**

278.    The lack of evidence of Mr. Buari's guilt should have caused defendants to be concerned that they had wrongfully and/or, at least, incorrectly charged Mr. Buari and were

wrongfully and incorrectly prosecuting him.  This awareness should have caused them to reinvestigate and reconsider the charges and continuing the prosecution.

279.    Instead, the defendants disingenuously stuck to the script and scenario they created – that Mr. Buari was responsible for that crime.

280.    The defendants disingenuously stuck to this constructed scenario, maliciously acted to derail Mr. Buari's attempts to regain his freedom, obstructed the just and honest resolution to the murder of the Harris brothers, and subjected Mr. Buari to over twenty-one years of wrongful imprisonment.

281.    Rather than question the integrity of their prosecution of Mr. Buari or admit its lack of integrity, the defendants, including those working in both the NYPD and the BCDAO, suppressed the truth about their unlawful actions, including, fabrication of evidence, eliciting false testimonies at trial, silencing honest and corroborated confessions and recantations, concealing exculpatory evidence at trial and thereafter, and using impermissible suggestion and/or coercion to cause witnesses for Mr. Buari to drop their involvement with his case.

## LIABILITY OF THE INDIVIDUAL DEFENDANTS

282.    All the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers, investigators prosecutors, supervisors, and employees, acting within the scope of their employment.

283.    The individual defendants, in committing the aforesaid conspiracies, acts, and omissions to act, were acting with actual malice; deliberately indifferent to; and in reckless disregard of, plaintiff's rights and thereby caused actual injuries to the plaintiff.

284.    The defendants, in committing the aforesaid acts, were acting as joint tortfeasors, described above, the individual defendants subjected the Mr. Buari to loss of liberty and other

deprivations of constitutional rights, including, but not limited to, deprivation of the rights to due process of law and protection from pain and suffering, severe and permanent emotional injuries, mental anguish as well as other psychological injuries, extreme emotional distress, shame, humiliation, indignity, damage to reputation, loss of earnings, and obliged them to pay for legal fees and expenses.

## MUNICIPAL LIABILITY

**For the Actions of the Police Officers Pursuant to the Policies and Practices in Existence at the Time of the Investigation and Prosecution of Buari's Case**

285.    All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the New York City Police Department.

286.    Defendant City and the NYPD, by their policy-making agents, servants, and employees, authorized, sanctioned, and/or ratified the police defendants' wrongful acts; and/or failed to prevent to stop these acts; and/or allow or encouraged these acts to continue.

287.    The actions of police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegation without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to call witnesses in their defense by impermissible means such as intimidation, coercion, and other abuses of authority.

288.    The existence of such unlawful *de facto* polices and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the NYPD and the City.

289.    Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officers and officials of the NYPD and the City and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs, and practices through their deliberate indifference to or reckless disregard of the effect of said, policies, customs, and practices upon the constitutional rights of persons in the City of New York.

290.    The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia,* the following:

    a.    The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

    b.    The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

    c.    The failure to properly supervise, train, instruct, and discipline police officers with regard to the adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

    d.   The failure to properly supervise, train, instruct, and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

    e.   The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, and to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions;

    f.   The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stories, *inter alia,* in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements designed to cover for and and/or falsely exonerate accused police officers;

    g.   Encouraging and/or failing to discipline officers for "testilying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt.

291.   The City policies, practices, and customs in existence at the time of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evidence, *inter alia,* by the following;

    a.   The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), dated July 7, 1994, states:

In the face of this problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has

become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training, and recruitment.

For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

Mollen Commission Report, p. 2-3.

b.  Accordingly, in 1990, the Office of Special Prosecutor, which investigated

charges of police corruption was abolished.

c.  The Mollen Commission concluded that police perjury and falsification of official

records is probably the most common form of police corruption facing the

criminal justice system…

…Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them,

…What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his

words, "doing God's work" – doing whatever it takes to get a
suspected criminal off the streets. This attitude is so entrenched,
especially in high-crime precincts, that when investigators
confronted one recently arrested officer with evidence of perjury,
he asked in disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

d.   Since at least 1984, defendant City and the New York City Police Department

have been on notice inadequate and that police officers joining the force,

including, upon information and belief, individual defendant police officers

herein, were disproportionately involved in misconduct and abuse. *See, e.g.,*

Mayor's Advisory Committee on Police Management and Personnel Policy, Final

Report, February 24, 1987.

