UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

CALVIN BUARI,

                                        Plaintiff,

                    - against -

THE CITY OF NEW YORK; New York City Police
Department Detectives ANDREW DIETZ, FNU TRACY,
VINCENT PRICE, EUGENE GOTTWIN, JOSEPH
NEENAN, CHRISTINE FORTUNE; Bronx County District
Attorney's Office Investigators JOHN WALL, FNU
SCHIFFMAN, FRANK VIGGIANO; Bronx County District
Attorney's Office Assistant District Attorneys ALLEN
KAREN, FELICITY LUNG, PETER CODDINGTON, GINA
MIGNOLA; and "JOHN and/or JANE DOES" # 1-10 who
are currently unknown members of the New York City Police
Department; and "RICHARD and/or RACHEL ROES # 1-
10" who are currently unknown members of the Bronx
County District Attorney's Office, all of whom are being sued
in their individual capacities,

                                        Defendants.
------------------------------------------------------------------------ X

**18-CV-12299 (ER)(BCM)**

**AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

     Plaintiff Calvin Buari, by and through his attorneys, the undersigned, states as follows:

**PRELIMINARY STATEMENT**

     1.     The Plaintiff, Mr. Calvin Buari ("Mr. Buari"), through his undersigned counsel

brings this civil rights action against the City of New York ("City") based on and arising out of

the wrongful acts and omissions of the New York City Police Department ("NYPD"), the Bronx

County District Attorney's Office ("BCDAO"), and individual employees and agents of these

office, for violating his rights secured by the Fourth, Fifth, Sixth, and Fourteenth Amendments to

the Constitution and the State of New York.

     2.     The grounds for this action arise out the wrongful, unlawful, and improper acts of

these defendants, including the creation and perpetuation of false evidence and conspiracy to create

and perpetuate false evidence; suppression and concealment of exculpatory evidence and conspiracy to suppress and conceal exculpatory evidence in violation of Mr. Buari's civil rights; false arrest; malicious prosecution; and intentional infliction of emotional distress.

3.     Mr. Buari seeks damages, both compensatory and punitive, an award of costs and attorney's fees, and such other and further relief as this court deems just and proper, for having spent over two decades in prison for crimes he did not commit. Although he consistently maintained his innocence at trial and throughout his numerous years in prison, Mr. Buari was branded as a murderer and was egregiously restricted in his ability to clear his name.

4.     Mr. Buari seeks monetary damages against the City pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) for the deliberate indifference of policymakers at the NYPD and the BCDAO to constitutional violations Mr. Buari faced herein.

5.     The tragic events that underlie this litigation arose on September 10, 1992, when Salhaddin and Elijah Harris, the ("Harris brothers"), were shot and killed on the south side of 213th Street near its intersection with Bronxwood Avenue in the Bronx, New York.

6.     NYPD detectives at the 47th Precinct were unsuccessful in finding any significant leads towards identifying the shooter. As the crack-cocaine epidemic brought a record-setting number of murders to this neighborhood, they were under immense pressure to solve this crime.

7.     In an effort to close the case, members of the NYPD focused their efforts on implicating Mr. Buari, who was known in the 47th Precinct. However, the NYPD lacked any probable cause or even reasonable suspicion to believe Mr. Buari had any connection to the murders.

8.     The NYPD arrested Mr. Buari for the murders of the Harris brothers based on false statements that were coerced out of Alrick Griffiths ("Mr. Griffiths"), who is now deceased. Mr.

Griffiths was a known drug dealer with a history of arrest (by the NYPD), with prior arrests for drug and gun possession. After Mr. Buari was indicted and arraigned for the murders, Mr. Griffiths fled to Jamaica to avoid further police coercion.

9.      Members of the BCDAO falsely advised the trial court that their office was "ready for trial," however Mr. Buari's trial was adjourned for years due to their inability to present a case against him.

10.     In and about August of 1995, nearly three years after Mr. Buari was arrested, the BCDAO and the 47th Precinct's renewed their conspiracy to falsely convict Mr. Buari by using coercion and inducement to cause another local drug dealer, Dwight Robinson, ("Mr. Robinson") to implicate Mr. Buari. Mr. Robinson had been a protégé of Mr. Griffiths and responsible for numerous deaths in the Bronxwood area. Mr. Robinson was the actual murderer of the Harris brothers.

11.     The prosecution knew they could rely on Mr. Robinson to falsely implicate Mr. Buari for murdering the Harris brothers, because the NYPD were initially investigating him for attempting to shoot and kill Mr. Buari. With the backing of Detective Vincent Price and prosecutor Allen Karen, Mr. Robinson used coercion and impermissible suggestion to induce several of his drug-dealing associates to falsely his false claims against Mr. Buari. The prosecution also offered deals to the various cooperators in exchange for their false testimony against Mr. Buari.

12.     Mr. Buari's trial lasted from October 11, 1995, through October 30, 1995.  The only evidence against Mr. Buari was the testimony of Mr. Robinson and his drug dealing associates – testimony that the police and prosecutors knew to be false. Based on that false evidence, Mr. Buari was convicted of two counts of murder in the second degree and sentenced to consecutive indeterminate terms of imprisonment from twenty-five years to life.

13.     Mr. Robinson was rewarded for his role in causing Mr. Buari's conviction by being allowed to operate his drug trade without any "heat" from the police.  His dynasty was short-lived, though, because his murderous disposition caused him to commit another heinous murder in a strikingly similar fashion to his murder of the Harris brothers. Mr. Robinson was arrested for the murder of Leroy McLennon on June 20, 1997 and was eventually sentenced to 25 years to life imprisonment.

14.     On December 29, 2003, while incarcerated, Mr. Robinson confessed to murdering the Harris brothers.  Around this same time, another trial witness, Kintu Effort, confessed to falsely implicating Mr. Buari due to the coercive tactics of the NYPD and the prosecution. However, the BCDAO continued to thwart the fact of Mr. Buari's innocence from being known. BCDAO investigators used intimidation and coercive tactics to cause Mr. Robinson and Mr. Effort to recant their confessions and on April 10, 2006, Mr. Buari's 440 motion based on the Robinson confession and Effort recantation was denied.

15.     In 2015, new eyewitnesses came forward to testify to Mr. Buari's innocence and Mr. Robinson's guilt and the BCDAO again resorted to coercion and intimidation to uphold Mr. Buari's false conviction.  Under the guise of an extra-judicial investigation by its newly formed Conviction Integrity Unit, BCDAO prosecutors and investigators sought out and berated Mr. Buari's newly discovered witnesses; disrupted their familial relationships; and prolonged their "investigation" to frustrate and prevent Mr. Buari's exoneration. Despite these efforts, several witnesses remained undeterred from telling the truth and Mr. Buari was eventually exonerated on May 5, 2017.

16.     After spending twenty-one years in prison, Mr. Buari was finally released on May 8, 2017. The BCDAO initially appealed the trial court's decision to vacate the conviction but ultimately dismissed the indictment on March 21, 2018.

## JURISDICTION

17.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1988, and the Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and pursuant to Article 1 §§ 1, 6, and 12 of the Constitution of the State of New York.

18.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

19.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

20.     Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

21.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

22.     Plaintiff Calvin Buari is a citizen of the United States and was at all times relevant to this Complaint a resident of the State of New York.

23.     Defendant City is a municipal corporation created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department and does maintain the NYPD which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

24.     Defendant Detective Andrew Dietz ("Det. Dietz") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

25.     Defendant Detective FNU Tracy ("Det. Tracy") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

26.     Defendant Detective Vincent Price ("Det. Price") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

27.     Defendant Detective Eugene Gottwin ("Det. Gottwin") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

28.     Defendant Detective Joseph Neenan ("Det. Neenan") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

29.     Defendant Detective Christine Fortune ("Det. Fortune") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

30.     Defendant Does # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those other officers, detectives, supervisors, and/or other agents, and employees of the NYPD, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations,

policies, customs, and usage of the City and the State of New York, who participated in the misconduct described herein.  They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  They are sued in their individual capacities.

31.    The BCDAO was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Bronx County of the City. It is an agency of Bronx County, a constituent county of the City. The District Attorney; Assistant District Attorneys; and Bronx District Attorney's investigators are deemed employees of both the County of the Bronx and the City.

32.    Assistant District Attorney Allen Karen ("ADA Karen"), a defendant in this claim, was at all times relevant to this Complaint a duly appointed and acting ADA, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is being sued in his individual capacity.

33.    Defendant BCDAO Assistant District Attorney Felicity Lung ("ADA Lung") was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and the State of New York. She is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  She is being sued in her individual capacity.

34.    Defendant BCDAO Assistant District Attorney Peter Coddington ("ADA Coddington") was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in his individual capacity within

the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual capacity.

35.     Defendant BCDAO Assistant District Attorney Gina Mignola ("ADA Mignola") was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and the State of New York. She is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  She is being sued in her individual capacity.

36.     Defendant Roes # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "Richard Roe" and "Rachel Roe," represent those other investigators, agents, and employees of the BCDAO, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York, who participated in the misconduct described herein. They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  They are sued in their individual capacities.

## STATEMENT OF FACTS

### Calvin Buari and the Night of the Murders

37.     In September of 1992, Calvin Buari was twenty-one-years-old and lived in the Wakefield section of the Bronx, New York on 211th Street between Bronxwood Avenue and Paulding Avenue.

38.     On the night of September 10, 1992, at approximately 9:00 p.m., Mr. Buari returned to the Wakefield neighborhood after having spent the day in Manhattan.

39.     Mr. Buari was going to visit his friend, John Parris, who lived on 213th Street between Bronxwood Avenue and Paulding Avenue.

40.     Mr. Buari walked through the intersection of 213th Street and Bronxwood Avenue, where a lot of people were out. Although the sun had gone down, the intersection was well lit by streetlights.

41.     Mr. Buari noticed two brothers, Mr. Robinson and his brother, Peter Robinson ("Peter"), on the southwest corner of 213th Street and Bronxwood Avenue sitting on milk crates just outside Frank's Soup Bowl restaurant. Mr. Robinson and Peter appeared to be smoking marijuana and drinking beer.

42.     As Mr. Buari proceeded down 213th Street towards Paulding Avenue, he noticed a person named Kintu Effort playing basketball on the street.

43.     Mr. Buari met John Parris on 213th Street approximately halfway between Bronxwood Avenue and Paulding Avenue, where they engaged in conversation.

44.     As Mr. Buari was talking with John Parris, an older woman stopped and asked Mr. Buari if she could use Mr. Buari's cigarette lighter. Mr. Buari recognized the woman as someone from the neighborhood but did not know her personally. Mr. Buari lent the woman his lighter.

45.     Seconds after Mr. Buari gave the woman his lighter, he heard gunshots ring out from the intersection of 213th Street and Bronxwood Avenue.

46.     Mr. Buari and Mr. Parris immediately ran down 213th Street towards Paulding Avenue.

10

47.     The woman who had just borrowed Mr. Buari's lighter immediately ran into a building that she, Mr. Buari, and Mr. Parris had been standing in front of.

48.     Later on, Mr. Buari and Mr. Parris walked to the corner of 213th Street and Bronxwood Avenue to see what had happened.

49.     A large crowd had gathered at the intersection.  Among the crowd was Mr. Robinson.

50.     Numerous police cars and police officers were present at the intersection.

51.     Mr. Buari learned that two males, the Harris brothers, had been shot and killed as they sat inside a white BMW parked near the corner of 213th Street and Bronxwood Avenue in front of Frank's Soup Bowl.