e.   The City of New York Office of the Comptroller, in an unpublished report, found

that the police often conduct inadequate investigations.

f.   Prior to July 1993, the CCRB, which is responsible for receiving and investigating

complaints of police misconduct made by citizens against members of the New

York City Police Department, operated as an agency of the New York City Police

Department rather than as an independent, unbiased entity.

g.   During the 1980s, the early 1990s, and in and about the time frame of the Buari

investigation, the CCRB received numerous complaints of police misconduct, but

failed fully investigate many of them and substantiated the guilt of the accused

police officer in a suspiciously minuscule number of cases.

h.   On average, in 1990-1992, the CCRB conducted complete investigations of only

36 percent of the complaints received, closed 40 percent of the total cases without

completing full investigations, and substantiated only 3.3 percent of the total complaints received.

i.   The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

j.   On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases.

k.   Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

l.   Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992.

m.  The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

n.   More than $82 million was paid in damages to victims of police misconduct in 1352 cases between 1992 and 1995.

o.   In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, defendant City imposes no discipline, either before or after resolution in court, almost never reopens an investigation

previously conducted after such resolution, and sometimes promotes the abusive

officer to a position of greater authority despite the judicial resolution.

p.   Former New York City Police Commission Robert Daly wrote in 1991 that the

"blue wall of solidarity with its macho more and prejudices, its cover-ups and

silence, is reinforced every day in every way."

292.   Upon information and belief, police officers receive no training regarding how to

conduct interrogations in a manner that will prevent false statements, and, in fact, are

indoctrinated in the use of false promises, threats, and intimidation.

293.   Upon information and belief, defendant City and its agency, the New York City

Police Department, failed to effectively screen, hire, train, supervise, and discipline their police

officers, including the defendant police officers herein, for lack of truthfulness, and for their

failure to protect citizens from the unconstitutional conduct of other police officers, thereby

permitting and allowing the defendant police officers to be in a position to elicit false testimony

from witnesses and to fabricate evidence sufficient to secure convictions in violation of federal

and state constitutional rights, and/or to permit these actions to take place with those officers'

knowledge of consent.

294.   Upon information and belief, the defendant police officers herein were the subject

of prior civilian and departmental complaints of misconduct that gave notice to or should have

given notice to defendant City and its agency, the New York City Police Department, that the

defendant police officers herein were likely to engage in conduct that would violate the civil and

constitutional rights of the public, such as the conduct complained of by the plaintiff herein.

295.   As a result of the foregoing conscious policies, practices, customs and/or usages,

defendant City and its agency, the New York City Police Department, permitted and allowed the

employment and retention of individuals as police officers whose individuals circumstances place the public or segments thereof at substantial risk of being the victims of preconceived determinations of guilt.

296.    The plaintiff's injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowledge and repeated failure of the defendant City and the New York City Police Department to properly supervise, train, and discipline their police officers.

297.    Defendant City knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1 and 6 of the Constitution of the State of New York, including, without limitation, the plaintiff's freedom of deprivation of liberty without due process of the law.

298.    The defendant City is directly liable and responsible for the acts of the individual police officer defendants for state law claims under the doctrine of *respondeat superior.*

### For the Actions of the BCDAO Prosecutors and their Investigators
### Pursuant to the Policies and Practices in Existence at the Time of the Buari Case

299.    All of the acts by the defendant prosecutors and their investigators described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein were engaged in with the full knowledge, consent, and under the supervisory authority of the BCDAO.

300.    Defendant City and the District Attorney's Office, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the defendant prosecutors' and

their investigators' wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

301. The actions of the defendant prosecutors and their investigators resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by the BCDAO, to prosecute and continue to prosecute persons through fabricated and manipulated allegation without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to call witnesses in their defense by impermissible means such as intimidation, coercion, and other abuses of authority.

302. The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the BCDAO and the City for a substantial period of time.

303. Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officials of the BCDAO and the City and their predecessor in interest did not take steps to terminate these policies and practices, did not discipline individuals who engage in such practices, or otherwise properly train prosecutors and investigators with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned ad ratified these policies, customs and practices through their deliberate indifferent to or reckless disregard of the effect of said policies, customs, and practices upon the constitutional rights of persons in the City of New York.