52.     Mr. Buari had never seen the Harris brothers before and did not know who they were or why they had been killed.

53.     Unbeknownst to Mr. Buari, Mr. Robinson was the person who had shot and killed the Harris brothers.

## INVESTIGATION AND FABRICATION OF EVIDENCE

### Initial Investigation

54.     Police officers quickly responded to the shooting and found the Harris brothers dead upon their arrival.

55.     Police officers secured the crime scene and recovered approximately 13 nine-millimeter spent shell casings.

56.     Although numerous people had been on the street at the time the shooting occurred, police officers failed to discover any eyewitnesses.

11

57.     Upon information and belief, if the police had conducted a minimally adequate investigation by speaking with witnesses and persons in the neighborhood, they would have discovered that Mr. Robinson was the person who had murdered the Harris brothers.  This evidence emerged during the post-conviction investigation regarding Mr. Buari's conviction.

58.     Police officers located a witness who claimed to have observed two individuals running away from the crime scene after shots had been fired. The witness was shown mugshot photos at the 47th Precinct and identified Kintu Effort as one of the individuals he had seen running.

59.     On November 4th, 1992, Det. Dietz interviewed Mr. Effort as part of his investigation of the Harris brothers' murder.

60.     During this interview, Mr. Effort stated that he was in the general area with a person named "John" at the time of the shooting on September 10, 1992.

61.     Mr. Effort stated that he did not see who shot the Harris brothers and that he ran to the residence of a friend when the shots were fired.

62.     Upon information and belief, Det. Dietz and other members of the 47th Precinct did not investigate Mr. Effort further.

**Fabrication of Evidence from Alrick Griffiths**

63.     On or about January 29, 1993, detectives arrested Mr. Griffiths for criminally possessing drugs and a loaded Barretta nine-millimeter handgun.

64.     Mr. Griffiths was Jamaican and known to sell drugs on the corner of 213th Street and Bronxwood Avenue.

65.     Mr. Robinson was a drug-dealing associate of Mr. Griffiths.

66.     Det. Dietz and other members of the 47th Precinct suspected that Mr. Griffiths might be connected to the murder of the Harris brothers and attempted to find evidence linking him to that crime.

67.     Upon information and belief, after Det. Dietz and members of the 47th Precinct were unable to obtain evidence linking Mr. Griffiths to the murder of the Harris brothers, they used impermissible suggestion and/or pressure and/or coercion to induce Mr. Griffiths to implicate someone else for that crime.

68.     Upon information and belief, as part of their effort to induce Mr. Griffiths to implicate someone else for the murder of the Harris brothers, Det. Dietz and members of the 47th Precinct spread a false rumor that Mr. Griffith's was a "snitch" and had "talked to the police."

69.     As a result of the false rumor that Mr. Griffiths was talking to the police, Mr. Griffiths' girlfriend, Elaine Salmon, went to the 47th Precinct on or about February 27, 1993, and informed Det. Dietz that Mr. Griffiths told her he was present on 213th Street and Bronxwood Avenue when one of the "Yankee guys that deal crack shoot two guys in the head who were sitting in a pretty white BMW."

70.     Upon information and belief, Det. Dietz knew that Mr. Robinson was a "Yankee guy" who dealt crack at 213th Street and Bronxwood Avenue.

71.     On or about March 22, 1993, members of the 47th Precinct arrested Mr. Buari for allegedly possessing a small amount of marijuana.

72.     Mr. Buari was issued a summons for the alleged marijuana and taken to the 47th Precinct to be questioned by detectives.

73.     Detectives, including Det. Tracy, attempted to elicit a statement from Mr. Buari implicating himself or someone else for recent criminal activity that had occurred in the confines of the 47th Precinct.

74.     Det. Tracy and the other detectives became enraged when Mr. Buari did not cooperate with their attempts to solicit information from him.

75.     Upon information and belief, detectives in the 47th Precinct knew that Mr. Buari lived in the vicinity of where Mr. Griffiths sold drugs and where the Harris brothers had been murdered.

76.     Upon information and belief, detectives from the 47th Precinct, including Det. Dietz and Det. Tracy, used impermissible suggestion and/or pressure and/or coercion to induce Mr. Griffiths into falsely stating that Mr. Buari had murdered the Harris brothers.

77.     Upon information and belief, the detectives promised Mr. Griffiths favorable treatment, leniency, and release from custody in exchange for these false statements.

78.     As a result of the false statements by Mr. Griffiths, induced by Det. Dietz, Det. Tracy and other 47th Precinct Detectives, Mr. Buari was arrested for murdering the Harris brothers on March 22, 1993.

79.     The 47th precinct detectives had no physical evidence to corroborate Mr. Griffiths' account of the murder.

80.     The 47th Precinct Detectives, including Det. Dietz and Det. Tracy, knew that Mr. Griffith's testimony was false, coerced, and did not constitute probable cause to arrest Mr. Buari for the Harris brothers' murder.

81.     Mr. Buari maintained that he was innocent of that crime.

14

**Mr. Buari's Indictment, Arraignment and Release on Bail**

82.      The BCDAO went forward in prosecuting Mr. Buari for the shooting deaths of the Harris brothers despite being aware that the only evidence against Mr. Buari was Mr. Griffiths' false statements.

83.      On March 26, 1993, the prosecution convened a grand jury to hear their case against Mr. Buari.

84.      Upon information and belief, the only evidence that the prosecution presented at the grand jury proceedings was the false testimony of Mr. Griffiths.

85.      Mr. Buari was indicted on charges of Murder in the Second Degree (four counts), Manslaughter in the First Degree (two counts), Criminal use of a Firearm in the First Degree, and Criminal Possession of a Weapon in the Second and Third Degrees, indictment number 2111/93. He was arraigned on these charges and pled not guilty.

86.      Mr. Buari was remanded in custody.

87.      Upon information and belief, members of the BCDAO rewarded Mr. Griffiths for falsely testifying against Mr. Buari by releasing him from custody.  Mr. Griffiths then fled to Jamaica, to avoid further police coercion and imprisonment.

88.      Mr. Buari retained attorney Kenneth Schreiber to defend him against the false charges that he had murdered the Harris brothers and prove his innocence.

89.      Through his investigation of Mr. Buari's case, Mr. Schreiber learned of several witnesses to the shooting deaths of the Harris brothers, including Mr. Robinson, Kintu Effort, Clarence Lamont Seabrook, Jerry Connor, and Stephan Robinson.

90.      Mr. Schreiber met with these witnesses, who advised him that Mr. Buari had not murdered the Harris brothers and that they would testify to this fact.

91.     Upon information and belief, the prosecution was fully aware that their case against Mr. Buari had no merit. They also did not have any evidence against Mr. Burari, because their one witness had fled the country.

92.     The BCDAO offered Mr. Buari a plea bargain of three-year imprisonment for the double homicide charge.

93.     Mr. Buari did not accept because he was innocent of the crimes.

94.     Mr. Buari eventually made bail and was released from custody.

**Detectives from the 47th Precinct Make a Deal with Dwight Robinson**

95.      In and about June 1995, almost three-years after the Harris brothers were murdered, drug violence in the 47th Precinct intensified.

96.     The 47th Precinct was said to have the "corner on blood," as rival drug dealers violently vied for control of the territory.

97.     From late June into July 1995, at least five people were shot and killed in the Wakefield neighborhood, with several others being seriously injured.

98.     One of the many people murdered in the 47th Precinct around this time was Mr. Robinson's brother, Peter.

99.     Upon information and belief, Mr. Robinson believed Mr. Buari was somehow connected to Peter Robinson's murder, however Mr. Buari was not responsible for nor connected to that crime.

100.    In August of 1995, Mr. Robinson attempted to kill Mr. Buari and Mr. Buari's friend, John Parris, by shooting them numerous times while they sat in a car.

101.    Mr. Buari and Mr. Parris were seriously injured when Mr. Robinson shot them numerous times, but they survived the attack.

102.    Shortly after this attack on Mr. Buari and Mr. Parris, detectives from the 47th Precinct took Mr. Robinson into custody.

103.    Det. Price, Gottwin, Neenan, and Fortune and other detectives from the 47th Precinct met with Mr. Robinson to discuss the violence that was taking place in their precinct, including the attempted murder of Mr. Buari and Mr. Parris.

104.    Upon information and belief, the detectives from the 47th Precinct were aware that Mr. Robinson was the "Yankee guy" that Mr. Griffiths had told his girlfriend murdered the Harris brothers.

105.    The detectives from the 47th Precinct were aware that the case against Mr. Buari for the shooting deaths of the Harris brothers was coming up for trial and that the prosecution did not have any evidence against Mr. Buari.

106.    The detectives from the 47th Precinct were aware that Mr. Robinson had animus towards Mr. Buari and attempted to kill him.

107.    The detectives from the 47th Precinct were aware that Mr. Robinson was a drug dealer who was vying for control over territory in their precinct.

108.    Upon information and belief, Det. Price, Gottwin, Neenan, Fortune, and other members of the 47th precinct proposed allowing Mr. Robinson to operate his drug trade in the Wakefield neighborhood without "heat" from the police if Mr. Robinson helped stem the violence that was going on there.

109.    Upon information and belief, although they were aware of evidence that Mr. Robinson was the murderer, Det. Price, Gottwin, Neenan, Fortune, and other members of the 47th precinct demanded that Mr. Robinson provide evidence implicating Mr. Buari for the shooting deaths of the Harris brothers.

110.    Upon information and belief, Mr. Robinson accepted the detectives' offer and agreed to falsely testify that Mr. Buari was responsible for murdering the Harris brothers.

111.    Upon information and belief, Det. Price, Gottwin, Neenan, Fortune, and other members of the 47th precinct made their arrangement with Mr. Robinson known to members of the BCDAO, including the Assistant District Attorney prosecuting Mr. Buari's case, Assistant District Attorney Allen Karen ("ADA Karen").

112.    Detectives Price, Gottwin, Neenan, Fortune, ADA Karen, together with Mr. Robinson, used impermissible suggestion and/or coercion and/or improper inducements to compel others to falsely implicate Mr. Buari for the shooting deaths of the Harris brothers, including witnesses who had intended to testify for Mr. Buari, including Jerry Connor, Clarence Lamont Seabrook, Brian Johnson, and Kenya Holder.

113.    Upon information and belief, Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen were fully aware that these four witnesses were drug-dealing associates of Mr. Robinson and would financially benefit if he gained control over the neighborhood drug trade.

114.    The prosecution also offered Mr. Connor, Mr. Seabrook, and Mr. Holder recommendations for leniency for open drug and/or gun charges in exchange for their false testimony against Mr. Buari.

115.    As a result of the coercion and suggestion exerted against them by Detectives Price, Gottwin, Neenan, Fortune, ADA Karen, and Mr. Robinson, and in consideration of favorable treatment and unlawful inducement promised by ADA Karen and the detectives, these witnesses agreed to falsely testify that Mr. Buari murdered the Harris brothers.

116.    Upon information and belief, members of the BCDAO, including ADA Karen, were fully aware of the improper and unlawful tactics used to elicit false testimony that Mr. Buari

18

had murdered the Harris brothers. However, ADA Karen publicly referred Mr. Robinson's newfound cooperation with the police and prosecution to convict Mr. Buari as "a gift."