304. The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia,* the following:

a. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators who participate with, conspire with, and advise police officers in using coercive interrogation techniques during the course of an investigation;

b. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators who conspire with police officers during the course of an investigation to prevent potential witnesses for the defense from testifying through coercive and intimidating tactics;

c. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

d. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators during the course of an investigation to prevent persons being interviewed from having access to counsel.

305.    The aforementioned City policies, practices, and customs of failing to supervise, train, instruct, and discipline prosecutors and investigators and encouraging their misconduct are evidence by the broad-sweeping prosecutorial misconduct detailed herein. Several different members of the BCDAO directly subjected Mr. Buari and witnesses in his case to coercive interrogations and deprived Mr. Buari of exculpatory evidence. These prosecutors and investigators represent the corrupt investigative policies and practices of the BCDAO.

306.    The City policies, practices and customs in existence at the time of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evidenced, *inter alia,* by the Mollen Commission's conclusion that the same tolerance for

perjury and falsifications that is exhibited among police officers is exhibited among BCDAO

prosecutors and investigators. The Commission specifically noted that "several former and

current prosecutors acknowledged-- 'off the record' – that perjury and falsifications are serious

problems in law enforcement that, though not condoned, are ignored." Mollen Commission,

Report, p. 42.

## DAMAGES

307.    The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-

faith acts and omissions of the City and the NYPD and BCDAO Defendants caused Mr. Buari to

be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced Mr. Buari to

serve nearly twenty-one years in jail and prison for a brutal crime he did not commit.

308.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless,

and/or deliberately indifferent acts and omissions, Mr. Buari sustained injuries and damages,

which continue to date and will continue into the future, including: loss of freedom for nearly

twenty-one years; pain and suffering; severe mental anguish; emotional distress; loss of family

relationships; severe psychological damage; loss of property; loss of income;  humiliation,

indignities and embarrassment; degradation; permanent loss of natural psychological

development; and restrictions on all forms of personal freedom including but not limited to diet,

sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity,

personal fulfillment, sexual activity, family relations, reading, television, movies, travel,

enjoyment, and expression, for which he is entitled to monetary relief.

309.    Specifically, and as a direct result of Defendants' intentional, bad faith, willful,

wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Buari sustained physical

injuries and damages, including: physical pain and suffering; personal injuries; infliction of

physical illness; and inadequate medical care, for which he is entitled to monetary relief.

310.    When Calvin Buari was falsely arrested for this crime, he had a good ongoing relationship with his girlfriend and other friends and had cordial ongoing relationships with various family members, including his mother and brother, all of which relationships were cut off, aside from occasional prison visits, for the remainder of his imprisonment for nearly twenty-one years.

311.    Defendants' unlawful actions also caused Calvin Buari to suffer significant mental anguish; social stigma; restrictions on liberty; loss of property; interference with familial relationships; and financial burdens.

312.    All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## FEDERAL CLAIMS

### COUNT I
**42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola Does # 1-10, and Roes # 1-10*

313.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

314.    Defendants Dietz, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Lung, Coddington, Does # 1-10, and Roes # 1-10, with malice and knowing that probable cause did not exist to arrest Calvin Buari and prosecute him for murdering the Harris brothers, acting individually and in concert, caused Calvin Buari to be arrested, charged, and prosecuted for that crime, thereby violating Calvin Buari's clearly established right, under the Fourth and Fourteenth

Amendments of the United States Constitution, to be free of unreasonable searches and seizures.
Specifically:

    a.   Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, and Does # 1-10, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to prosecutors, Mr. Buari and his trial counsel, the grand jury, and the trial court exculpatory facts that vitiated probable cause against Calvin Buari and would have impeached witnesses for the prosecution at trial, including, but not limited to, the fact that the identification of Calvin Buari as the murderer of the Harris brothers were the result of impermissible suggestion and/or coercion, and that the police had fabricated inculpatory evidence and withheld exculpatory and impeachment evidence.  These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to Dwight Robinson and away from Calvin Buari; and

    b.   Defendants Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola and Roes # 1-10, acting individually and in concert, substantially interfered with exculpatory evidence that vitiated probable cause against Calvin Buari and would have impeached evidence introduced by the prosecution at trial, including, but not limited to, the fact that the identification of Calvin Buari as the murderer of the Harris brothers was the result of impermissible suggestion and/or coercion, that the police had fabricated inculpatory evidence and withheld exculpatory and impeachment evidence, and that Dwight Robinson was the murderer of the Harris brothers.  These Defendants also failed to conduct a constitutionally adequate

investigation in light of evidence pointing to Dwight Robinson and away from

Calvin Buari.