117.    Additionally, Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen used impermissible suggestion and/or pressure and/or coercion to cause Mr. Effort to falsely implicate Mr. Buari for the shooting deaths of the Harris brothers.

118.    Although detectives thoroughly investigated Mr. Effort shortly after the September 10, 1992 murders and found him to be credible when he claimed to have no knowledge of the murders, Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen threatened to charge Mr. Effort as an accessory to the murders if he did not cooperate by testifying against Mr. Buari. Specifically, the threat was that if Mr. Effort did not cooperate with them, Mr. Robinson and his drug-dealing associates would testify that Mr. Effort helped Mr. Buari murder the Harris brothers.

119.    ADA Karen further induced the false statement by offering Mr. Effort a recommendation of leniency, if he testified against Mr. Buari, for a four to eight-year prison sentence he was serving for a drug-related crime.

120.    As a result of the coercion exerted by Detectives Price, Gottwin, Neenan, Fortune, and ADA Karen, along with the promise of favorable treatment, Mr. Effort agreed to falsely testify that Mr. Buari had murdered the Harris brothers.

**Mr. Buari's Trial and Conviction**

121.    At a *Wade* hearing held on October 3rd and 6th, 1995, before Judge Joseph Cerbone, Detectives Price, Fortune and Neenan falsely testified that Mr. Buari became a suspect for the Harris brothers' murder after an unrelated criminal investigation led them to interview Mr. Robinson, who informed them that Mr. Buari had murdered the Harris brothers.

122.    Detectives Price, Fortune and Neenan falsely testified that Mr. Robinson was in fear for his life because he believed Mr. Buari was trying to kill him.

123.    Mr. Buari has never tried to harm Mr. Robinson.

124.    Further, Detectives Price, Fortune and Neenan did not inform the Court that they had taken Mr. Robinson into custody to question him in the first place because he attempted to murder Mr. Buari and Mr. Parris.

125.    Detectives Price, Fortune and Neenan did not inform the Court of the arrangements that they and ADA Karen had made with Mr. Robinson and his drug-dealing associates to secure false testimony against Mr. Buari.

126.    Judge Cerbone denied Mr. Buari's motions to suppress Mr. Robinson's identification of him as the murderer of the Harris brothers.

127.    Mr. Buari was subsequently tried before a jury, which lasted from October 11, 1995 through October 30, 1995.

128.    At trial, the only evidence linking Mr. Buari to the murder of the Harris brothers was the false testimony of Mr. Robinson and his drug-dealing associates, Clarence Lamont Seabrook, Kenya Holder, Jerry Connor, Brian Johnson, and Mr. Effort.

129.    ADA Karen importuned, suborned, and allowed Mr. Seabrook, Mr. Connor, and Mr. Holder to falsely testify to witnessing Mr. Buari shoot the Harris brothers on September 10, 1992 in front Frank's Soup Bowl Restaurant.

130.    In reward for their false testimony, the BCDAO provided Mr. Seabrook, Mr. Connor, and Mr. Holder a recommendation of leniency from prosecution for their open drug/gun cases.

131.    ADA Karen importuned, suborned, and allowed Mr. Effort to falsely testify that he handed Mr. Buari the murder weapon and witnessed Mr. Buari shoot the Harris brothers on September 10, 1992.

132.    In reward for his false testimony, the BCDAO provided Mr. Effort with a recommendation of leniency regarding his prison sentence for a drug-related crime.

133.    ADA Karen did not disclose that he threatened to prosecute Mr. Effort as an accessory to the murder of the Harris brothers if he did not testify.

134.    ADA Karen importuned, suborned and allowed Mr. Robinson to falsely testify that he had witnessed Mr. Buari shoot the Harris brothers.

135.    ADA Karen additionally allowed Mr. Robinson to falsely deny that he, with the assistance of members of the police and ADA Karen, had caused Mr. Seabrook, Mr. Connor, and Mr. Holder to falsely testify against Mr. Buari, and

136.    ADA Karen additionally allowed Mr. Robinson to falsely claim that his testimony was being given without suggestion or coercion from members of the 47th precinct or the BCDAO.

137.    ADA Karen did not disclose that Detectives from the 47th Precinct had promised Mr. Robinson that he would be allowed to operate his drug trade without "heat" from the police if he falsely testified against Mr. Buari.

138.    The jury convicted Mr. Buari of two counts of murder in the second degree.  Mr. Buari was sentenced to consecutive indeterminate terms of imprisonment from twenty-five years to life.

### Dwight Robinson's Conviction

139.    On June 20, 1997, Mr. Robinson murdered Leroy McClennon (Mr. McClennon) in virtually the same manner in which he had murdered the Harris brothers:

    a.   He shot Mr. McClennon several times with a 9-millimeter handgun;

    b.   He murdered Mr. McClennon on the corner of 213th Street and Bronxwood Avenue;

    c.   Numerous people were present while he committed the crime; and

    d.   Mr. Robinson fled the scene of the crime and returned shortly thereafter and attempted to mix in with the crowd that had formed.

140.    Two of the detectives assigned to investigate the murder of Mr. McClennon were Det. Neenan Det. Fortune – detectives that, upon information and belief, had helped coerce and/or induce Mr. Robinson to testify against Mr. Buari.

141.    Upon information and belief, Detectives Neenan and Fortune recognized the striking similarities between Mr. McClennon's murder and the murder of the Harris brothers.

142.    Mr. Robinson was arrested shortly after the McClennon murder by members of the 47th precinct when a witness alerted them that Mr. Robinson was the perpetrator.

143.    After his arrest, Mr. Robinson confessed to murdering Mr. McClennon over a drug dispute.  Mr. Robinson was subsequently sentenced to twenty-five years to life.

**Mr. Buari's First C.P.L. § 440 Motion**

144.    In or about March 8, 2002, the Appellate Division, First Department, assigned the Office of the Appellate Defender including Risa Gerson and Brian Stull to represent Mr. Buari on his appeal of the December 5, 1995 judgment of conviction entered against him.

145.    Appellate counsel contacted Mr. Effort and during their interview, Mr. Effort recanted his trial testimony.

146.    Mr. Effort stated that (1) he had not actually seen Mr. Buari shoot the Harris brothers and that (2) he falsely testified at Mr. Buari's criminal trial because prosecutors had

threatened to charge him as an accessory to the murder of the Harris brothers if he did not cooperate with them.

147.    On September 19, 2002, Mr. Effort provided Mr. Buari's appellate counsel with an affidavit recanting his testimony at Mr. Buari's criminal trial and explaining why he had testified falsely.

148.    On November 23, 2002, appellate counsel visited Mr. Robinson at Upstate Correctional Facility. At that meeting, Mr. Robinson refused to say anything specific about the murder of the Harris brothers but did not renew his allegation that Mr. Buari was the killer.  Instead, he stated that only he knew what happened on that date.

149.    On June 26, 2003, Mr. Buari and his appellate counsel moved pursuant to New York Criminal Procedure Law ("N.Y.C.P.L.") § 440.10 to vacate his conviction, alleging that (1) he was denied his constitutional right to a fair and impartial jury; (2) the prosecution violated *Brady v. Maryland,* 373 US 83 (1963) by failing to relinquish impeachment evidence concerning the prosecution's witnesses; and (3) that the prosecution's witness, Mr. Robinson's, conviction for a murder occurring at the same manner and location as the Harris brothers' murder, was "newly discovered" evidence that would have resulted in a more favorable verdict.  The BCDAO, including ADA Karen, opposed Mr. Buari's motion.

150.    On December 5, 2003, Mr. Buari's appellate counsel met with Mr. Robinson at Clinton Correctional Facility.  At this meeting, Mr. Robinson told Mr. Buari's appellate counsel that he had falsely accused Mr. Buari of the Harris Brothers' murders and that he had gotten his associates to give similar, false testimony against Mr. Buari.

151.     On December 14, 2003, Mr. Robinson sent a handwritten letter to Mr. Buari's appellate counsel expressing his desire to make a full confession to his murder of the Harris brothers.

152.     On December 29, 2003, Mr. Robinson confessed to appellate counsel that he had murdered the Harris brothers.  The following day, Mr. Robinson executed an affidavit confessing to having murdered the Harris brothers.

153.     At or about this time, Mr. Robinson spoke to John Parris on a prisoner telephone using another inmate's calling card.  During this conversation, Mr. Robinson apologized to Mr. Parris for having almost killed him and confessed to having murdered the Harris brothers.

154.     Upon information and belief, the BCDAO, including ADA Karen and BCDAO Investigators Frank Viggiano, Stanley Schiffman, and John Wall, were aware of and possessed a recording of this telephone call.

155.     On or about January 23, 2004, Mr. Buari supplemented his original N.Y.C.P.L. § 440.10 motion with additional "newly discovered" evidence consisting of Mr. Robinson's confession to murdering the Harris brothers and the affidavit they had obtained from Mr. Effort.

156.     Upon learning of Mr. Buari's new evidence regarding Mr. Effort and Mr. Robinson, members of the BCDAO, including ADA Karen, sent out BCDAO investigators, including Viggiano, Schiffman, and Wall, to attempt to obtain withdrawals of their new recantation testimony in any way possible.

157.     Upon information and belief, BCDAO investigators, including Viggiano, Schiffman, and Wall, made visits to Mr. Effort and his family members.

158.   Upon information and belief, BCDAO investigators, including Viggiano, Schiffman, and Wall, used undue suggestion and coercion against Mr. Effort and his family members in an attempt to cause Mr. Effort to withdraw the recantation of his trial testimony.

159.   Members of the BCDAO investigators, including Viggiano, Schiffman, and Wall, visited Mr. Robinson and members of his family.

160.   Upon information and belief, BCDAO investigators, including Viggiano, Schiffman, and Wall, used undue suggestion and coercion against Mr. Robinson and his family members in an attempt to cause Mr. Robinson to recant his confession to murdering the Harris brothers. They threatened that Mr. Robinson would spend the rest of his life in jail if he did not recant his confession to murdering the Harris brothers. They threatened that any application Mr. Robinson ever made for parole would be rejected if he did not recant his confession to murdering the Harris brothers. They also intentionally manipulated and strained Mr. Robinson's relationship with his mother to pressure him to retract his confession.

161.   As a result of the coercion and/or impermissible suggestion and/or improper inducements exerted by BCDAO investigators, including Viggiano, Schiffman, and Wall, Mr. Robinson agreed to recant his confession to murdering the Harris brothers.

162.   A hearing was held in the Supreme Court, Bronx County, before the Honorable Dominic Massaro on November 17, 2004. Mr. Robinson recanted his confession; he insisted that he neither committed the Harris brothers' murders nor Mr. McClennon's murder, for which he was serving time. Mr. Robinson falsely testified that he only cooperated with Mr. Buari's appellate counsel because he thought his life would be in danger if he did not do so. However, neither Mr. Buari, nor anyone on his behalf, has ever threatened or tried to harm Mr. Robinson or his family.

163.    Mr. Effort testified that his initial recantation was accurate, and that Mr. Buari did not murder the Harris brothers.

164.    Judge Massaro found Mr. Robinson's testimony to be credible and Mr. Effort's testimony incredible. In a decision dated April 10, 2006, Judge Massaro denied Mr. Buari's 440 motion.