315.    The aforementioned Defendants performed the above-described acts under color

of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference

to Mr. Buari's clearly established constitutional rights.  No police officer or member of a district

attorney's office would have believed this conduct was lawful after 1992.

316.    Mr. Buari is completely innocent of murdering the Harris brothers. The

prosecution finally terminated in Mr. Buari's favor in March 21, 2018 when the indictment was

dismissed.

317.    As a direct and proximate result of these Defendant's actions, Mr. Buari was for

more than two decades wrongly convicted and imprisoned and suffered the other grievous and

continuing damages and injuries set forth above.

## COUNT II
**42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and
Denial of Fair Trial by Fabricating Evidence and Deliberately Failing to Conduct a
Constitutionally Adequate Investigation**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,
Viggiano, Karen, Lung, Coddington, Mignola Does # 1-10, and Roes # 1-10*

318.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further

alleges as follows:

319.    Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Schiffman,

Viggiano, Karen, Lung, Coddington, Mignola Does # 1-10, and Roes # 1-10, acting individually

and in concert, deprived Calvin Buari of his clearly established constitutional fright under the

Fourteenth Amendment of the United States Constitution, to a fair trial.  Specifically:

    a.   Defendants Dietz, Tracy Price, Gottwin, Neenan, Fortune, and Does # 1-10

         deprived Calvin Buari of his right to a fair trial by: fabricating inculpatory

evidence and intentionally using unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications, including, but not limited to, fabricating the false identifications of Calvin Buari as the murderer by Dwight Robinson, Kintu Effort, Brian Johnson, Clarence Lamont Seabrook, Kenya Holder, and Jerry Connor; withholding exculpatory and impeachment evidence from Mr. Buari and his counsel, including, without limitation, the circumstances of the witness interviews of Dwight Robinson, Kintu Effort, Brian Johnson, Clarence Lamont Seabrook, Kenya Holder, and Jerry Connor, which would have shown that the identifications of Calvin Buari were fabricated and/or the result of suggestion and coercion; and by deliberately failing to conduct a constitutionally adequate investigation in light of evidence pointing to Dwight Robinson and away from Calvin Buari;

b. Defendants Wall, Schiffman, Viggiano, Karen,, Lung, Coddington, Mignola and Roes # 1-10 deprived Calvin Buari of his right to a fair trial by: intentionally using impermissible suggestion and/or coercion to suppress exculpatory evidence, including, but not limited to, causing Dwight Robinson to recant his confession of murdering the Harris brothers and dissuading eyewitness Patricia Damm from testifying on Plaintiff's behalf; withholding exculpatory and impeachment evidence from Mr. Buari and his counsel, including, but not limited to, a recorded prisoner telephone call in which Dwight Robinson admitted to murdering the Harris brothers; and by deliberately failing to conduct a constitutionally adequate investigation in light of evidence pointing to Dwight Robinson and away from Calvin Buari.

320.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Buari's clearly established constitutional right to be free from deprivation of liberty without due process of law.

321.    Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated in Mr. Buari's favor on March 21, 2018 when the indictment was dismissed.

322.    As a direct and proximate result of these defendant's actions, Mr. Buari spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III
### 42 U.S.C. § 1983 Failure to Intercede
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

323.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

324.    By their conduct and under color of state law, Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman, Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10, had opportunities to intercede on behalf of Calvin Buari to prevent his false arrest, malicious prosecution, false imprisonment, deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

325.    These Defendants' failures to intercede violated Calvin Buari's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No

reasonable police officer or ADA in or after 1992 would have believed that failing to intercede to prevent these Defendants from fabricating inculpatory evidence, intentionally using unduly direct suggestion and/or coercion to obtain witness identifications, withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Calvin Buari to be arrested and prosecuted without probable cause, were lawful.

326.    Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated in Mr. Buari's favor on March 21, 2018 when the indictment was dismissed.