165.    In an order dated August 17, 2006, Judge Nardelli granted Mr. Buari leave to appeal the denial of his 440 motion, however Mr. Buari's appeal was denied.

**Newly Discovered Evidence Leads to Mr. Buari's Exoneration**

166.    After his appeal was denied, Mr. Buari's family engaged in a social media and publicity campaign in an effort to raise awareness of Mr. Buari's wrongful conviction and to find new evidence of his innocence.

167.    Towards that end, Mr. Buari also sought out and hired private investigators.  In 2012, he hired a private investigator named Joseph Barry ("Mr. Barry").

168.    Mr. Barry obtained evidence from a woman named Kimberlia Clarke ("Kimberlia") who had occupied a second-floor apartment in the building next to Frank's Soup Bowl restaurant at and about the time the Harris brothers were murdered.

169.    On September 10, 1992, at approximately 9:00 p.m., Kimberlia had just finished bathing her children when she heard gunshots.

170.    She immediately looked out of her window onto the intersection of 213th Street and Bronxwood Avenue where she saw Mr. Robinson firing a gun into a car.  She knew Mr. Robinson as someone who sold drugs on her block.

171.    Kimberlia ran to her apartment door and screamed for her sister, Nakia, to come inside.

172.    Kimberlia moved out of the neighborhood a short time after this event.

173.    Kimberlia did not learn that Mr. Buari had been convicted for the crime she witnessed Mr. Robinson commit until 2014, when she was revisiting her old neighborhood and saw a flyer with Mr. Buari's picture on it and describing his case. Kimberlia called the telephone number listed on the flyer, which put her in touch with Mr. Barry.

174.    Mr. Barry also obtained evidence from Nakia Clarke ("Nakia"), who was staying with Kimberlia, her sister, at the time the Harris brothers were murdered.

175.    On September 10, 1992, at approximately 9:00 p.m., Nakia was sitting on the stoop of her sister's apartment building right next to Frank's Soup Bowl, when she saw a person walk towards a white car containing two males parked near the corner and start shooting a gun into it. She saw that the bodies of the two men jerked about as the shots were fired. Nakia recognized the shooter as Mr. Robinson, who sold drugs on the block.

176.    Nakia was horrified by what she saw and ran into her sister's apartment.

177.    Nakia did not learn that Mr. Buari had been convicted of the murder she had witnessed Mr. Robinson commit until 2014.  She had never talked to anyone about what she had seen until Kimberlia brought up the flyer she had come across that described Mr. Buari's case.

178.    Initially, Nakia was scared and did not want to tell anyone what she had witnessed, but she eventually decided to talk to Mr. Barry after deciding it was the right thing to do.

179.    Mr. Barry also obtained evidence from Caroline Brown ("Ms. Brown") who occupied an apartment at 908 East 213th Street, a few houses down from Frank's Soup Bowl towards Paulding Avenue, at the time of the Harris brothers' murders.

180.    On the night of September 10, 1992, Ms. Brown was returning from a friend's house when she ran into Mr. Buari and a friend who were talking outside her apartment building.

181.    Ms. Brown stopped and asked Mr. Buari for his cigarette lighter, which Mr. Buari gave to her.

182.    Ms. Brown then heard gunshots ring out from the direction of Bronxwood Avenue.

183.    Ms. Brown recalled Mr. Buari and his friend run towards Paulding Avenue while she ran into her building.

184.    A short while later, Ms. Brown learned that two men had been shot and killed while sitting in a car outside of Frank's Soup Bowl.

185.    Ms. Brown moved out of the neighborhood shortly after this event.

186.    Ms. Brown did not learn that Mr. Buari had been convicted of the September 10, 1992 murders until years later when she and a friend came across a Buzzfeed article on Mr. Buari's case on the internet.  She then called a telephone number listed in the article to provide her information.

187.    On or about October 15, 2015, Mr. Buari submitted this and other new evidence in support of a new motion for vacatur of his conviction pursuant to N.Y.C.P.L. § 440.10(1)(g) and based upon his actual innocence.  The motion was assigned to the Hon. Eugene Oliver, Justice of the Supreme Court of the State of New York, Bronx County.

**Bronx County District Attorney's Conviction Integrity Unit's Investigation**

188.    On or about October 29, 2015, ADA Peter Coddington ("ADA Coddington") contacted Mr. Buari's counsel and stated that the BCDAO took Mr. Buari's claims seriously, that they wanted to investigate those claims, and that the incoming Bronx District Attorney, Darcel Clark ("DA Clark"), might want to weigh in on those claims.

189.    Rather than proceed to a hearing on his October 15, 2015 N.Y.C.P.L. § 440.10 motion, the BCDAO requested that Mr. Buari consent to allowing their Conviction Integrity Unit ("CIU") to investigate his claim of innocence.

190.    The BCDAO's CIU reviews post-judgment claims of actual innocence and wrongful conviction in "serious" cases. The BCDAO's review of these types of cases are extra-judicial.

191.    Members of the BCDAO, including ADA Gina Mignola ("ADA Mignola"), ADA Coddington, and ADA Felicity Lung ("ADA Lung"), falsely promised and assured Mr. Buari's counsel that the investigation would be fair, open-minded and not adversarial.

192.    Upon information and belief, members of the BCDAO, including ADA Mignola, ADA Coddington, and ADA Lung actually sought to sabotage Mr. Buari's 440.10 motion and maintain his conviction.

193.    Based on the representations made by the BCDAO, Mr. Buari and his attorneys agreed to hold his N.Y.C.P.L. § 440.10 motion in abeyance while the BCDAO Wrongful Integrity Unit investigated his claims.

194.    ADA Lung and ADA Coddington were assigned to lead the investigation on behalf of the BCDAO CIU and were overseen by ADA Mignola.

195.    In October 2015, ADA Coddington contacted Mr. Buari's counsel, Myron Beldock ("Mr. Beldock") and informed him that he intended to have investigators, including NYPD homicide detectives, interview Mr. Buari's newly discovered witnesses.

196.    Mr. Beldock expressed concern that NYPD homicide detectives would be interested in maintaining Mr. Buari's conviction and be adversarial to Mr. Buari's witnesses.

29

197.     ADA Coddington assured Mr. Beldock that he was going to conduct a "straight up reinvestigation" and said that the BCDAO had "no love for Dwight Robinson."

198.     Mr. Beldock wrote each of Mr. Buari's witnesses and advised them that investigators from the BCDAO might try to contact them regarding information they had.  Mr. Beldock further advised them that they could agree to talk to the investigators, refuse to talk to the investigators, or agree to only talk to the investigators with an attorney present.

199.     Kimberlia, Nakia, Ms. Brown, and other witnesses for Mr. Buari advised Mr. Beldock that they would only want to talk to the BCDAO investigators with an attorney present.

200.     In November 2015, Mr. Beldock provided ADA Coddington and ADA Lung with up-to-date contact information for Kimberlia, Nakia, Ms. Brown, and other witnesses for Mr. Buari and advised ADA Coddington that each of those witnesses would only agree to be interviewed by BCDAO investigators with an attorney present.

201.     Upon information and belief, in or about August 2016, ADA Mignola, ADA Coddington, and ADA Lung caused BCDAO investigators to seek out Mr. Buari's witnesses with the goal of intimidating them not to testify for Mr. Buari.

202.     In or about August 2016, BCDAO investigators began showing up at the homes and places of work of Mr. Buari's witnesses. BCDAO investigators would arrive unannounced, show their law enforcement badges to friends and co-workers of Mr. Buari's witnesses, and state they were investigating a double homicide.

203.     Contrary to ADA Coddington's representations to Mr. Beldock, BCDAO investigators were adversarial and intimidating towards Mr. Buari's witnesses.

204.     Mr. Buari's witnesses were greatly upset by their treatment by the BCDAO investigators.

205.    Ms. Brown was greatly distressed and felt the experience was harmful to her health.

206.    As a result of the BCDAO investigators' conduct, Nakia was kicked out of the battered women's shelter she was staying at and lost her job.

207.    Judge Oliver found the treatment of Mr. Buari's witnesses by the BCDAO investigators was "unconscionable."

208.    After BCDAO investigators had thoroughly interrogated Mr. Buari's witnesses, ADA Lung requested that Kimberlia, Nakia, and Ms. Brown be brought to the BCDAO so that she could assess their credibility in person.

209.    Mr. Buari's counsel arranged for Kimberlia, Nakia, and Ms. Brown to be brought to the BCDAO to be examined by Ms. Lung. Because the mistreatment these witnesses had suffered at the hands of the BCDAO investigators, they requested to be represented by counsel during Ms. Lung's examination.

210.    Kimberlia, Nakia, and Ms. Brown were represented on a pro bono basis by independent counsel, Rita Dave ("Ms. Dave"), during Ms. Lung's examination.

211.    ADA Lung was unnecessarily adversarial and combative while examining Mr. Buari's witnesses.

212.    Members of the BCDAO, including Gina Mignola and Felicity Lung, castigated these witnesses for seeking counsel and suggested that their request indicated that they were guilty of something.

213.    While examining Nakia, ADA Lung took an opportunity when Ms. Dave stepped outside to improperly solicit her to speak to her without her lawyer present. ADA Lung implied, in sum and substance, that Nakia would not need to be represented by a lawyer if she was innocent and had nothing to hide. This false innuendo was repeated throughout the BCDAO investigation

of Mr. Buari's case and during the N.Y.C.P.L. § 440.10 hearing by ADA Lung and ADA Mignola, the head of the Wrongful Conviction Unit. ADA Mignola even stated that she would be "hard-pressed to understand" why an eyewitness to a murder would feel the need to be represented by counsel.

214.    Judge Oliver later rebuked this position of the BCDAO in his November 29, 2017 decision by stating, "Ms. Clarke (referring to Nakia) is a United States Citizen and has every right to have an attorney present during questioning."

215.    On January 13, 2017, ADA Mignola advised Mr. Buari's counsel that the BCDAO stated that the "credible evidence" did not establish that Mr. Buari was innocent or that the conviction was "wrongfully obtained."

216.    Mr. Buari's counsel subsequently requested that the Court proceed with a hearing on Mr. Buari's N.Y.C.P.L. § 440 motion.

217.    With Mr. Buari's litigation revived and active, the BCDAO CIU ceased its investigation.

218.    As a result of the BCDAO's conduct, including ADA Mignola, ADA Coddington, and ADA Lung, in causing Mr. Buari to submit to the BCDAO's investigation of the claims of his October 15, 2015 N.Y.C.P.L. § 440.10 motion, when they were actually trying to sabotage Mr. Buari's claims, Mr. Buari was wrongfully imprisoned for approximately one additional year.

**Mr. Buari's Exoneration**

219.    A N.Y.C.P.L. § 440 hearing was held in the Supreme Court, Bronx County beginning on March 27, 2017, and concluding on April 7, 2017.

220.    Mr. Buari's case consisted of testimony from himself, Kimberlia, Nakia, Ms. Brown, and Mr. Barry.

32

221.    Cross-examination of Mr. Buari and his witnesses by ADA Lung provided no basis to doubt the veracity of their testimony.

222.    The BCDAO represented to the Court and counsel that they were going to have Mr. Robinson testify as their only witness, but later informed the Court that they would not call Mr. Robinson at the last minute.  Upon information and belief, in fact the BCDAO never intended to have Mr. Robinson testify and had not ever arranged for his testimony or sought to prepare him for his potential testimony. This ruse again delayed Mr. Buari's 440 motion and his eventual release by several days.