327.    As a direct and proximate result of these defendant's actions, Mr. Buari spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT IV
### 42 U.S.C. § 1983 Civil Rights Conspiracy
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune,*
*Viggiano, Shiffman, Karen, Does # 1-10, and Roes # 1-10*

328.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

329.    Detectives Dietz, Tracy, Price, Gottwin, Neenan, Fortune, and Does # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including ADA Karen, Alrick, Griffiths, Dwight Robinson, Kintu Effort, Brian Johnson, Clarence Lamont Seabrook, Kenya Holder, and Jerry Connor to act in concert in order to deprive Mr. Buari of this clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

330.     In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

     a.   Falsely arresting and imprisoning Calvin Buari, knowing that they lacked probable cause;

     b.   Fabricating inculpatory evidence in reports, witness statements and pretrial communications with the prosecution, including the purportedly independent identifications of Calvin Buari;

     c.   Committing perjury during hearings and at trial;

     d.   Eliciting false testimonies to implicate Calvin Buari; and

     e.   Intentionally or with deliberate indifference, failing to comply with their duty to disclose *Brady* material during the pendency of the case.

331.     Defendants Viggiano, Schiffman, Wall, and Roes # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including ADA Karen and Dwight Robinson, to act in concert in order to deprive Calvin Buari of his clearly established Fourth and Fourteenth Amendment right to be free from malicious prosecution, false imprisonment, deprivation of liberty without due process, and to a fair trial.

332.     In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

     a.   Fabricating inculpatory evidence in reports and pre-hearing communications with the prosecution, including the purportedly independent recantation of Dwight Robinson's confession to murdering the Harris brothers;

     b.   Committing perjury and/or soliciting perjury from witnesses during a hearing; and

     c.    Intentionally or with deliberate indifference, failing to comply with their duty to

disclose *Brady* material during the pendency of the case.

333.    Mr. Buari is completely innocent of murdering the Harris brothers. The

prosecution finally terminated on March 21, 2018, when the indictment was dismissed.

334.    As a direct and proximate result of these defendant's actions, Mr. Buari spent

several years wrongly convicted and imprisoned and suffered the other grievous and continuing

damages and injuries set forth above.

### COUNT V
### 42 U.S.C. § 1983 Supervisory Liability
#### *Against DA Darcel Clark and ADA Mignola*

335.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

336.    The individual defendants ADA Lung, ADA Coddington, and/or BCDAO

investigators Roes # 1-10, acted with impunity in an environment in which they were not

adequately trained, supervised, or disciplined by Defendants Darcel Clark, Gina Mignola and

other supervisors, in this case and as a matter of practice.

337.    Defendants Darcel Clark, Gina Mignola, and other supervisors acted with gross

negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by

failing to provide adequate training, supervision, and discipline of the defendant BCDAO ADAs

and BCDAO investigators, and thereby caused the individual defendant ADAs and Investigators

to deprive Calvin Buari of his clearly established constitutional rights, including his rights to be

free from malicious prosecution, and deprivation of liberty without due process of law, and to a

fair trial.

338.    Had Defendants Darcel Clark, Gina Mignola and other supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers, these defendants would not and should not have unduly used direct suggestion to prevent witnesses from testifying for Mr. Buari and intentionally and maliciously caused Calvin Buari to continue to be maliciously prosecuted without probable cause.  Defendants Darcel Clark, Gina Mignola and other supervisors were directly involved in the investigation of Calving Buari and directly supervised the specific investigative acts taken by the individual BCDAO ADAs and Investigators in this case.

339.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Darcel Clark, Gina Mignola and other supervisors under color of state law violated their clearly established duty, in 2015, to supervise defendants ADA Lung, ADA Coddington, and Roes # 1-10,  and no reasonable ADA supervisor in 2015 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate ADAs and Investigators was lawful.

340.    Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated on March 21, 2018, when the indictment was dismissed.

341.    As a direct and proximate result of these defendant's actions, Mr. Buari spent several years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT V**
**42 U.S.C. § 1983 *Monell* Claim**
***Monell* Unconstitutional Policy, Custom, or Pattern and Practice of Promoting,**
**Facilitating, or Condoning Improper, Illegal and Unconstitutional Investigative Techniques**
**and Failure to Supervise, Disciple, and Train**
*Against Defendant City of New York for the Actions and Omissions of the Police Officer*
*Defendants and the NYPD*

342.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

343.    Prior to and at the time of the unlawful investigation, prosecution, and conviction, of Calvin Buari, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning, improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false statements and testimonies; (b) the use coercive tactics, intimidation, undue suggestion, and unlawful bribery to interfere with a criminal defendant's right to call witnesses; (c) the fabrication of inculpatory evidence; (d) the suppression of exculpatory and/or impeachment evidence; (d) the intentional failure to conduct adequate investigations of crimes; and (e) engaging in affirmative concealment and cover up of this type of misconduct.