223.    For example, when the BCDAO first informed Judge Oliver of their intention to produce Mr. Robinson, both the Court and Mr. Buari's counsel advised the BCDAO of their obligation to inform Mr. Robinson of his Fifth Amendment right against self-incrimination and to remain silent. The BCDAO had not previously so informed Mr. Robinson and the Court suggested that the BCDAO provide an attorney for Mr. Robinson.

224.    The BCDAO requested that the Court take Judicial notice of Mr. Buari's prior 440 hearing, all prior motions, all previously rendered decisions, and the criminal trial transcript.

225.    On May 5, 2017, after the hearing, the Court, from the bench, issued an oral decision, vacating the conviction of Mr. Buari based upon N.Y.C.P.L. 440.10(1)(g) and ordered a new trial.  In his oral decision, the Court stated that it found Mr. Buari's witnesses credible. The Court released Mr. Buari on his own recognizance despite ADA Lung's insistence that the Court set bail in the amount of $500,000.00. The court set July 17, 2017 as the date for the re-trial of Mr. Buari on the indictment.

226.    Mr. Buari was released from custody on May 8, 2017.

227.    On May 24, 2017, The BCDAO filed a Notice of Appeal to the oral decision.

228.    On June 19, 2017, Mr. Buari's counsel received an email from ADA Lung that read "I am writing to inform you that I received a call today from an individual #1 who indicated that shortly [sic] the homicide an individual #2 told individual #1 that the defendant Calvin Buari was not the shooter; rather Calvin Buari was present and ordered the shooting."

229.    On June 20, 2017, Mr. Buari's counsel sent an email to ADA Lung requesting documentation and information regarding the above conversation.

230.    On June 26, 2017, Mr. Buari's counsel sent a letter to DA Darcel Clark, ADA Lung and ADA Coddington requesting documentation and information regarding the above conversation. The letter also asked DA Clark:

> whether [the BCDAO] intends to re-try Mr. Buari on July 17, 2017, or whether you intend to pursue the appeal or both or neither. Of course, I would be remiss if I did not repeat my drum-beated plea to put some finality to this case.  Appealing a credibility determination, made by a Supreme Court Judge after a full hearing, is a futile endeavor. Retrying this case would be equally useless because your witnesses, weak to begin with, have only become more damaged over time and you cannot refute the newly discovered evidence.

231.    There was no reply by DA Clark, ADA Mignola, ADA Lung or ADA Coddington and none of them ever provided the information requested, which constituted *Brady* material.

232.    In fact, the repeated demands to DA Clark, ADA Mignola, ADA Lung and ADA Coddington for the above material, for withdrawal of the appeal, and dismissal of the charges, went unanswered and were ignored.

233.    At subsequent court appearances, ADA Lung and ADA Coddington advised the Court that they intended to re-try Mr. Buari for the Harris brother murders.

234.    They asked for the re-trial to be adjourned so that they could see and review Judge Oliver's written decision of his vacatur of the conviction.

235.   In his subsequent written decision, dated November 9, 2017,  Judge Oliver also specifically found:  (a) the evidence presented by the Mr. Buari was "overwhelming"; (b) the "abundance" of the new evidence was never presented in the original 440 hearing; (c) Mr. Buari's witnesses were "completely credible" and "direct"; (d) the hostility and negativity directed at them by the BCDAO and ADA Lung was "unnecessary and unprofessional"; (e) the BCDAO and its representatives were "unnecessarily hostile" to Nakia Clarke; (f)  the BCDAO and its representatives' treatment of Nakia Clarke during the reinvestigation was "unconscionable"; (g) Nakia Clarke's testimony was brave and powerful; (h)  the BCDAO and its representatives arguments as to Mr. Buari's witness Caroline Brown were "offensive"; (i) Mr. Buari, in his testimony gave direct responses and did not appear to be evasive (j)  the testimony of the Mr. Buari's witnesses was "overwhelming" and "credible;" and (k) the court noted the serious issues with Mr. Robinson's credibility and that "Despite repeated assertions to the contrary, the People did not call Dwight Robinson as a witness."

236.   Mr. Buari's counsel again wrote the BCDAO and requested that they re-consider their decision to either appeal the case or have a new trial. The office continued the prosecution despite having no good-faith basis to do so.

237.   Instead, despite the strong rebuke of the BCDAO's behavior in this matter; despite the overwhelming evidence of Mr. Buari's innocence; and despite the legal futility of appealing a Supreme Court Justice's credibility determinations after a testimonial hearing, the BCDAO continued the prosecution of Mr. Buari by filing a Notice of Appeal of the written decision.

238.   On November 29, 2017, the parties appeared before Bronx Supreme Court Justice Ralph Fabrizio. ADA Lung again re-iterated the office's intention to retry the case and pursue the

appeal of the oral and written decisions of Judge Oliver.  ADA Lung also falsely told Judge

Fabrizio that the defense "blocked the re-investigation at every turn."

239.    ADA Lung had repeatedly made this false and spurious claim both on and off the

record numerous times. Judge Fabrizio set March 21, 2018, for a status conference.

240.    On December 1, 2017, Mr. Buari's counsel again implored DA Darcel Clark via a

letter to withdraw the appeals and dismiss the indictment.  The letter was ignored and went

unanswered.

241.    The parties appeared at a status conference date before Judge Fabrizio on March

21, 2018.

242.    At that appearance, ADA Lung moved to dismiss the indictment on the record

before Judge Fabrizio, who granted the motion and dismissed the indictment.

**The Defendants' Unconstitutional Efforts to Elicit False Testimonies Implicating Mr. Buari**

243.    As the specific facts alleged above show, the defendant police officers, detectives

district attorneys and district attorney investigators concealed from Mr. Buari, his defense counsel,

and from the public as well, that they had elicited false statements from each of the prosecution's

witnesses at the trial which implicated Mr. Buari in murdering the Harris brothers and during Mr.

Buari's post-conviction proceedings.

244.    All of these facts were known, or should have been known, to the defendants at the

time they were investigating and reinvestigating the murder of the Harris brothers.

245.    The defendants deliberately concealed Mr. Robinson's guilt, perpetuated

falsehoods pertaining to Mr. Buari, and failed to disclose these facts, favoring instead their

collective predetermined attributions of guilt and the expedient accusation that it was Mr. Buari

who had murdered the Harris brothers.

246.     Instead of investigating readily available evidence which connected Mr. Robinson to the murder of the Harris brothers, the defendant police officers, detectives, district attorneys and district attorney investigators who were responsible for investigating, prosecuting, and reinvestigating Mr. Buari, deliberately elicited false testimonies and abandoned any reasonable effort to legitimately investigate the crime, resulting in the malicious prosecution of Mr. Buari, his subsequent wrongful conviction, and his wrongful imprisonment for more than twenty-one years.

247.     As shown through the complaint, the testimonies and statements at Mr. Buari's October 1995 trial elicited from Mr. Connor, Mr. Seabrook, Mr. Effort, Mr. Robinson, Mr. Johnson, and Mr. Holder were inaccurate, false and fabricated.

248.     As shown through the complaint, the prosecution's efforts to elicit false testimony from Mr. Robinson simultaneously concealed striking evidence of Mr. Robinson's bias towards Mr. Buari, including Mr. Robinson's attempted murder of Mr. Buari.

249.     The defendants' failure to conduct a constitutionally adequate investigation and use of coercion to elicit false testimony against Mr. Buari put the public at great risk and deprived Mr. Buari of a fair trial.  Defendants additionally deprived Mr. Buari of the fair opportunity to challenge the false case put forward by their compromised witnesses and the police officers and detectives who testified at his criminal trial.

250.     Similarly, despite the evidence demonstrating Mr. Robinson's guilt, which corroborated and established Mr. Buari's innocence, certain defendants, including but not limited to BCDAO investigator Viggiano and ADA Lung have continued to perpetuate their false narrative against Mr. Buari by publicly asserting that Mr. Buari killed the Harris brothers.

**Defendants' Unconstitutional Efforts to Deprive Mr. Buari of Compulsory Process**

251.    As specific facts alleged above show, defendant detectives Dietz, Tracy, Price Gottwin, Neenan, and Fortune, along with ADA Karen, deliberately and substantially interfered with Mr. Buari's ability to call witnesses in his own defense by unlawfully compelling Mr. Effort, Mr. Peterson, Mr. Johnson, Mr. Holder, Mr. Connor, and Mr. Robinson to give false testimonies implicating Mr. Buari as the murderer of the Harris brothers. All of these witnesses succumbed to the detectives' and District Attorneys' tactics of suggestion and coercion, and in exchange for leniency regarding criminal charges.

252.    The defendant police officers, detectives, district attorneys, and/or district attorney's investigators deliberately obstructed Mr. Buari's constitutionally-protected access to freedom and exoneration when they acted to suppress Kintu Effort's recantation of his false trial testimony and when they successfully caused Mr. Robinson, the actual murderer, to recant his confession.

253.    In suppressing newly-found evidence and provoking Mr. Robinson's false testimony during Mr. Buari post-conviction hearing, defendants deprived plaintiff's access to compulsory process, subjected him to continued imprisonment, restricted his access to familial connections, and denied him any opportunity to repair his reputation in the view of the public for more than a decade.

254.    In contrast to Mr. Robinson's false testimonies in court, his honest confession contained details of his murder of the Harris brothers and the reasoning behind his silence.

255.    Mr. Robinson's confession was strikingly corroborated by the fact that his *modus operandi* in the Harris brothers case matched that of the McClennon case in which he was convicted and in the Buari and Parrish shooting.

256.    The veracity of Mr. Robinson's confession was further corroborated by Kintu Effort's recantation of his trial testimony and his account of coercion by the prosecution.

257.    It is self-evident that the confession of a self-admitted murderer, corroborated by evidence of his *modus operandi* and supporting recantation of the purported immediate accessory to the crime, should have resulted in the acquittal of Mr. Buari during his initial hearing for post-conviction relief.

258.    An honest appraisal of this evidence would have resulted in vacatur of Mr. Buari's conviction and his subsequent release from prison and exoneration.

259.    When newly found evidence in the form of statements from Nakia, Kimberlia, Ms. Brown, and other witnesses further corroborated Mr. Buari's innocence and Mr. Robinson's guilt, defendants ADA Lung and ADA Coddington interfered with Mr. Buari's ability to call witnesses by harassing and intimidating these witnesses to attempt to dissuade them from testifying on Mr. Buari's behalf.

260.    In spite of the evidence demonstrating Mr. Buari's innocence and Mr. Robinson's guilt, the City and individual NYPD and BCDAO defendants attempted to continue to suppress the truth about what happened on September 10, 1992, by using the BCDAO CIU to sabotage Mr. Buari's efforts to seek post-conviction relief.

**Defendants' Failure to Conduct a Constitutionally Adequate Investigation**

261.    The lack of evidence of Mr. Buari's guilt should have caused defendants to be concerned that they had wrongfully and/or, at least, incorrectly charged Mr. Buari and were wrongfully and incorrectly prosecuting him.  This awareness should have caused them to reinvestigate and reconsider the charges and continuing the prosecution.

262.    Instead, the defendants disingenuously stuck to the script and scenario they created – that Mr. Buari was responsible for that crime.