344.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Calvin Buari, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline and train NYPD detectives and officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews.

345.     The NYPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to adequately supervise, discipline, and train NYPD Department detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple New York City Police detectives and supervisors in relations to multiple witnesses in the Buari investigation, as described above.

346.     The NYPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train was also reflected by several prior cases and investigations within the 47th precinct and beyond which, upon information and belief, were known to the NYPD defendants and policymakers prior to and during the Buari investigation. The misconduct committed in those cases was actually or constructively known to the NYPD supervisors and policymakers prior to and during the Buari investigation, and upon information and belief, NYPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate detectives and officers in response to such notice or make any meaningful investigation into the above practices and techniques. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Buari.

347.     Such unconstitutional municipal customs, practices and/or polices were the moving force behind the false testimonies, statements, unlawful bribery, and coercive tactics used against Mr. Buari, causing his arrest, prosecution, and nearly twenty-one years of incarceration, as well as the other grievous injuries and damages set forth above.

<u>COUNT VI</u>

**42 U.S.C. § 1983 *Monell* Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal, and Unconstitutional Investigative Techniques and Failure to Supervise, Discipline and Train**
*Against Defendant City of New York for the Actions and Omissions of the BCDAO Defendants and the BCDAO*

348.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

349.    At the time of Calvin Buari's prosecution, and continuing through the time the charges were against Mr. Buari were dismissed, the Bronx County District Attorney ("BCDA"), as the manager, chief administrator and policy-maker of the BCDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his or her employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Bronx, New York.

350.    Among other things, BCDAO engaged in a custom and practice of engaging in malicious prosecutions by: (a) knowingly presenting false testimony and arguments at criminal proceedings; (b) suppressing *Brady* information; and (c) covering up these unlawful practices.

351.    These policies, customs, and practices began with Robert Johnson's induction as BCDA in 1989, continued when Darcel Clark became BCDA in 2016, and persisted through at least 2017.

352.    The BCDA, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors working with the BCDAO.

353.    These policies, customs, and practices proximately caused the violations of Calvin Buari's constitutional rights described above and his malicious prosecution, false imprisonment and other damages.

354.    The BCDA's policy was to tolerate, fail to discipline, and encourage violations of his or her Office's constitutional obligation to not maliciously prosecute defendants.  The BCDA's deliberate indifference to such violations created an atmosphere that "anything goes" and prosecutions should be secured at all costs that caused such violations to continue, including in Calvin Buari's case.

355.    Under the BCDAO's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required.

356.    The BCDAO's training and discipline policies and practices were likewise consciously designed to permit and encourage malicious prosecutions.

357.    Prosecutors were trained not to disclose *Brady* and other information favorable to a defendant by misrepresentation or rationalizing non-disclosure by subjectively assessing the information as unreliable and encouraged to cover up *Brady* information kept hidden by other members of the BCDAO.

358.    Through a policy, custom, and practice of not disciplining prosecutors for *Brady* and other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the BCDAO encouraged such violations by demonstrating to his prosecutors that there would be no negative consequences for the failure to comply with *Brady* and other constitutional requirements.

359.    Upon information and belief, despite numerous court decisions finding that prosecutors had maliciously prosecuted defendants by failing to disclose *Brady* and other information favorable to a defendant or otherwise had engaged in conduct that misled courts,

juries, defendants, and/or defense attorneys, none of the BCDAO prosecutors or investigators involved were disciplined.

360.     Upon information and belief, under the BCDAO's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

361.     Upon information and belief, even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.

362.     Upon information and belief, no prosecutor was reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

363.     To the contrary, in opposing defendants' efforts to obtain *Brady* and other information favorable to the defendant, or relief for a prosecutor's improper failure to provide such disclosure, the BCDAO stubbornly defended the propriety of their employees' behavior, thereby ratifying and signaling their tolerance of it.  Upon information and belief, personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions.