263.    The defendants disingenuously stuck to this constructed scenario, maliciously acted to derail Mr. Buari's attempts to regain his freedom, obstructed the just and honest resolution to the murder of the Harris brothers, and subjected Mr. Buari to over twenty-one years of wrongful imprisonment.

264.    Rather than question the integrity of their prosecution of Mr. Buari or admit its lack of integrity, the defendants, including those working in both the NYPD and the BCDAO, suppressed the truth about their unlawful actions, including, fabrication of evidence, eliciting false testimonies at trial, silencing honest and corroborated confessions and recantations, concealing exculpatory evidence at trial and thereafter, and using impermissible suggestion and/or coercion to cause witnesses for Mr. Buari to drop their involvement with his case.

## LIABILITY OF THE INDIVIDUAL DEFENDANTS

265.    All the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers, investigators prosecutors, supervisors, and employees, acting within the scope of their employment.

266.    The individual defendants, in committing the aforesaid conspiracies, acts, and omissions to act, were acting with actual malice; deliberately indifferent to; and in reckless disregard of, plaintiff's rights and thereby caused actual injuries to the plaintiff.

267.    The defendants, in committing the aforesaid acts, were acting as joint tortfeasors, described above, the individual defendants subjected the Mr. Buari to loss of liberty and other deprivations of constitutional rights, including, but not limited to, deprivation of the rights to due process of law and protection from pain and suffering, severe and permanent emotional injuries,

mental anguish as well as other psychological injuries, extreme emotional distress, shame, humiliation, indignity, damage to reputation, loss of earnings, and obliged them to pay for legal fees and expenses.

## DAMAGES

268.   The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the City and the NYPD and BCDAO Defendants caused Mr. Buari to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced Mr. Buari to serve nearly twenty-one years in jail and prison for a brutal crime he did not commit.

269.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Buari sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for nearly twenty-one years; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; loss of income;  humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

270.   Specifically, and as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Buari sustained physical injuries and damages, including: physical pain and suffering; personal injuries; infliction of physical illness; and inadequate medical care, for which he is entitled to monetary relief.

271.   When Calvin Buari was falsely arrested for this crime, he had a good ongoing

relationship with his girlfriend and other friends and had cordial ongoing relationships with various family members, including his mother and brother, all of which relationships were cut off, aside from occasional prison visits, for the remainder of his imprisonment for nearly twenty-one years.

272. Defendants' unlawful actions also caused Calvin Buari to suffer significant mental anguish; social stigma; restrictions on liberty; loss of property; interference with familial relationships; and financial burdens.

273. All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

### FEDERAL CLAIMS

### COUNT I
**42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola Does # 1-10, and Roes # 1-10*

274. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

275. Defendants Dietz, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Lung, Coddington, Does # 1-10, and Roes # 1-10, with malice and knowing that probable cause did not exist to arrest Mr. Buari and prosecute him for murdering the Harris brothers, acting individually and in concert, caused Mr. Buari to be arrested, charged, and prosecuted for that crime, thereby violating his clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures. Specifically:

      a. Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, and Does # 1-10, acting individually and in concert, fabricated evidence and intentionally withheld from

and misrepresented to prosecutors, Mr. Buari and his trial counsel, the grand jury, and the trial court exculpatory facts that vitiated probable cause against Mr. Buari and would have impeached witnesses for the prosecution at trial, including the fact that the identification of Mr. Buari as the murderer of the Harris brothers was the result of impermissible suggestion and/or coercion, and that the police had fabricated inculpatory evidence and withheld exculpatory and impeachment evidence.  These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to Mr. Robinson and away from Mr. Buari; and

b. Defendants Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola and Roes # 1-10, acting individually and in concert, substantially interfered with exculpatory evidence that vitiated probable cause against Mr. Buari and would have impeached evidence introduced by the prosecution at trial, including, but not limited to, the fact that the identification of Mr. Buari as the murderer of the Harris brothers was the result of impermissible suggestion and/or coercion, that the police had fabricated inculpatory evidence and withheld exculpatory and impeachment evidence, and that Mr. Robinson was the murderer of the Harris brothers.  These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to Mr. Robinson and away from Mr. Buari.

276.    The aforementioned Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Buari's clearly established constitutional rights.  No police officer or member of a district attorney's office would have believed this conduct was lawful after 1992.

43

277. Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated in Mr. Buari's favor in March 21, 2018 when the indictment was dismissed.

278. As a direct and proximate result of these Defendant's actions, Mr. Buari was for more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## <u>COUNT II</u>
**42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and Denial of Fair Trial by Fabricating Evidence and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman, Viggiano, Karen, Lung, Coddington, Mignola Does # 1-10, and Roes # 1-10*

279. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

280. Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola Does # 1-10, and Roes # 1-10, acting individually and in concert, deprived Calvin Buari of his clearly established constitutional fright under the Fourteenth Amendment of the United States Constitution, to a fair trial.  Specifically:

    a. Defendants Dietz, Tracy Price, Gottwin, Neenan, Fortune, and Does # 1-10 deprived Calvin Buari of his right to a fair trial by: fabricating inculpatory evidence and intentionally using unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications, including, but not limited to, fabricating the false identifications of Calvin Buari as the murderer by Mr. Robinson, Mr. Effort, Mr. Johnson, Mr. Seabrook, Mr. Holder, and Mr. Connor; withholding exculpatory and impeachment evidence from Mr. Buari and his counsel, including, without limitation, the circumstances of the witness interviews of Mr. Robinson, Mr. Effort, Mr. Johnson, Mr. Seabrook, Mr. Holder,

and Mr. Connor, which would have shown that the identifications of Mr. Buari were fabricated and/or the result of suggestion and coercion; and by deliberately failing to conduct a constitutionally adequate investigation in light of evidence pointing to Mr. Robinson and away from Mr. Buari;

b. Defendants Wall, Schiffman, Viggiano, Karen,, Lung, Coddington, Mignola and Roes # 1-10 deprived Mr. Buari of his right to a fair trial by: intentionally using impermissible suggestion and/or coercion to suppress exculpatory evidence, including causing Mr. Robinson to recant his confession of murdering the Harris brothers and dissuading eyewitness Ms. Damm from testifying on Plaintiff's behalf; withholding exculpatory and impeachment evidence from Mr. Buari and his counsel, including, but not limited to, a recorded prisoner telephone call in which Mr. Robinson admitted to murdering the Harris brothers; and by deliberately failing to conduct a constitutionally adequate investigation in light of evidence pointing to Mr. Robinson and away from Mr. Buari.

281.   These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Buari's clearly established constitutional right to be free from deprivation of liberty without due process of law.

282.   Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated in Mr. Buari's favor on March 21, 2018 when the indictment was dismissed.

283.   As a direct and proximate result of these defendant's actions, Mr. Buari spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III
### 42 U.S.C. § 1983 Failure to Intercede
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

284.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further

alleges as follows:

285.    By their conduct and under color of state law, Defendants Dietz, Tracy, Price,

Gottwin, Neenan, Fortune, Wall, Shiffman, Viggiano, Karen, Lung, Coddington, Mignola, Does

# 1-10, and Roes # 1-10, had opportunities to intercede on behalf of Mr. Buari to prevent his false

arrest, malicious prosecution, false imprisonment, deprivation of liberty without due process of

law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or

refused to do so.

286.    These Defendants' failures to intercede violated Mr. Buari's clearly established

constitutional right to be free from unreasonable search and seizure and not to be deprived of

liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No

reasonable police officer or ADA in or after 1992 would have believed that failing to intercede to

prevent these Defendants from fabricating inculpatory evidence, intentionally using unduly direct

suggestion and/or coercion to obtain witness identifications, withholding material, exculpatory

and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate

investigation, and causing Mr. Buari to be arrested and prosecuted without probable cause, were

lawful.

287.    Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution

finally terminated in Mr. Buari's favor on March 21, 2018 when the indictment was dismissed.

288.    As a direct and proximate result of these defendant's actions, Mr. Buari spent more than two decades wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT IV**
**42 U.S.C. § 1983 Civil Rights Conspiracy**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune,*
*Viggiano, Shiffman, Karen, Does # 1-10, and Roes # 1-10*

289.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

290.    Detectives Dietz, Tracy, Price, Gottwin, Neenan, Fortune, and Does # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including ADA Karen, Mr. Griffiths, Mr. Robinson, Mr. Effort, Mr. Johnson, Mr. Seabrook, Mr. Holder, and Mr. Connor to act in concert in order to deprive Mr. Buari of this clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

291.    In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Falsely arresting and imprisoning Mr. Buari, knowing that they lacked probable cause;

b.    Fabricating inculpatory evidence in reports, witness statements and pretrial communications with the prosecution, including the purportedly independent identifications of Mr. Buari;

c.    Committing perjury during hearings and at trial;

d.    Eliciting false testimonies to implicate Mr. Buari; and

e.   Intentionally or with deliberate indifference, failing to comply with their duty to disclose *Brady* material during the pendency of the case.

292.   Defendants Viggiano, Schiffman, Wall, and Roes # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including ADA Karen and Mr. Robinson, to act in concert in order to deprive Mr. Buari of his clearly established Fourth and Fourteenth Amendment right to be free from malicious prosecution, false imprisonment, deprivation of liberty without due process, and to a fair trial.

293.   In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.   Fabricating inculpatory evidence in reports and pre-hearing communications with the prosecution, including the purportedly independent recantation of Mr. Robinson's confession to murdering the Harris brothers;

b.   Committing perjury and/or soliciting perjury from witnesses during a hearing; and

c.   Intentionally or with deliberate indifference, failing to comply with their duty to disclose *Brady* material during the pendency of the case.

294.   Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated on March 21, 2018, when the indictment was dismissed.

295.   As a direct and proximate result of these defendant's actions, Mr. Buari spent several years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V
### 42 U.S.C. § 1983 Supervisory Liability
*Against DA Darcel Clark and ADA Mignola*

296.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

297.    The individual defendants ADA Lung, ADA Coddington, and/or BCDAO investigators Roes # 1-10, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendants Clark, Mignola and other supervisors, in this case and as a matter of practice.

298.    Defendants Clark, Mignola, and other supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant BCDAO ADAs and BCDAO investigators, and thereby caused the individual defendant ADAs and Investigators to deprive Mr. Buari of his clearly established constitutional rights, including his rights to be free from malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

299.    Had Defendants Clark, Mignola and other supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers, these defendants would not and should not have unduly used direct suggestion to prevent witnesses from testifying for Mr. Buari and intentionally and maliciously caused Mr. Buari to continue to be maliciously prosecuted without probable cause. Defendants Clark, Mignola and other supervisors were directly involved in the investigation of Mr. Buari and directly supervised the specific investigative acts taken by the individual BCDAO ADAs and Investigators in this case.

300.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Clark, Mignola and other supervisors under color of state law violated their clearly established duty, in 2015, to supervise defendants ADA Lung, ADA Coddington, and Roes # 1-10,  and no reasonable ADA supervisor in 2015 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate ADAs and Investigators was lawful.

301.    Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated on March 21, 2018, when the indictment was dismissed.