364.     The violations of Calvin Buari's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct chargeable to defendant City of New York amounting to deliberate indifference to the constitutional rights of persons, including Mr. Buari, subject to prosecution by the BCDAO, including:

a.   The institution and implementation of inadequate and unlawful policies, procedures and customs concerning:

i.       the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including grand jury proceedings, pretrial hearings, and trials;

ii.       the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred; and

iii.      the continuing duty to obtain, preserve, and timely disclose, during criminal prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses and the prosecution's theory of the case; and

b.   the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

365.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policy making officials for the defendant City, including, but not limited to the BCDAO which knew to a moral certainty that such policies, procedures, regulations, practices and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases; that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for the further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make wrong choice; and that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

366.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances: as noted above, numerous

credible allegations, many substantiated by judicial decisions, that prosecutors and investigators wrongfully withheld evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady* or state discovery laws and/or had presented or failed to correct false or misleading testimony and argument; numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of the New York City or BCDAO prosecutors with that rule; judicial decisions putting the BCDAO on notice that the City could be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process; the need to train, supervise and discipline prosecutors in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

367.    Despite this knowledge, the supervisory and policymaking officers and officials of the defendant City, including the BCDAO, perpetuated or failed to take preventative or remedial measures to terminate said policies, procedures, regulations, practices and/or customs; did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in violations of *Brady* and related constitutional obligations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practice and/or customs, described above, with deliberate indifference to the effect this would have upon the constitutional rights of individuals and citizens of the City and State of New York.

368.     The aforesaid policies, practices and customs of defendant City of New York were collectively and individually a substantial factor in bring about the aforesaid violations of Calvin Buari's rights under the Constitution and laws of the United States, and in causing his malicious prosecution and resulting damages.

369.     Under the principles of municipal liability for federal civil rights violations, the BCDA has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations to make timely disclosure of exculpatory or favorable evidence or *Brady* materials to the defense and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during grand jury proceeding, pretrial hearings, and at trial.

370.     The BCDA, personally and/or through his or her authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel, hiring, training, supervision and discipline, with respect to his Office's performance and its duties.

371.     The BCDA at all relevant times was and is an elected officer of Bronx County, one of the constituent counties of defendant City of New York, and the Office was and is funded out of the City's budget.

372.     Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law § 2, and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Bronx County), and hence defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his employees and agents.

373.     At all relevant times, the BCDA, personally and/or through his or her authorized delegates, had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

374.     By virtue of the foregoing, defendant City of New York is liable for having substantially caused the foregoing violations of Calvin Buari's constitutional rights and his resulting injuries.

### STATE LAW CLAIMS

### COUNT VII
**Malicious Prosecution**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

375.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

376.     Defendants Dietz, Tracy, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10, despite knowing that probable cause did not exist to prosecute Mr. Buari for murdering the Harris brothers, intentionally, recklessly, and with malice caused Mr. Buari to be prosecuted and convicted for this crime. Furthermore, these Defendants intentionally concealed and misrepresented to prosecutors, grand jurors, the trial court, and courts of post-conviction hearings facts that further vitiated probable cause against Mr. Buari, including but not limited to the facts that the statements concerning Mr. Buari purportedly made by Alrick Griffiths, Dwight Robinson, Jerry Connor, Brian Johnson, Clarence Lamont Seabrook, Kenya Holder, and Kintu Effort were the product of unduly suggestive identification and/or direct suggestion and/or coercion.

377.    Mr. Buari is completely innocent of murdering the Harris brothers. The

prosecution finally terminated in Mr. Buari's favor on March 21, 2018 when the indictment was

dismissed.

378.    As a direct and proximate result of these Defendant's actions, Mr. Buari spent

several years wrongly convicted and imprisoned and suffered the other grievous and continuing

damages and injuries set forth above.

<u>**COUNT VIII**</u>
**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

379.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further

alleges as follows:

380.    The improper, deliberate, and traumatizing conduct of Defendants Dietz, Tracy,

Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola, Does #

1-10, and Roes # 1-10 in deliberately causing, or recklessly disregarding the risk of causing, the

wrongful prosecution conviction, incarceration, and concomitant severe emotional distress, was

extreme and outrageous, and directly and proximately caused the grievous injuries and damages

set forth above.