302.    As a direct and proximate result of these defendant's actions, Mr. Buari spent several years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT VI
### 42 U.S.C. § 1983 *Monell* Claim
*Monell* **Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal and Unconstitutional Investigative Techniques and Failure to Supervise, Disciple, and Train**
*Against Defendant City of New York for the Actions and Omissions of the Police Officer Defendants and the NYPD*

303.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

304.    Members of the NYPD, including Detectives Dietz, Tracy, Price, Gottwin, Neenan, Fortune, and other 47th Precinct Detectives, violated Mr. Buari's constitutional rights by coercing false testimony and fabricating false evidence to cause Mr. Buari to be falsely arrested, maliciously prosecuted, and wrongfully convicted.

a.   On or about March 22, 1993, members of the NYPD including Detectives Dietz, Tracy and other 47th Precinct Detective coerced Mr. Griffiths into giving false testimony that Mr. Buari was the person who murdered the Harris brothers.

b.   After Mr. Griffiths fled the country to avoid further coercion by the NYPD, members of the NYPD, including Detectives Price, Gottwin, Neenan, Fortune, and other Detectives from the 47th Precinct coerced other witnesses into giving false testimony that Mr. Buari was the person who murdered the Harris brothers, including Mr. Robinson, Mr. Connor, Mr. Seabrook, Mr. Johnson, Mr. Holder, and Mr. Effort.

c.   In and about October 1995, members of the NYPD, including Detectives Price, Gottwin, Neenan, Fortune, and other Detectives from the 47th Precinct further coerced witnesses, including Mr. Robinson, Mr. Connor, Mr. Seabrook, Mr. Johnson, Mr. Holder, and Mr. Effort, to falsely testify at Mr. Buari's trial to cause Mr. Buari to be falsely convicted.

305.   The foregoing violations of Mr. Buari's constitutional rights and his resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Buari, subject to arrest by the NYPD, namely:

a.   The NYPD's institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning:

i.   The duty not to initiate an arrest and prosecution that is not based on probable cause;

ii. The duty not to coerce, create or to otherwise use false, misleading or unreliable evidence, testimony, statements or arguments during criminal proceedings;

iii. The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument whenever such misconduct is discovered to have occurred;

iv. The continuing obligation to timely and fully disclose material favorable to the defense as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and their progeny; and

b. The NYPD's deliberate indifference to the need (of which it has failed) to adequately instruct train, supervise, and discipline its employees with respect to such matters.

306. The aforesaid deliberate or de facto policies, procedures, regulations, practices and customs, including the failure to properly instruct, train, supervise, and discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including the NYPD and its delegates, who knew:

a. To a moral certainty that such policies, procedures, regulations, practices and customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. That such issues present police employees with difficult choices of the sort that instruction, training, supervision, and discipline will make correct choices less difficult and incentivize making correct choices;

52

c. That the making of wrong choices by police employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him or her constitutional injury; and

d. That employees of the NYPD had demonstrated a long history of making wrong choices in such matters.

307. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

a. Numerous credible allegations, many of which were substantiated by judicial decisions, that the NYPD had:

v. Participated in coercing and/or manufacturing of false testimony or evidence;

vi. Presented false and/or misleading evidence to prosecutors and/or at hearings and at trial, and failed to correct such false and/or misleading evidence;

vii. Failed to disclose information favorable to a defendant that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

b. The inherent obviousness of the need to train, supervise, and discipline members of the NYPD in their aforementioned constitutional obligations to counteract the inherent pressure on police officers to make arrests and obtain convictions.

308. Evidence of the NYPD's deliberate indifference to police misconduct violative of a criminal suspects' and defendants' constitutional rights, including the coercion of false or

53

misleading statements, fabrication of evidence, and withholding information favorable to the

defense was evidenced by The Report of the Commission to Investigate Allegations of Police

Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"),

dated July 7, 1994, states:

> In the face of this problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training, and recruitment.
>
> For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.
>
> Mollen Commission Report, p. 2-3.

a. Accordingly, in 1990, the Office of Special Prosecutor, which investigated

charges of police corruption was abolished.

b. The Mollen Commission concluded that police perjury and falsification of

official records is probably the most common form of police corruption facing

the criminal justice system…

> …Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their

supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them,

…What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

309.    Furthermore, since at least 1984, defendant City and the NYPD have been on notice inadequate and that police officers joining the force, including, upon information and belief, individual defendant police officers herein, were disproportionately involved in misconduct and abuse. *See, e.g.,* Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

a.  The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations.

b.  Prior to July 1993, the CCRB, which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity.

c.  During the 1980s, the early 1990s, and in and about the time frame of the Buari investigation, the CCRB received numerous complaints of police misconduct,

but failed fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases.

d. On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received.

e. The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

f. On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases.

g. Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

h. Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992.

i. The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

j.  More than $82 million was paid in damages to victims of police misconduct in 1352 cases between 1992 and 1995.

k.  In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, defendant City imposes no discipline, either before or after resolution in court, almost never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

l.  Former New York City Police Commission Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho more and prejudices, its cover-ups and silence, is reinforced every day in every way."

310.  Thus, police officers were incentivized to violate the constitutional rights of people and criminal defendants, since they knew they were likely to be rewarded for making arrests and securing convictions but would suffer no negative consequences if it ever became known that they were violating the rights of the people and defendants they were causing to be arrested and prosecuted.

311.  Police officers were emboldened to violate basic constitutional provisions protecting criminal suspects' and defendants' constitutional right to a fair trial by their knowledge that the NYPD and BCDAO were willing to pursue or tolerate policies, customs, and practices that brazenly violated criminal suspects' and defendants' fundamental constitutional rights.

312.  The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations  of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Mr. Buari's constitutional rights beginning with his false arrest and the initiation of

a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings and trial.

313.    The aforesaid policies, procedures, regulations, practices, and customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Buari's rights under the Constitution and Laws of the United States and in causing his damages.

314.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining police personnel regarding their conduct enforcing the laws of the State of New York, including but not limited to, their obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence, testimony mad argument during pretrial and trial proceedings, and to correct such false or misleading evidence, testimony, and argument when they become aware of it.

315.    The City's Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to the NYPD's performance of its duties.

316.    The City's Police Commissioner, personally and/or through his authorized delegates, at all relevant times, had final authority and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

317.    During all times material to this Amended Complaint, the City, through its policymakers, owed a duty to the public at large and to Mr. Buari, which such policymakers

knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

318.   The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the individual Police Defendants of Mr. Buari's rights under the Constitution and laws of the United States.

319.   By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Mr. Buari's constitutional rights and his resultant injuries.

**<u>COUNT VII</u>**
**42 U.S.C. § 1983 *Monell* Claim**
*(Against Defendant City of New York for the Actions and Omissions*
*of the Bronx County District Attorney's Office)*

320.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

321.   Beginning on or about March 22, 1993, members of the BCDAO violated Mr. Buari's constitutional rights by initiating a prosecution against him for the September 10, 1992 murder of the Harris brothers without having probable cause to do so.

m. The BCDAO had no evidence directly linking Mr. Buari to the September 10, 1992 murders.

n. The only evidence the BCDAO had regarding Plaintiff was the false, misleading, and unreliable statements of Mr. Griffiths that had been coerced by the 47th Precinct detectives because of their animus for Mr. Buari and desire to close the case.

o. The BCDAO was also aware that Mr. Griffith's statement against Mr. Buari was directly contradicted by Mr. Griffith's girlfriend, whose evidence suggested that the actual murderer of the Harris brothers was Mr. Robinson, the "Yankee guy" who was a drug dealing associate of Mr. Griffiths.

p. The BCDAO made no effort to correct Mr. Griffith's false, inaccurate, incomplete, and misleading statements against Mr. Buari.

q. But for the BCDAO's improper conduct in initiating a criminal prosecution against Mr. Buari without probable cause, Mr. Buari would not have been falsely imprisoned and maliciously prosecuted.

322.   On or about March 26, 1993, the BCDAO further violated Mr. Buari's constitutional rights by securing a grand jury indictment against him that was not based on probable cause.

a. At Mr. Buari's grand jury hearing, the prosecution knowingly elicited the false, misleading, and unreliable statements from Mr. Griffiths that had originally been coerced by the 47th Precinct detectives implicating Mr. Buari in the murder of the Harris brothers.

b. The prosecution intentionally did not put before the grand jury evidence in their possession that directly negated Mr. Buari's guilt and that established Mr. Robinson was the person that had murdered the Harris brothers.

c. The prosecution's actions at Mr. Buari's grand jury hearing violated its duty of fair dealing to the accused and candor to the courts and caused Mr. Buari to be indicted without probable cause and on evidence that the BCDAO knew to be false.

    d.   But for the prosecution's improper conduct at Mr. Buari's grand jury hearing in presenting and failing to correct false testimony by Mr. Griffiths, as well as failing to introduce evidence that directly negated Mr. Buari's guilt, the grand jury would not have voted to indict Mr. Buari and Mr. Buari would not have continued to be falsely imprisoned and maliciously prosecuted.

323.    On or about October 3, 1995, the BCDAO further violated Mr. Buari's rights by securing a decision that found the identification of Mr. Buari as the murderer of the Harris brothers by several witnesses to be valid based when the BCDAO knew that the witnesses' testimony was false and coerced.

    a.   The pretrial hearing was held to test the identification process by which the witnesses, which the BCDAO had assembled after Mr. Griffiths' disappearance, had identified Mr. Buari as the murderer of the Harris brothers.

    b.   During the hearing, ADA Karen knowingly elicited false testimony from Mr. Robinson and 47th Precinct Detectives, including Detectives Price, Fortune, and Neenan, that Mr. Buari became a suspect for the Harris brothers' murder after interviewing Mr. Robinson in an unrelated criminal investigation.

    c.   ADA Karen knowingly elicited false testimony that Mr. Robinson was in fear for his life because Mr. Buari was trying to kill him.

    d.   ADA Karen and his witnesses did not inform the court that Mr. Robinson had been brought in for questioning by the 47th Precinct detectives for the attempted murder of Mr. Buari.

    e.   The court was also not presented with, and did not consider, evidence that police and prosecutors had coerced Mr. Robinson and his associates to falsely testify

against Mr. Buari by, for example, promising Mr. Robinson that he could operate his drug operations in the precinct without "heat" from the police for testifying against Mr. Buari, and threatening to charge Mr. Effort as an accessory to the murders if he did not testify against Mr. Buari.

f.   But for the prosecution's improper conduct at the pretrial hearing in knowingly coercing false testimony, presenting false evidence at the hearing, and failing to correct the false testimony, the court would have denied the prosecution's application to permit identification testimony at trial and the case against Mr. Buari would have been dismissed.