381.    In the alternative, Defendants Dietz, Tracy, Price, Gottwin, Fortune, Wall,

Schiffman, Viggiano, Karen,  Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10

negligently and grossly negligently, and in breach of their duties owed to Mr. Buari to, *inter alia,*

to refrain from using suggestive techniques and/or direct suggestion and/or coercive techniques

in interviews and interrogations to obtain false witness statements, refrain from substantially and

unlawfully interfering with the defendant's right to call witness, and otherwise act to deny Mr.

Buari due process of law, directly and proximately caused Mr. Buari to be maliciously

prosecuted, and wrongly imprisoned for nearly twenty-one years. Defendants' actions

unreasonably endangered Mr. Buari's physical health and safety, and caused him to suffer

physical harm, including physical ailments resulting from the circumstances and duration of his

wrongful incarceration.

382.    These Defendants engaged in these acts within the scope of their employment.

383.    These claims are tolled as these Defendants concealed from Mr. Buari – and still

are concealing to this day – their conduct giving rise to this cause of action.

## COUNT IX
### Negligence
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,
Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

384.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further

alleges as follows.

385.    Defendants Dietz, Tracy, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano,

Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10 are liable for negligence,

having breached their duty of reasonable case to Mr. Buari. Specifically, and by way of example,

these Defendants:

a.    Failed to accurately report how Mr. Buari became a suspect in the crime and/or

how defendant detectives obtained his name in connection with the crime;

b.    Failed to accurately report the circumstances surrounding Dwight Robinson's

false implication of Mr. Buari as the person who murdered the Harris brothers;

386.    The Defendants also negligently failed to have or adhere to adequate policies

regarding appropriate communication with the defendant's witnesses. These negligent acts led to

considerable obstacles preventing Mr. Buari's access to post-conviction relief and the

elimination of this malicious prosecution, thus extending the amount of time he spent imprisoned.

387.    These Defendants' negligence and gross negligence directly and proximately caused Mr. Buari to be wrongfully prosecuted and imprisoned for nearly twenty-one years and/or extended the length of time he was wrongfully imprisoned.

388.    These Defendants engaged in these acts within the scope of their employment.

389.    Mr. Buari is completely innocent of the crimes of which he was accused. Mr. Buari's cause of action for negligence was unavailable to him until the prosecution finally terminated in his favor on March 21, 2018, when the indictment was dismissed.

390.    These claims are tolled as these Defendants concealed from Mr. Buari – and still are concealing to this day – their conduct giving rise to this cause of action.

## COUNT X
### *Respondeat Superior* Claim
#### *Against Defendant City of New York*

391.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

392.    At all times relevant to this Complaint, Defendants Price, Gottwin, Fortune, Wall, Dietz, Viggiano, Karen, Lung, Coddington, and Mignola, acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with the City of New York.

393.    The conduct by which the Police Defendants committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Defendant's personal motives, but rather was undertaken while the

Defendants were on duty, carrying out their routine investigative functions as detectives, investigators, and police officers.

394.    Under the doctrine of *respondeat superior,* the City of New York is liable for their agents' state law torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, and negligence.

## COUNT XI
## New York State Constitution
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

395.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

396.    The conduct of Defendants Price, Gottwin, Fortune, Wall, Dietz, Viggiano, Karen, Lung, Coddington, Mignola, described above, also violated Mr. Buari's rights under the New York State Constitution, Article I §§ 6 to due process of law.

397.    Mr. Buari is completely innocent of the murdering of the Harris brothers. The prosecution finally terminated in Mr. Buari favor on March 21, 2018, when the indictment was dismissed.

398.    As a direct and proximate result of these Defendants' actions, Mr. Buari was wrongly imprisoned for nearly twenty-one years and suffered other grievous and continuing damages and injuries set forth above.

399.    Defendant City of New York is liable under *respondeat superior* for the actions of its employees within the scope of their employment.

**WHEREFORE**, Calvin Buari prays as follows:

    (a)    That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

    (b)    That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

    (c)    For a trial by jury;

    (d)    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

    (e)    For any and all other relief to which he may be entitled.

Dated:    New York, New York
           December 13, 2018

/s/Marc A. Cannan
Marc A. Cannan (MC 0513)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor
New York, New York 10016
(212) 490-0400

/s/Oscar Michelen
Oscar Michelen (OM 5199)
CUOMO LLC
200 Old Country Road
Mineola, New York 11501
(516) 741-3222

*Attorneys for Plaintiff Calvin Buari*