324.   On or about October 11, 1995, the BCDAO further violated Mr. Buari's rights by causing his wrongful conviction through eliciting false testimony and withholding exculpatory evidence.

a.   During Mr. Buari's trial, the prosecution introduced false testimony against Mr. Buari from Mr. Robinson and his drug-dealing associates, Mr. Seabrook, Mr. Holder, Mr. Connor, Mr. Johnson, and Mr. Effort.

b.   The prosecutor was aware that admitting this false testimony would violate Mr. Buari's constitutional rights, but the prosecutor elicited the testimony anyway.

c.   The false testimony given by Mr. Robinson and his drug-dealing associates, was the only evidence against Mr. Buari at trial.

d.   The prosecution also concealed material evidence at trial so that the jury would not learn that the BCDAO and Detectives from the 47th Precinct had improperly coerced Mr. Robinson and his drug-dealing associates, to give false testimony implicating Mr. Buari in the murder of the Harris brothers.

e.  The aforementioned conduct of the BCDAO ADAs in knowingly presenting, and failing to correct, false testimony at trial, failing to disclose information favorable to the defense prior to or during the trial, and knowingly eliciting false testimony, violated Mr. Buari's constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

325.  On or about November 17, 2014, the BCDAO further violated Mr. Buari's rights by causing the denial of his motion to vacate his conviction through eliciting false testimony and withholding exculpatory evidence.

a.  When the BCDAO learned that Mr. Buari was seeking to have his conviction overturned based, *inter alia*, on Mr. Robinson's and Mr. Effort's testimony that the prosecution had caused them to testify falsely at Mr. Buari's trial and that Mr. Robinson was the actual murderer of the Harris brothers, investigators visited these witnesses and their families to coerce the witnesses into recanting their exculpatory statements.

b.  The prosecution additionally withheld exculpatory evidence from the court, including a recorded telephone call from Mr. Robinson to Mr. Harris in which Mr. Robinson admitted to murdering the Harris brothers.

c.  The aforementioned conduct of the BCDAO personnel violated Mr. Buari's constitutional rights and caused him to remain wrongfully imprisoned.

326.  The foregoing violations of Mr. Buari's constitutional rights and his resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable

to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Buari, subject to prosecution by the BCDAO, namely:

    a. The BCDAO's institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning:

        viii. The duty not to initiate a criminal prosecution that is not based on probable cause;

        ix. The duty not to create or to otherwise use false, misleading or unreliable evidence, testimony, statements or arguments during criminal proceedings;

        x. The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument whenever such misconduct is discovered to have occurred;

        xi. The continuing obligation to timely and fully disclose material favorable to the defense as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny; and

    b. The BCDAO's deliberate indifference to the need (of which it has failed) to adequately instruct train, supervise, and discipline its employees with respect to such matters.

327. The aforesaid deliberate or de facto policies, procedures, regulations, practices and customs, including the failure to properly instruct, train, supervise, and discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including the Bronx County District Attorney and his delegates, who knew:

64

a. To a moral certainty that such policies, procedures, regulations, practices and customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make correct choices less difficult and incentivize making correct choices;

c. That the making of wrong choices by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him or her constitutional injury; and

d. That employees of the BCDAO had a long history of making wrong choices in such matters.

328. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

a. Numerous credible allegations, many of which were substantiated by judicial decisions (some of which are listed in Exhibit A, attached hereto and incorporated by reference), that the BCDAO ADAs had:

xii.  Participated in the manufacturing of false testimony or evidence;

xiii.  Presented or failed to correct false or misleading testimony and argument;

xiv.  Failed to disclose information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York; and

b. The inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

329. At the time of Plaintiff's prosecution, the Bronx County District Attorney's indifference to the aforementioned types of prosecutorial misconduct was evidenced by his failure to: conduct internal disciplinary investigations; discipline the prosecutors who were known to engage in such misconduct (including the prosecutors responsible for the misconduct found in the judicial decisions listed in Exhibit A); or refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees.

330. Instead of disciplining such prosecutors for the aforementioned types of prosecutorial misconduct, the Bronx County District Attorney's policy, custom, or practice was to give them raises, promotions and commendations, based in part on their record of securing indictments, winning at trial and extracting guilty pleas, even in weak cases or cases (like Mr. Buari's) where reasonable grounds did not exist to believe the defendant committed the offense charged.

331. Thus, prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequences if it ever became known that they were violating the rights of the defendants they were prosecuting.

332. Further encouraging prosecutors to win at any cost was their knowledge that the BCDAO had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions.

333.     Indeed, prosecutors were emboldened to violate basic constitutional provisions protecting criminal defendants' constitutional right to a fair trial by their knowledge that the Bronx County District Attorney's was willing to pursue or tolerate policies, customs, and practices that brazenly violated criminal defendants' fundamental constitutional rights.

334.     Evidence of the Bronx County District Attorney's deliberate indifference to prosecutorial misconduct violative of a criminal defendants' constitutional rights, including the making of false or misleading arguments to a jury, and withholding information favorable to the defense was uncovered during the civil rights litigation in *Ramos v. City of New York*, 285 A.D.2d 284 (1st Dept 2001), a case involving the wrongful conviction of a young man due to the knowing use of false evidence and argument and *Brady* violations.  During that litigation, discovery of BCDAO personnel records, together with deposition testimony, showed that in approximately 72 cases where courts had found prosecutorial misconduct occurred (including the use of and failure to correct false or misleading testimony and *Brady* violations), officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect for misbehavior while prosecuting a criminal case.  Discovery also revealed that that the BCDAO had no meaningful disciplinary policy, procedure, training, or practice: and that the BCDAO trained prosecutors in blatantly unlawful practices to prevent disclosure of evidence favorable to criminal defendants under *Brady*.

335.     Further evidence of the Bronx County District Attorney's deliberate indifference to prosecutorial misconduct was uncovered in the companion lawsuits *Poventud v. City of New York,* 07 Civ. 3998 (DAB)(THK) (U.S.D.C. S.D.N.Y.) and *Maldonado v. City of New York*, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed June 14, 2004), which also involved the knowing use of false evidence and argument and committing *Brady* violations by the BCDAO.  Counsel in these cases

reviewed personnel files for BCDAO cases where prosecutor misconduct had been found from between 1989 through 2006 and did not discover any documentary evidence of disciplinary action ever being taken against the prosecutors.

336.     The discovery obtained in the *Ramos, Poventud,* and *Maldonado* lawsuits is summarized in Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 544-558 (2011) (copy attached as Exhibit B), which is incorporated herein by reference.  Notwithstanding the disclosure and recognition of the unconstitutional prosecutorial practices of the BCDAO that resulted from those cases, the Bronx County District Attorney's deliberately indifferent policies, customs, and practices continued.

337.     The Bronx County District Attorney's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Mr. Buari's constitutional rights beginning with the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings and trial.

338.     The aforesaid policies, procedures, regulations, practices, and customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Buari's rights under the Constitution and Laws of the United States and in causing his damages.

339.     Under the principles of municipal liability for federal civil rights violations, the Bronx County District Attorney (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in his office

regarding their conduct in the prosecution of criminal matters, including but not limited to, their obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence, testimony mad argument during pretrial and trial proceedings, and to correct such false or misleading evidence, testimony, and argument when they become aware of it.

340.    The Bronx County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to his Office's performance of its duties.

341.    The Bronx County District Attorney, at all relevant times, was and is an elected officer of Bronx County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

342.    The Bronx County District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2; New York has provided by statute (New York County Law §§ 53, 941) that Defendant City's constituent counties (including Bronx County), and hence Defendant City has liability for torts committed by County officers and employees, such as the Bronx County District Attorney and his assistants, and Defendant City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

343.    The Bronx County District Attorney personally and/or through his authorized delegates, at all relevant times, had final authority and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

344.     During all times material to this Amended Complaint, the City, through its policymakers, owed a duty to the public at large and to Mr. Buari, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

345.     By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Mr. Buari's constitutional rights and his resultant injuries.

## STATE LAW CLAIMS

### COUNT VIII
**Malicious Prosecution**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

346.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

347.     Defendants Dietz, Tracy, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10, despite knowing that probable cause did not exist to prosecute Mr. Buari for murdering the Harris brothers, intentionally, recklessly, and with malice caused Mr. Buari to be prosecuted and convicted for this crime. Furthermore, these Defendants intentionally concealed and misrepresented to prosecutors, grand jurors, the trial court, and courts of post-conviction hearings facts that further vitiated probable cause against Mr. Buari, including the facts that the statements concerning Mr. Buari purportedly made by Mr. Griffiths, Mr. Robinson, Mr. Connor, Mr. Johnson, Mr. Seabrook, Mr. Holder, and Mr. Effort were the product of unduly suggestive identification and/or direct suggestion and/or coercion.

348. Mr. Buari is completely innocent of murdering the Harris brothers. The prosecution finally terminated in Mr. Buari's favor on March 21, 2018 when the indictment was dismissed.

349. As a direct and proximate result of these Defendant's actions, Mr. Buari spent several years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT IX**
**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

350. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

351. The improper, deliberate, and traumatizing conduct of Defendants Dietz, Tracy, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10 in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution conviction, incarceration, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

352. In the alternative, Defendants Dietz, Tracy, Price, Gottwin, Fortune, Wall, Schiffman, Viggiano, Karen,  Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10 negligently and grossly negligently, and in breach of their duties owed to Mr. Buari to, *inter alia,* to refrain from using suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false witness statements, refrain from substantially and unlawfully interfering with the defendant's right to call witness, and otherwise act to deny Mr. Buari due process of law, directly and proximately caused Mr. Buari to be maliciously prosecuted, and wrongly imprisoned for nearly twenty-one years. Defendants' actions unreasonably

endangered Mr. Buari's physical health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration.

353.    These Defendants engaged in these acts within the scope of their employment.

354.    These claims are tolled as these Defendants concealed from Mr. Buari – and still are concealing to this day – their conduct giving rise to this cause of action.

## COUNT X
### *Respondeat Superior* Claim
*Against Defendant City of New York*

355.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

356.    At all times relevant to this Complaint, Defendants Price, Gottwin, Fortune, Wall, Dietz, Viggiano, Karen, Lung, Coddington, and Mignola, acted as agents of the City, in furtherance of the business, including law enforcement functions, of the City, and within the scope of their employment or agency with the City.

357.    The conduct by which the Police Defendants committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Defendant's personal motives, but rather was undertaken while the Defendants were on duty, carrying out their routine investigative functions as detectives, investigators, and police officers.

358.    Under the doctrine of *respondeat superior,* the City is liable for their agents' state law torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, and negligence.

<u>**COUNT XI**</u>
**New York State Constitution**
*Against Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Wall, Shiffman,*
*Viggiano, Karen, Lung, Coddington, Mignola, Does # 1-10, and Roes # 1-10*

359.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further

alleges as follows:

360.     The conduct of Defendants Price, Gottwin, Fortune, Wall, Dietz, Viggiano, Karen,

Lung, Coddington, Mignola, described above, also violated Mr. Buari's rights under the New York

State Constitution, Article I §§ 6 to due process of law.

361.     Mr. Buari is completely innocent of the murdering of the Harris brothers. The

prosecution finally terminated in Mr. Buari favor on March 21, 2018, when the indictment was

dismissed.

362.     As a direct and proximate result of these Defendants' actions, Mr. Buari was

wrongly imprisoned for nearly twenty-one years and suffered other grievous and continuing

damages and injuries set forth above.

363.     Defendant City is liable under *respondeat superior* for the actions of its employees

within the scope of their employment.

**WHEREFORE**, Mr. Buari prays as follows:

(a)     That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

(b)     That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

(c)     For a trial by jury;

(d)     For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)     For any and all other relief to which he may be entitled.

Dated:     New York, New York
           November 11, 2019                    /s/Marc A. Cannan
                                                Marc A. Cannan (MC 0513)
                                                BELDOCK LEVINE & HOFFMAN LLP
                                                99 Park Avenue, 26th Floor
                                                New York, New York 10016
                                                (212) 490-0400

                                                /s/Oscar Michelen
                                                Oscar Michelen (OM 5199)
                                                CUOMO LLC
                                                200 Old Country Road
                                                Mineola, New York 11501
                                                (516) 741-3222

                                                *Attorneys for Plaintiff Calvin Buari*