UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/2021

CALVIN BUARI,

                    Plaintiff,

-against-

CITY OF NEW YORK; ANDREW DIETZ, New York City
Police Department Detective; FNU TRACY, New York City
Police Department Detective; VINCENT PRICE, New York
City Police Department Detective; EUGENE GOTTWIN,
New York City Police Department Detective; JOSEPH
NEENAN, New York City Police Department Detective;
CHRISTINE FORTUNE, New York City Police
Department Detective; JOHN WALL, Bronx County
District Attorney's Office Investigator; FNU SCHIFFMAN,
Bronx County District Attorney's Office Investigator;
FRANK VIGGIANO, Bronx County District Attorney's
Office Investigator; ALLEN KAREN, Bronx County
District Attorney's Office Assistant District Attorney;
FELICITY LUNG, Bronx County District Attorney's Office
Assistant District Attorney; PETER CODDINGTON, Bronx
County District Attorney's Office Assistant District
Attorney; GINA MIGNOLA, Bronx County District
Attorney's Office Assistant District Attorney; JOHN
AND/OR JANE DOES #1–10, who are currently unknown
members of the New York City Police Department; and
RICHARD AND/OR RACHEL ROES #1–10, who are
currently unknown members of the Bronx County District
Attorney's Office,

                    Defendants.

1:18-cv-12299-MKV

OPINION AND ORDER
GRANTING IN PART
AND DENYING IN PART
DEFENDANTS'
MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

In October 1995, a New York State Supreme Court jury convicted Plaintiff Calvin Buari

("Buari") of two counts of murder in the second degree in connection with a 1992 double homicide

in the Bronx, New York, based solely on the testimony of alleged witnesses. Buari was sentenced

to consecutive indeterminate terms of imprisonment of twenty-five years to life. In May 2017, a

judge vacated Buari's conviction pursuant to New York Criminal Procedure Law Section

1

440.10(1)(g) and ordered a new trial.  The Bronx District Attorney's Office ("Bronx DA") declined to retry Buari and dismissed his indictment in March 2018.  Buari has always maintained his innocence.

In December 2018, Buari commenced this action against the City of New York ("City"); New York City Police Department ("NYPD") Detectives ("Det.") Andrew Dietz, Fnu Tracy, Vincent Price, Eugene Gottwin, Joseph Neenan, and Christine Fortune, (collectively, the "NYPD Defendants"); Bronx County Assistant District Attorneys ("ADA") Allen Karen, Felicity Lung, Peter Coddington, and Gina Mignola (collectively, the "ADA Defendants"); Investigators Frank Viggiano, Stanley Schiffman, and John Wall (collectively, the "Investigator Defendants"); John and/or Jane Does #1–10, who are unidentified officers, detectives, supervisors, and other agents and employees of the NYPD ("Does #1–10"); and Richard and/or Rachel Roes #1–10, who are unidentified investigators, agents, and employees of the Bronx DA's Office ("Roes #1–10").  (Am. Compl. ¶¶ 23–36 [ECF No. 58].)[1]  Buari brings claims under 42 U.S.C. § 1983 and New York State law for malicious prosecution, due process violations, failure to intercede, conspiracy, supervisory liability, municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *respondeat superior*.  (*Id.* ¶¶ 274–363.)  Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Mot. Dismiss ("Mot.") [ECF No. 61].)

Buari alleges serious misconduct by members of the NYPD and the Bronx DA's Office. Until proven at trial with competent evidence, Buari's allegations of course remain unproven allegations.  Some of Buari's claims may ultimately be difficult to prove.  But at this early stage in the litigation, the Court is constrained to accept Buari's allegations as true and to draw all

---

[1] It appears Buari also seeks to assert a claim against Bronx District Attorney Darcel Clark ("DA Clark"). (Am. Compl. ¶¶ 296–302.) But DA Clark is not named in the case caption, *see* Fed. R. Civ. P. 10(a) (noting that the "title of the complaint must name all the parties"), and there is no proof of service on the docket as to DA Clark. Nevertheless, given Plaintiff's clear intent to assert a claim against DA Clark, the Court addresses it below.

reasonable inferences in Buari's favor.  For the reasons discussed below, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    Factual Background[2]

#### A.  The Underlying Crime and Investigation

On September 10, 1992, at approximately 9:00 p.m., Buari was walking through his neighborhood, the Wakefield section of the Bronx, to visit a friend.  (Am. Compl. ¶¶ 37–40.)  As he crossed the intersection of 213th Street and Bronxwood Avenue, Buari saw Dwight Robinson ("Robinson") and his brother Peter.  (*Id.* ¶ 41.)  Buari met his friend near the intersection.  (*Id.* ¶ 43.)  As they were talking, they heard gunshots.  (*Id.* ¶ 45.)  They ran down 213th Street (*id.* ¶ 46), but later returned to the intersection to see what had happened (*id.* ¶ 48).  Buari learned that two males, the Harris brothers, had been shot and killed while sitting in a white BMW (the "Harris Murders").  (*Id.* ¶ 51.)

Police officers of the 47th Precinct secured the crime scene, but failed to locate any eyewitnesses.  (*Id.* ¶¶ 54–56.)  They eventually located a witness who claimed to have observed Kintu Effort ("Effort") and another individual fleeing the scene.  (*Id.* ¶ 58.)  On November 4, 1992,

---

[2] The following facts are taken from the Amended Complaint. On the pending Motion, the Court is "constrained to accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006) (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)); *accord Oakley v. Dolan*, 980 F.3d 279, 283 (2d Cir. 2020); *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017).

Buari requests that the Court strike the statement of facts from Defendants' brief because it "improperly assert[s] facts not alleged in the [Amended Complaint]" and "improperly rel[ies] on material outside the [Amended Complaint]." (Mem. Law Opp. ("Opp.") 7–8 [ECF No. 65].) The Court declines to address this matter because the Court does not rely on Defendants' account of the facts. *See Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) (second alteration in original) ("[A] district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." (first quoting *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991); then citing *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988))).

Det. Dietz interviewed Effort, who stated that he did not see who committed the Harris Murders. (*Id.* ¶¶ 59–61.)

On January 29, 1993, police arrested Alrick Griffiths, a drug-dealing associate of Robinson, for possession of narcotics and a loaded handgun. (*Id.* ¶¶ 63–65.) Suspecting that Griffiths was involved with the Harris Murders, Det. Dietz tried to find evidence linking him to the crime. (*Id.* ¶ 66.) Finding no such evidence, Det. Dietz sought to coerce Griffiths into implicating someone else by spreading a false rumor that Griffiths was a "snitch" and "talked to police." (*Id.* ¶ 41.) As the rumor spread, Griffiths' girlfriend visited the 47th Precinct and advised Det. Dietz that Griffiths was at the 213th Street and Bronxwood Avenue intersection when one of the "Yankee guys that deal crack shoot [sic] two guys in the head who were sitting in a pretty white BMW." (*Id.* ¶ 69.)

On March 22, 1993, Buari was arrested for marijuana possession. (*Id.* ¶ 71.) Det. Tracy attempted to elicit from him information about recent criminal activity in the 47th Precinct. (*Id.* ¶¶ 72–73.) Buari declined to offer any information. (*Id.* ¶ 74.)

Knowing Buari lived near the 213th Street and Bronxwood Avenue intersection, Dets. Dietz and Tracy coerced Griffiths into falsely implicating Buari for the Harris Murders. (*Id.* ¶ 76.) In exchange for his false testimony, Dets. Dietz and Tracy offered Griffiths favorable treatment, leniency, and release from custody. (*Id.* ¶ 77.) As a result of Griffiths' false statements, Buari was arrested for the Harris Murders. (*Id.* ¶ 78.)

### B. Buari's Prosecution

The Bronx DA began prosecuting Buari for the Harris Murders based solely on Griffiths' statements. (Am. Compl. ¶ 82.) On March 26, 1993, a grand jury indicted Buari on charges of second-degree murder, first-degree manslaughter, first-degree criminal use of a firearm, and second- and third-degree criminal possession of a weapon. (*Id.* ¶ 85.)

Buari retained counsel, Kenneth Schreiber, Esq., who investigated the charges and discovered several witnesses, including Robinson, Effort, Clarence Lamont Seabrook ("Seabrook"), and Jerry Connor ("Connor").  (*Id.* ¶ 88.)  These witnesses advised Schreiber that Buari did not commit the Harris Murders.  (*Id.* ¶ 90.)  The Bronx DA offered Buari a plea bargain of three years' imprisonment on the murder charges (*id.* ¶ 92), but Buari rejected the offer, maintaining his innocence (*id.* ¶ 93).  He was later released on bail.  (*Id.* ¶ 94.)

In the summer of 1995, drug violence in the 47th Precinct intensified.  (*Id.* ¶¶ 95–97.) Robinson's brother, Peter, was murdered that summer.  (*Id.* ¶ 98.)  Believing Buari was involved, Robinson attempted to kill him by shooting at him while he was sitting in a parked car.  (*Id.* ¶¶ 99–100.)  Buari survived the attack but sustained serious injuries.  (*Id.* ¶ 101.)  Police took Robinson into custody.  (*Id.* ¶ 102.)

Dets. Price, Gottwin, Neenan, and Fortune met with Robinson to discuss the drug violence in the 47th Precinct.  (*Id.* ¶ 103.)  The detectives proposed allowing Robinson to operate his drug trade without interference, or "heat," from the police if he implicated Buari for the Harris Murders. (*Id.* ¶¶ 108–09.)  Robinson accepted and agreed to testify against Buari.  (*Id.* ¶ 110.)  Dets. Price, Gottwin, Neenan, and Fortune advised ADA Alan Karen, the lead prosecutor on Buari's case, of this arrangement.  (*Id.* ¶ 111.)  Those detectives, together with ADA Karen, then coerced Robinson's drug-dealing associates Connor, Seabrook, Johnson, and Kenya Holder ("Holder"), to implicate Buari falsely.  (*Id.* ¶¶ 113, 115.)  The Bronx DA offered Connor, Seabrook, and Holder recommendations for leniency for open drug and weapon charges in exchange for their testimony. (*Id.* ¶ 114.)  Dets. Price, Gottwin, Neenan, and Fortune and ADA Karen also coerced Effort into falsely implicating Buari by threatening to charge him as an accessory to the Harris Murders and offering him leniency on his current prison sentence.  (*Id.* ¶¶ 118–20.)

At a suppression hearing, Dets. Price, Fortune, and Neenan falsely testified that Buari became a suspect after they interviewed Robinson, who claimed Buari was trying to kill him. (*Id.* ¶ 121.) The detectives did not testify to the arrangements with Robinson and the other witnesses. (*Id.* ¶ 125.) The judge denied Buari's request to suppress Robinson's identification of him. (*Id.* ¶ 126.)

In October 1995, Buari was tried before a jury and convicted of two counts of second-degree murder. (*Id.* ¶¶ 127, 138.) The only evidence linking him to the Harris Murders was the testimony of Robinson, Seabrook, Holder, Connor, Johnson, and Effort. (*Id.* ¶ 128.) At trial, ADA Karen elicited the testimony from the witnesses but did not disclose the leniency arrangements with them. (*Id.* ¶¶ 129–37.) Buari was sentenced to consecutive indeterminate terms of imprisonment from twenty-five years to life. (*Id.* ¶ 138.)

In June 1997, Robinson was arrested for the murder Leroy McClennon. (*Id.* ¶¶ 139, 143.) He was convicted and sentenced to a term of imprisonment of twenty-five years to life. (*Id.* ¶ 143.)

## C. Post-Conviction Proceedings

Attorneys from the Office of the Appellate Defender took up Buari's appeal. (Am. Compl. ¶ 144.) They spoke with Effort, who recanted his trial testimony and provided an affidavit explaining that he testified falsely because the Bronx DA threatened to charge him as an accessory. (*Id.* ¶¶ 145–47.) Buari moved pursuant to New York Criminal Procedure Law Section 440.10 to vacate his conviction ("First 440.10 Motion"). (*Id.* ¶ 149.) Thereafter, Buari's attorneys met with Robinson, who confessed to testifying falsely at Buari's trial and encouraging his associates to do the same. (*Id.* ¶¶ 150, 152–53.) Buari supplemented the First 440.10 Motion with Effort's affidavit and Robinson's confession that he, and not Buari, committed the Harris Murders. (*Id.* ¶ 155.)

In response to this new evidence, ADA Karen sent out the Investigator Defendants to obtain withdrawals of the recantations "in any way possible."  (*Id.* ¶ 156.)  The Investigator Defendants visited Effort, Robinson, and their families and pressured them to withdraw their recantations.  (*Id.* ¶¶ 157–60.)  The Investigator Defendants threatened Robinson that if he did not recant, any parole application he made would be rejected.  (*Id.* ¶ 160.)

At a hearing on the First 440.10 Motion, Robinson recanted his confession and insisted that he did not commit the Harris Murders, while Effort testified that his recantation was accurate and that Buari did not commit the Harris Murders.  (*Id.* ¶¶ 162–63.)  The judge found Robinson to be credible and Effort to be not credible and denied the First 440.10 Motion.  (*Id.* ¶ 164.)  The Appellate Division, First Department, affirmed.  (*Id.* ¶ 165.)

Buari's family launched a social media campaign to raise awareness of his wrongful conviction and discover new evidence.  (*Id.* ¶ 166.)  Private investigators discovered several new witnesses.  (*Id.* ¶¶ 167–86.)  Buari then filed a second 440.10 motion ("Second 440.10 Motion"). (*Id.* ¶ 187.)

Shortly thereafter, ADA Coddington contacted Buari's attorneys and stated that the Bronx DA's Conviction Integrity Unity ("CIU") wanted to investigate Buari's innocence claims.  (*Id.* ¶¶ 188–90.)  Buari and his attorneys agreed to hold the Second 440.10 Motion in abeyance while the CIU investigated.  (*Id.* ¶ 193.)  ADAs Mignola, Coddington, and Lung of the CIU directed investigators to intimidate Buari's new witnesses not to testify.  (*Id.* ¶¶ 201, 203–07.)

Buari revived the Second 440.10 Motion, and the court held an eleven-day hearing at which Buari and his newfound witnesses testified.  (*Id.* ¶ 216–20.)  The prosecutors repeatedly claimed that they would produce Robinson to testify but never did.  (*Id.* ¶¶ 222–23.)

On May 5, 2017, the court vacated Buari's conviction, ordered a new trial, and ordered that Buari be released on his own recognizance.  (*Id.* ¶ 225.)  The Bronx DA appealed (*id.* ¶ 227), and ADA Lung advised Buari's attorneys that a new witness had implicated Buari.  (*Id.* ¶ 228.)  At subsequent hearings, ADAs Lung and Coddington stated that the Bronx DA intended to retry Buari.  (*Id.* ¶¶ 233, 238.)  Buari's attorneys repeatedly requested that the prosecutors drop the case.  (*Id.* ¶¶ 230–32, 236, 240.)  At a status conference in spring 2018, the Bronx DA moved to dismiss the indictment, and the court granted the motion.  (*Id.* ¶¶ 241–42.)

## II.    Procedural Background

Buari commenced this action on December 28, 2018.  (Compl. [ECF Nos. 1, 3].)  On October 11, 2019, at a pre-motion conference, the Court (Ramos, *J.*) granted leave to file the Amended Complaint and set a briefing schedule for Defendants' Motion to Dismiss.  Buari filed the Amended Complaint on November 11, 2019.

The Amended Complaint alleges eleven causes of action: (1) malicious prosecution under Section 1983 against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (Am. Compl. ¶¶ 274–78); (2) due process violations under Section 1983 for fabrication of evidence and failure to investigate against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 279–83); (3) failure to intercede under Section 1983 against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 284–88); (4) conspiracy under Section 1983 against the NYPD Defendants, ADA Karen, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 289–95); (5) supervisory liability under Section 1983 against DA Clark and ADA Mignola (*id.* ¶¶ 296–302); (6) municipal liability under Section 1983 and *Monell* against the City with respect to the NYPD (*id.* ¶¶ 303–19); (7) municipal liability under Section 1983 and

*Monell* against the City with respect to the Bronx DA (*id.* ¶¶ 320–45); (8) malicious prosecution under New York State law against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 346–49); (9) intentional or negligent infliction of emotional distress under New York State law against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 350–54);[3] (10) *respondeat superior* under New York State law against the City (*id.* ¶¶ 355–58); and (11) due process violations under the New York State Constitution against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 359–363).

Defendants filed their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 11, 2019. The case was reassigned to me in February 2020. Buari filed an Opposition (Opp.), and Defendants filed a Reply (Reply. Mem. Law ("Reply") [ECF No. 69]).

## LEGAL STANDARDS

### I.        Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*,

---

[3] Buari withdrew his emotional distress claim in his Opposition. (Opp. 27 n.4.)

550 U.S. at 555 (alterations, internal quotation marks, and citations omitted).  In ruling on a motion

to dismiss, the Court must "accept as true all factual allegations and draw from them all reasonable

inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as

factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen

v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).  The Court's role at this stage is "not to weigh the

evidence that might be presented at trial but merely to determine whether the complaint itself is

legally sufficient." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 713 (S.D.N.Y. 2012)

(quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

## II.    Materials Considered

In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by

reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)

(citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); and *Hayden v. County of

Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).  A document is incorporated by reference where the

complaint "make[s] a clear, definite and substantial reference" to it.  *Thomas v. Westchester Cty.

Health Care Corp.*, 232 F. Supp. 2d 273, 275–76 (S.D.N.Y. 2002) (collecting cases).  "[E]ven if

not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies

and which is *integral to the complaint*' may be considered by the court in ruling on [a motion to

dismiss]." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (second alteration in original)

(quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); and citing *Glob.

Network Commc'ns*, 458 F.3d at 156).  "A document is integral to the complaint 'where the

complaint relies heavily upon its terms and effect.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d

Cir. 2016) (quoting *Chambers*, 282 F.3d at 153).

In addition, the Court may take judicial notice of certain publicly available documents, including, for example, a plaintiff's arrest reports, indictments, and criminal disposition data. *Corley v. Vance*, 365 F. Supp. 3d 407, 432 (S.D.N.Y. 2019) (collecting cases); *see Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (noting that courts may "look to public records, including complaints filed in state court, in deciding a motion to dismiss" (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); and *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998))).  When taking judicial notice of such documents, the Court does so "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1991)).

### III.    Section 1983

To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'"  *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

## ANALYSIS

### I.    Absolute Prosecutorial Immunity

As a preliminary matter, Defendants argue that all Bronx DA Defendants are entitled to absolute prosecutorial immunity.  (Mot. 9–13.)  Buari responds that ADA Karen is not entitled to absolute immunity because Buari has alleged conduct not intimately tied to the judicial process.

11

(Opp. 9.)  Buari also argues that ADAs Lung, Coddington, and Mignola and the Investigator Defendants are not entitled to qualified immunity because their misconduct in connection with the Second 440.10 Motion occurred during a non-adversarial investigative review.  (Opp. 10, 12.)

### A. Applicable Law

The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam) (collecting cases); *see Deronette v. City of New York*, No. 05 CV 5275(SJ), 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); and *United States v. Colbert*, No. 87 Civ. 4789, 1991 WL 183376, at *4 (S.D.N.Y. Sept. 11, 1991)).  Indeed, it is appropriate to address the issue of absolute immunity before assessing whether the plaintiff has sufficiently alleged constitutional violations.  *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 n.4 (2d Cir. 1995).

Immunity may be asserted as a defense in an 12(b)(6) motion where "the facts supporting the defense appear[] on the face of the complaint."  *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (citing *Pani*, 152 F.3d at 74–75); *see also Deronette*, 2007 WL 951925, at *4 ("Courts may consider absolute immunity on a 12(b)(6) motion to dismiss when facts establishing the defense appear directly in the complaint." (citing *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995))). In asserting an immunity defense at the pleading stage, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."  *McKenna*, 386 F.3d at 436.

The doctrine of "absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate."  *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994); *see also Root v. Liston*, 444 F.3d 127, 131 (2d Cir. 2006) (describing

absolute immunity as an "extreme protection"). The doctrine "creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney." *Pinaud*, 52 F.3d at 1147. A prosecutor asserting immunity bears the burden of showing that it applies. *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (citing *Burns v. Reed*, 500 U.S. 478, 486–87 (1991)).

In determining whether a prosecutor is entitled to absolute immunity, courts apply a "functional" test, "looking to the function being performed rather than to the office or identity of the defendant." *Hill*, 45 F.3d at 660 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). Under the functional test, prosecutors "are absolutely immune from claims arising from conduct 'intimately associated with the judicial phase of the criminal process.'" *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 357 (2d Cir. 2004) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). The functional test is objective. *Hill*, 45 F.3d at 662. Courts must "view the relevant circumstances as would a reasonable official in the claimant's position," *Giraldo*, 694 F.3d at 165–66 (collecting cases), and consider "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor," *id.* at 166.

Absolute prosecutorial immunity covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley*, 509 U.S. at 273. This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316(PGG), 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321–22 (2d Cir. 1980)), "the knowing use of perjured testimony," "the deliberate

withholding of exculpatory information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns*, 500 U.S. at 490 (collecting cases), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

However, absolute immunity does not thwart every claim against prosecutors. *See Pinaud*, 52 F.3d at 1147. Under the functional test, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33); *see Buckley*, 509 U.S. at 273 (citing *Burns*, 500 U.S. at 494–96)). Investigative tasks beyond the scope of absolute immunity are those "normally performed by a detective or police officer." *Buckley*, 509 U.S. at 273; *see Kanciper v. Lato*, 989 F. Supp. 2d 216, 228–29 (E.D.N.Y. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'" (quoting *Day v. Morgenthau*, 909 F.2d 75, 77–78 (2d Cir. 1990))). Where absolute immunity does not apply, a prosecutor is eligible only for qualified immunity. *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (citing *Buckley*, 509 U.S. at 273).

There is no bright line for absolute immunity based on the stage of a criminal proceeding. *Moye*, 2012 WL 2569085, at *6; *see Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987). Absolute immunity generally applies "where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Moye*, 2012 WL 2569085, at *6 (quoting *Tabor v. New York City*, No. 11 CV 0195 FB, 2012 WL 603561, at *4 (E.D.N.Y. Feb. 23, 2012)); *see Warney v. Monroe County*, 587 F.3d 113, 123 (2d Cir. 2009) (noting that "a prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor

acts as an advocate"). Conversely, absolute immunity generally does not apply "where formal proceedings have not begun and the prosecutor is acting in an investigative capacity." *Moye*, 2012 WL 2569085, at *6 (citing *Tabor*, 2012 WL 603561, at *4). It is therefore critical to distinguish between "those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence." *Smith*, 147 F.3d at 94.

### B. Application

In considering whether the Bronx DA Defendants are entitled to absolute prosecutorial immunity, the Court "must examine the role played by each . . . defendant to determine whether he or she performed a function for which absolute immunity is required." *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) (citing *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987) (per curiam)). Where a plaintiff fails to "plausibly state any claims against any Defendant, the Court need not address with granularity to which claims each Defendant is immune." *Dava v. City of New York*, No. 15-cv-08575 (ALC), 2016 WL 4532203, at *4 (S.D.N.Y. Aug. 29, 2016).

#### 1. ADA Karen

Buari alleges that the Bronx DA knowingly presented Griffiths' false statements to the grand jury. (Am. Compl. ¶¶ 82–85.)[4] Buari further alleges that ADA Karen induced witnesses to implicate Buari falsely, specifically, offering Connor, Seabrook, Holder, and Effort recommendations for leniency and threatening to charge Effort as an accessory to the Harris Murders. (*Id.* ¶¶ 112–20, 125, 129–37.) Buari also alleges that ADA Karen directed the Investigator Defendants to obtain withdrawals of Effort's and Robinson's recantation testimony. (*Id.* ¶ 156–61.)

---

[4] While ADA Karen is neither explicitly mentioned in connection with the grand jury proceedings in the Amended Complaint (*see* Am. Compl. ¶¶ 82–87) nor listed as the ADA in the indictment (*see* Mot. Ex. 4 [ECF No. 61-4]), the Court, drawing reasonable inferences in Buari's favor, as it must, presumes ADA Karen was involved with the grand jury proceedings given Buari's allegation that he was the "[ADA] prosecuting Mr. Buari's case" (Am. Compl. ¶ 111).

ADA Karen is entitled to absolute immunity for all acts alleged in the Amended Complaint. First, ADA Karen's alleged presentation of false evidence to the grand jury "lie[s] at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process" and is therefore protected by absolute immunity. *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (collecting cases); *see Imbler*, 424 U.S. at 430–31 (holding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983"); *Hill*, 45 F.3d at 661 (noting that "prosecutors are immune from § 1983 liability for their conduct before a grand jury" (collecting cases)); *Urrego v. United States*, No. 00 CV 1203(CBA), 2005 WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (noting that "when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false" (collecting cases)); *see also Bernard*, 356 F.3d at 503, 505 (holding that ADAs who "knowingly presenting false evidence to, while at the same time withholding exculpatory evidence from, the various grand juries that returned the[] flawed indictments" were entitled to absolute immunity); *Pinaud*, 52 F.3d at 1149 (finding that ADAs who made misrepresentations to a grand jury were entitled to absolute immunity).

Second, ADA Karen's alleged actions in inducing witnesses to implicate Buari falsely is also protected because "the falsification of evidence and the coercion of witnesses . . . [are] prosecutorial activities for which absolute immunity applies." *Taylor*, 640 F.2d at 452 (citing *Lee*, 617 F.2d at 321–22); *see Morris v. Martin*, No. 16-CV-601, 2016 WL 4059209, at *6 (N.D.N.Y. June 21, 2016) ("Absolute immunity has been found to extend to such acts as falsification of evidence, coercion of witnesses, solicitation and subornation of perjured testimony, [and] withholding of evidence . . . ." (citing *Taylor*, 640 F.2d at 452)), *report & recommendation*

16

*adopted*, 2016 WL 4098611 (N.D.N.Y. July 28, 2016); *see also Cox v. City of New Rochelle*, No. 17-CV-8193 (KMK), 2019 WL 3778735, at *11 (S.D.N.Y. Aug. 12, 2019) (holding that convincing witnesses to testify falsely is an advocacy-related action covered by absolute immunity (collecting cases)); *Collins v. City of New York*, 923 F. Supp. 2d 462, 470, 472 (E.D.N.Y. 2013) (holding that ADAs were absolutely immune from claims that they "coerc[ed] [witnesses] into giving false testimony, present[ed] that testimony at trial, and fail[ed] to disclose the circumstances of their testimony"); *Bertuglia*, 839 F. Supp. 2d at 735–36 (holding that ADAs were absolutely immune from claims that they "coerced and harassed various witnesses into giving false testimony").

Finally, ADA Karen's alleged directing the Investigator Defendants to pressure Effort and Robinson to recant their recantations is also protected even though it occurred after Buari's conviction. In *Warney*, the Second Circuit held that "absolute immunity shields work performed during a post-conviction collateral attack, at least insofar as the challenged actions are part of the prosecutor's role as an advocate for the state." 587 F.3d at 123. There, the court found that the failure by prosecutors to disclose exculpatory DNA results during post-conviction habeas proceedings was covered by absolute immunity because the actions were "integral to the overarching advocacy function of dealing with post-trial initiatives challenging an underlying criminal conviction." *Id.* at 124. Similarly, ADA Karen's alleged actions were integral to defending Buari's conviction against a post-conviction attack and are therefore protected by absolute immunity. *Id.*; *see Giraldo*, 694 F.3d at 166; *see also Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (holding that absolute immunity shielded prosecutor from claim that he withheld exculpatory evidence discovered after plaintiff's conviction because his "functions in representing the State in [plaintiff's] post-conviction motions and direct appeal very much implicated the judicial process"); *Newsome v. City of Newark*, No. 13–cv–06234 (CCC), 2014 WL 4798783, at

*1, *4 (D.N.J. Sept. 25, 2014) (holding that prosecutor was absolutely immune from claim that he "urged the victim to recant the recantation" because "determining whether or not Plaintiff's request that the charges be dropped, based on the victim's recantation, had a valid basis" was a prosecutorial function).  Accordingly, because all alleged actions by ADA Karen are protected by absolute immunity, the Court dismisses all claims against ADA Karen.

### 2.  ADAs Lung, Coddington, and Mignola

Buari alleges that ADAs Lung, Coddington, and Mignola directed the Investigator Defendants to seek out Buari's witnesses and intimidate them not to testify.  (Am. Compl. ¶ 201.) Buari also alleges that ADA Lung fervently opposed the Second 440.10 Motion (*id.* ¶¶ 219–25), then stalled for months before moving to dismiss the indictment (*id.* ¶¶ 228–42).

The actions of ADAs Lung, Coddington, and Mignola in connection with the Second 440.10 Motion are protected by absolute immunity because they were "performed in defending a conviction from collateral attack." *Warney*, 587 F.3d at 122; *see Giraldo*, 694 F.3d at 166; *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003) (citing *Houstin v. Partee*, 978 F.2d 362, 365–66 (7th Cir. 1992)).  Buari's attempt to distinguish *Warney* and characterize the actions of ADAs Lung, Coddington, and Mignola as part of "a purportedly non-adversarial investigative review of Plaintiff's case" is unavailing.  (Opp. 10.)  The actions of ADAs Lung, Coddington, and Mignola were in response to, and in anticipation of contesting, Buari's Second 440.10 Motion.  (*See* Am. Compl. ¶¶ 187–89.)  Buari's holding the Second 440.10 Motion in abeyance while they investigated his claim does not disassociate their actions from the judicial phase of the criminal process.  *See Giraldo*, 694 F.3d at 166; *Ortiz v. Case*, 782 F. App'x 65, 67 (2d Cir. 2019) (summary order) (alteration in original) (holding that investigative acts by ADAs before plaintiff's motion to vacate was filed were protected by absolute immunity because they "would have been in

anticipation of the inevitable motion to vacate the conviction and to evaluate if and how to 'defend[] a conviction from collateral attack'" (quoting *Warney*, 587 F.3d at 122)). Indeed, as Buari alleges, ADAs Lung, Coddington, and Mignola "sought to sabotage Mr. Buari's 440.10 motion *and maintain his conviction*." (Am. Compl. ¶ 192 (emphasis added).) Such conduct is associated with their roles as advocates and is therefore protected by absolute immunity. *See Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) (noting the prosecutor's "duty to defend a conviction"); *see also Peterson v. Bernardi*, 719 F. Supp. 2d 419, 436 n.20 (D.N.J. 2010) (noting that "when confronted with a request to scrutinize a long-settled conviction, the prosecutor's interest is in preserving its hard-fought guilty verdict").

Finally, the absolute immunity to which ADA Mignola is entitled also reaches Buari's separate claim against her for supervisory liability. In *Van de Kamp*, the Supreme Court held that "supervisory prosecutors are immune in a suit directly attacking their actions related to an individual trial." 555 U.S. at 346. It is immaterial that ADA Mignola's acts occurred in connection with post-trial proceedings. Her supervision was directly connected with the advocacy functions of the prosecutors. *Id.*; *see Warney*, 587 F.3d at 122–25; *Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 205 (S.D.N.Y. 2004) ("To the extent the supervision or policies concern the prosecutorial decisions for which the ADAs have absolute immunity, then those derivative allegations against supervisors must also be dismissed on the ground that the supervising district attorneys have absolute immunity for the prosecution-related decisions of their subordinates . . . ." (quoting *Sheff v. City of New York*, No. 03 Civ.708 DLC, 2004 WL 594894, at *6 (S.D.N.Y. Mar. 24, 2004))); *see also Ortiz v. Case*, No. 16CV322V, 2018 WL 8620414, at *16 (W.D.N.Y. May 18, 2018) (finding that absolute immunity "also reaches plaintiff's claims for supervisory liability" (citing *Van de*

*Kamp*, 555 U.S. 335)), *aff'd*, 782 F. App'x 65 (2d Cir. 2019) (summary order).[5]  Accordingly, the

Court dismisses all claims against ADAs Lung, Coddington, and Mignola.

### 3.   Investigator Defendants (Viggiano, Schiffman, and Wall)

Buari alleges that the Investigator Defendants coerced Robinson to recant his confession

to committing the Harris Murders and attempted to coerce Effort to withdraw his recantation of

his trial testimony implicating Buari.  (Am. Compl. ¶¶ 157–61.)  Critically, Buari alleges that they

were "sent out" to do this by members of the Bronx DA's Office, including ADA Karen.  (*Id.*

¶ 156.)

The Investigator Defendants are each entitled to absolute immunity.  The Second Circuit

has held that absolute prosecutorial immunity extends to persons assisting and working under the

direction of prosecutors, when they perform functions closely tied to the judicial process.  *Hill*, 45

F.3d at 660 (citing *Davis v. Grusemeyer*, 996 F.2d 617, 630 n.28 (3d Cir. 1993), *overruled on other

grounds by Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644 (3d Cir. 1998)); *accord

Bernard*, 356 F.3d at 502.  In seeking withdrawals of Effort's and Robinson's recantations, the

Investigator Defendants were performing prosecutorial functions—protecting Buari's guilty

verdict from a post-conviction collateral attack—under the direction of ADA Karen.  Thus, the

absolute prosecutorial immunity that protects ADA Karen extends to the Investigator Defendants.

*See Hamilton v. City of New York*, No. 15-CV-4574 (CBA) (SJB), 2019 WL 1452013, at *13

(E.D.N.Y. Mar. 19, 2019) (extending absolute immunity to an investigator of the district attorney's

office who sought to procure false testimony from a witness); *Jackson v. Seewald*, No. 11 Civ.

5826(LAK)(JCF), 2013 WL 149341, at *7 (S.D.N.Y. Jan. 14, 2013) (extending absolute immunity

to investigators of the district attorney's office); *see also O'Neal v. Morales*, 679 F. App'x 16, 18–

---

[5] For the same reason, the Court finds that if DA Clark were properly named as a party, *see supra* note 1, she would be entitled to absolute immunity and would therefore be dismissed from the action.

19 (2d Cir. 2017) (summary order) (affirming grant of absolute immunity to detective who conducted investigative acts that furthered the advocacy function of preparing for trial "at the behest of the [ADA]" and "*only* because the ADA requested that he do so").  Accordingly, the Court dismisses all claims against the Investigator Defendants.

## II.        Malicious Prosecution (Counts I and VIII)

Buari brings causes of action against the NYPD Defendants for malicious prosecution under Section 1983 and New York State law.  (Am. Compl. ¶¶ 274–78, 346–49.)  Buari alleges that the NYPD Defendants fabricated evidence and withheld exculpatory evidence that vitiated probable cause.  (*Id.* ¶ 275.a.)  Defendants argue that Buari's malicious prosecution claims fail because (1) Buari has not demonstrated a favorable termination of proceedings, (2) Buari cannot overcome the presumption of probable cause created by the grand jury indictment, and (3) the NYPD Defendants did not initiate or continue the prosecution.  (Mot. 13–17.)

### A. Applicable Law

To state a claim for malicious prosecution under Section 1983 and New York State law, a plaintiff must show: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).  A Section 1983 malicious prosecution claim also requires "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (citing *Murphy*, 118 F.3d at 944–46; and *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116–17 (2d Cir. 1995)).

A defendant initiates a proceeding when he "play[s] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* (alteration in original) (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696, 583 N.Y.S.2d 283 (2d Dep't 1992); and citing *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189, 687 N.Y.S.2d 330 (1st Dep't 1999)).  A claim for malicious prosecution against a police officer "requires some showing that the defendant distorted the process by which [the] plaintiff was brought to trial." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (quoting *Breeden v. City of New York*, No. 09–CV–4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014)).  "Showing that the police 'failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the initiation element of malicious prosecution." *Id.* (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160 (2d Cir. 2010)); *see also Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (noting that a police officer "initiate[s] a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor" (collecting cases)).

With respect to the second element, favorable termination, different standards govern a Section 1983 claim and a claim under New York law.  "New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004).  Rather, a plaintiff need only demonstrate that "the circumstances surrounding the termination are not inconsistent with the innocence of the accused." *Cantalino v. Danner*, 96 N.Y.2d 391, 395, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 198, 712 N.Y.S.2d 43, 734 N.E.2d 750 (2000).  There is no "per se rule that a dismissal in the interest of

justice can never constitute a favorable termination." *Cantalino*, 96 N.Y.2d at 396.  The favorable termination element is satisfied "when charges are dismissed 'because they were groundless.'" *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 368 (S.D.N.Y. 2010) (quoting *Cantalino*, 96 N.Y.2d 397).

The Section 1983 requirement is more stringent: the plaintiff must "show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning v. City of Glen Falls*, 908 F.3d 19, 22 (2d Cir. 2018).  "No single type of disposition is necessary or sufficient, but the termination must be 'measured in objective terms by examining the totality of the circumstances.'" *Rosario v. City of New York*, 18 Civ. 4023 (LGS), 2019 WL 4450685, at *4 (S.D.N.Y. Sept. 16, 2019) (quoting *Lanning*, 908 F.3d at 28).  "Allegations that merely assert that charges were dismissed are not sufficient." *Demaitre v. City of New York*, 18 Civ. 12403 (PGG), 2020 WL 6048192, at *4 (S.D.N.Y. Oct. 11, 2020) (citing *Johnson v. City of New York*, No. 20-CV-3083 (LLS), 2020 WL 2192830, at *5 (S.D.N.Y. May 5, 2020); and *Ndemenoh v. City Univ. of N.Y.*, No. 20-CV-4492 (LLS), 2020 WL 4547302, at *2, *5 (S.D.N.Y. Aug. 4, 2020)).  A plaintiff who satisfies the Section 1983 standard necessarily satisfies the less-stringent New York standard.  *See, e.g.*, *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 71–73 (S.D.N.Y. 2020).

No claim for malicious prosecution can survive if there was probable cause for the prosecution.  *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003).  Probable cause is "described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd*, 336 F.3d at 76 (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)); *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (noting that "the relevant probable cause determination is whether there was

probable cause to believe the criminal proceeding could succeed and, hence, should be commenced" (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999))).   A grand jury indictment creates a presumption of probable cause that "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello*, 612 F.3d at 162 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).   The plaintiff "bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Savino*, 331 F.3d at 73 (citing *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994)).

Finally, malice requires a showing "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978)).   "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78 (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (noting that malice may reasonably be inferred where probable cause is "totally lacking" (quoting *Wilson v. McMullen*, No. 07–CV–948, 2010 WL 1268055, *6 (E.D.N.Y. Mar. 30, 2010))).   "Falsifying evidence is sufficient to show malice." *Bailey*, 79 F. Supp. 3d at 451 (collecting cases).

### B.  Application

Buari has sufficiently pleaded each element of malicious prosecution.  First, Buari has alleged that Dets. Dietz and Tracy initiated his prosecution by knowingly inducing Griffiths to state falsely that Buari committed the Harris Murders, which resulted in Buari's arrest and indictment.  (Am. Compl. ¶¶ 76–78, 80, 82–85.)  On a 12(b)(6) motion, those allegations must be

credited.  *Iqbal*, 556 U.S. at 678.  Precedent is clear that police officers who induce a witness to give false testimony that results in an arrest and grand jury indictment have "initiated" a criminal proceeding.  *See Manganiello*, 612 F.3d at 163; *Ricciuti*, 124 F.3d at 130 (finding that a police officer can "play[] a role in initiating the prosecution by preparing [an] alleged false confession and forwarding it to prosecutors"); *see also Chimurenga v. City of New York*, 45 F. Supp. 3d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution." (collecting sources)).

Furthermore, Buari has plausibly alleged that Dets. Price, Gottwin, Neenan, and Fortune caused a continuation of his prosecution by inducing witnesses to testify falsely.  (Am. Compl. ¶¶ 104, 108–20.)  Buari alleges that the detectives apprised ADA Karen of the arrangement, that Dets. Price, Fortune, and Neenan testified falsely against Buari at the suppression hearing, and that Robinson, Effort, and the other witnesses testified falsely against Buari at trial.  (*Id.* ¶¶ 121–38.)  These allegations, accepted as true, support a reasonable inference that the prosecution would not have continued had the detectives not testified falsely and induced the witnesses to testify falsely.  *See Davis v. City of New York*, 296 F.R.D. 127, 130 (E.D.N.Y. 2013) (finding that allegations that officers testified falsely against plaintiff could satisfy the continuation element (citing *Manganiello*, 612 F.3d at 163)).

Defendants argue that the state court's exercise of independent judgment in indicting, convicting, and denying post-trial motions breaks the chain of causation.  (Mot. 17.)  But where, as here, police officers allegedly deceive and mislead subsequent decision-makers with false information, the chain of causation remains intact because the officers are charged with reasonably foreseeing that their actions will influence the subsequent decisions resulting in a deprivation of

the plaintiff's liberty. *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 397 (S.D.N.Y. 2016) (collecting cases); *see Hamilton v. City of New York*, No. 15-CV-4574 (CBA) (SJB), 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019) (quoting *Bermudez v. City of New York*, 790 F.3d 368, 374 (2d Cir. 2015)); *see also Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."). Put simply, the NYPD Defendants "cannot avoid liability by pointing a finger at the [state court] that [they] allegedly deceived and misled." *Shabazz*, 201 F. Supp. 3d at 397.[6]

Second, the totality of the circumstances surrounding the dismissal of Buari's indictment supports a plausible inference of actual innocence sufficient to satisfy the second prong of Buari's malicious prosecution claim under Section 1983. In vacating Buari's conviction and ordering a new trial, the state court found that Buari had established by a preponderance of evidence that the newly discovered evidence probably would have resulted in a more favorable verdict. (Decision of *People v. Buari*, No. 2111-1993, slip op. at 19 (Sup. Ct. Bronx Cnty. Nov. 9, 2017) (Oliver, Jr., *J.*), Ex. A to Decl. Alan H. Scheiner Supp. Mot. Dismiss ("Scheiner Decl.") [ECF No. 61-3].) In addition, Buari's Certificate of Disposition, which "constitutes presumptive evidence of a favorable termination," *Hincapie*, 434 F. Supp. 3d at 72 (citing *United States v. Green*, 480 F.3d

---

[6] Defendants rely on *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999); but that case in inapposite. In *Townes*, the plaintiff was arrested for possession of handguns and narcotics after the taxicab in which he was a passenger was stopped and searched unreasonably. *Id.* at 141–42. The Second Circuit found that the state court's denial of the plaintiff's motion to suppress the handguns and narcotics broke the chain of causation because "the defendants' allegedly tortious conduct had long since ended" and "[t]he state trial court, which alone had the power to suppress the improperly obtained evidence, had control over the ultimate outcome of [the plaintiff's] case." *Id.* at 147. Here, conversely, it is alleged that the misconduct by the NYPD Defendants continued through Buari's trial and tainted the state court's exercise of independent judgment. At this stage of the litigation, those allegations are sufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283; *Glob. Network Commc'ns*, 458 F.3d at 154.

627, 632 (2d Cir. 2007)), provides that he "shall be restored, in contemplation of law, to the status occupied before the arrest and prosecution" (Cert. of Disposition, *People v. Buari*, No. 2111-1993 (Sup. Ct. Bronx Cnty.), Ex. 2 to Decl. Marc C. Cannan Opp. Defs.' Mot. Dismiss ("Cannan Decl.") [ECF No. 66-2]), and that status is innocent, *see Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (noting that when a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge"); *accord Hincapie*, 434 F. Supp. 3d at 72. Moreover, the Bronx DA declined to retry Buari and dismissed the indictment. Weighing multiple factors, it believed that it could not prove guilt beyond a reasonable doubt and requested that the indictment be dismissed (Cannan Decl. Ex. 1 ¶ 15 [ECF No. 66-1]), which further supports a plausible allegation of favorable termination. *See Virgil v. City of New York*, No. 17-cv-5100, 2019 WL 4736982, at *7 (E.D.N.Y. Sept. 27, 2019) (finding that "a dismissal based on the state's express inability to prove its case beyond a reasonable doubt is sufficient to show a favorable termination [under] § 1983").

Defendants argue that the state court "denied th[e] part of the Second § 440 Motion seeking dismissal on the grounds of actual innocence." (Mot. 16.) Indeed, the state court found that Buari "failed to establish his innocence by clear and convincing evidence." (*Buari*, slip op. at 23, Ex. A to Scheiner Decl.) But the standard for favorable termination does not require a showing of innocence by clear and convincing evidence. *See Hincapie*, 434 F. Supp. 3d at 71, 73 (rejecting identical argument and noting that "neither an acquittal nor a finding of actual innocence by clear and convincing evidence is necessary"). At the 12(b)(6) stage, a plaintiff need only plausibly allege that "the criminal proceedings against him were terminated in a manner *indicating* his innocence." *Lanning*, 908 F.3d at 29 (emphasis added). Buari has done that here. *See Hincapie*, 434 F. Supp. 3d at 73 (finding that allegations of "significant weaknesses in the case including the

testimony of newly discovered witnesses which tended to exonerate [plaintiff and] the lack of physical evidence . . . are sufficient to plead favorable termination"); *Rosario*, 2019 WL 4450685, at *4 (finding plaintiff plausibly pleaded favorable termination where his "conviction was vacated and his indictment was dismissed, after he was imprisoned for nearly twenty years . . . [and] [t]he DA's Office decided not to retry Plaintiff because it did not believe it could prove the case"). Because he has satisfied the more-stringent Section 1983 standard for favorable termination, Buari necessarily also satisfies the New York standard. *See Hincapie*, 434 F. Supp. 3d at 71–73.

Third, for purposes of a motion to dismiss at the pleading stage, Buari's allegations that Dets. Dietz and Tracy induced Griffiths to testify falsely before the grand jury (Am. Compl. ¶¶ 76, 84–85) must be accepted as true, *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283, and, as such, overcome at this stage the presumption of probable cause associated with the grand jury indictment, *see Bouche v. City of Mount Vernon*, No. 11–CV–5246, 2013 WL 322613, at *6 (S.D.N.Y. Jan. 28, 2013) ("[I]f a defendant knows that witness statements are false or coerced, this will defeat probable cause."); *Richards v. City of New York*, No. 97–CV–7990, 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) (noting that an indictment "obtained through improper means" is stripped of its presumptive force (citing *United States v. Williams*, 504 U.S. 36, 51–52 (1992))); *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (deeming presumption of probable cause rebutted where plaintiff alleged that police officers "failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, . . . and fabricated oral statements of witnesses"); *Bailey*, 79 F. Supp. 3d at 457 (finding that police officers' alleged coercion of individuals whose testimony was used to secure an arrest warrant rebutted presumption of probable cause).

Defendants argue that Buari has failed to allege that the detectives knew that Griffiths' testimony was false.  (Mot. 14–15.)  However, Buari makes further allegations that permit the reasonable inference that the detectives knew of the falsity, and on a 12(b)(6) motion, those allegations must be accepted as true.  *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283.  Specifically, Buari alleges that: (a) there was no physical evidence corroborating Griffiths' testimony; (b) Det. Dietz suspected that Griffiths was connected to the Harris Murders; (c) Griffiths' girlfriend informed Det. Dietz that one of the "Yankee guys that deal crack" committed the Harris Murders; and (d) Det. Dietz knew that Robinson was a "Yankee guy" who dealt crack.  (Am. Compl. ¶¶ 66, 69–70, 76; *see* Mot. 14 n.12).  These allegations support a reasonable inference that the indictment was "the product of fraud and bad faith conduct."  *Hincapie*, 434 F. Supp. 3d at 74 (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016)); *cf. B. v. City of New York*, No. 14-cv-1021 (KAM)(PK), 2016 WL 4530455, at *15 (E.D.N.Y. Aug. 29, 2016) (granting motion to dismiss where "[n]one of the allegations even suggest the nature of the purported misconduct").  At the 12(b)(6) stage, Buari "is not required to prove that the defendants lied before the grand jury or in their discussions with . . . prosecutors; instead, he need only provide sufficiently specific factual allegations regarding the nature and content of their lies."  *Demosthene v. City of New York*, No. 18-cv-1358 (ARR) (PK), 2019 WL 181305, at *5 (E.D.N.Y. Jan. 10, 2019) (citing *Lewis v. City of New York*, No. 12-CV-2836 (RRM)(RML), 2013 WL 6816615, at *9 (E.D.N.Y. Dec. 24, 2013), *aff'd*, 591 F. App'x 21 (2d Cir. 2015) (summary order); and *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 476 (S.D.N.Y. 2009)).  While Defendants argue that Buari does not allege that *Defendants* lied to the grand jury (Reply 6), there is no meaningful difference between Defendants lying and Defendants inducing a witness to lie.  *See Bouche v. City of Mount Vernon*, No. 11 Civ. 5246(SAS), 2012 WL 987592, at *1, *7 (S.D.N.Y. Mar. 23, 2012) (denying motion to dismiss

malicious prosecution claim where plaintiff alleged that officers induced witnesses to provide false statements in exchange for leniency in pending criminal matters); *Ambrose*, 623 F. Supp. 2d at 474–77 (denying motion for judgment on the pleadings where plaintiff alleged that officers "coerced a lineup witness into implicating Plaintiff"). Finally, Defendants' reliance on *Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003) (Mot. 14–15), is misguided because that case was decided at the summary judgment stage. *See Hincapie*, 434 F. Supp. 3d at 74 ("Defendants improperly rely on *Savino v. City of New York*, . . . a case decided on summary judgment to argue that Plaintiff has not met his burden at the motion to dismiss stage to rebut the presumption of probable case. The relevant burden is not the same."). Accordingly, at the present stage of the litigation, accepting his allegations as true, Buari has overcome the presumption of probable cause sufficiently to withstand a motion to dismiss.

Finally, because Buari's allegations plausibly rebut the presumption of probable cause created by the grand jury indictment, the Court may reasonably infer malice. *See Lowth*, 82 F.3d at 573 (noting that "malice may be inferred from the lack of probable cause" (quoting *Conkey v. State*, 74 A.D.2d 998, 999, 427 N.Y.S.2d 330 (4th Dep't 1980))); *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994) (noting that "the existence of malice may be inferred from a finding that defendants lacked probable cause to initiate criminal proceedings"). Buari's allegations that the NYPD Defendants falsified evidence also satisfy the malice element. *See Grant v. City of New York*, No. 15-CV-3635 (ILG) (ST), 2019 WL 1099945, at *9 (E.D.N.Y. Mar. 8, 2019) (finding that malice is shown through "submission of falsified evidence or withholding of material evidence" (citing *Torres v. Jones*, 26 N.Y.3d 742, 762, 27 N.Y.S.3d 468, 47 N.E.3d 747 (2016))); *see also Manganiello*, 612 F.3d at 164 (finding that malice "could easily be inferred . . . [from the detective's] willingness to coerce an inculpatory statement from one unwilling person in exchange

for not reporting that person's known criminal activities").  Because Buari has pleaded all four elements of malicious prosecution, the Court denies Defendants' Motion to dismiss the malicious prosecution claims in Counts I and VIII.

### III.   Section 1983 Due Process, or Denial of Fair Trial (Count II)

Buari asserts a Section 1983 due process claim against the NYPD Defendants under two distinct theories: fabrication of evidence and failure to investigate.  (Am. Compl. ¶¶ 279–83.)  First, Buari alleges that the NYPD Defendants fabricated incriminating evidence by coercing witnesses to implicate Buari falsely and failing to disclose the circumstances of the witness interviews.  (*Id.* ¶ 280.a.)  Second, he alleges that the NYPD Defendants deliberately failed to investigate evidence pointing to Robinson.  (*Id.* ¶ 280.a.)  Defendants argue that Buari has not alleged facts supporting a plausible inference that the NYPD Defendants knew that the testimony against Buari was false.  (Mot. 17.)  Defendants also argue that Buari has no due process right to a police investigation.  (Mot. 18 n.14.)

#### A.  Applicable Law

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."  *Harris v. City of New York*, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (quoting *Zahrey*, 221 F.3d at 355).  To state a due process claim based on fabrication of evidence, the plaintiff must show that: "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result."  *Bailey*, 79 F. Supp. 3d at 446 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)); *see Ricciuti*, 124 F.3d at 130 (collecting cases).  While a fair trial claim is distinct from a malicious prosecution claim, *Bailey*, 79 F. Supp. 3d at 446; *see Morse v. Spitzer*, No. 07–CV–4793

(CBA)(RML), 2012 WL 3202963, at *5–6 (E.D.N.Y. Aug. 3, 2012), a plaintiff may bring "claims for both malicious prosecution and denial of his fair right to trial based on the same alleged fabrication of evidence," *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (citing *Ricciuti*, 124 F.3d at 130–31; and *Jovanovic v. City of New York*, No. 04 Civ. 8437(PAC), 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006)).

As Defendants correctly argue, "there is no constitutional right to an adequate investigation." *Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) (citing *Campbell v. Giuliani*, No. 99 Civ. 2603, 2000 WL 194815, at *3 n. 6 (E.D.N.Y. Feb. 16, 2000)); *see Harrington v. County of Suffolk*, 607 F.3d 31, 35 (2d Cir. 2010). Thus, "[a] police officer's failure to pursue a particular investigative path is not a constitutional violation." *Schweitzer v. Brunstein*, No. 16-CV-1172 (RRM) (LB), 2016 WL 4203482, at *2 (E.D.N.Y. Aug. 9, 2016) (collecting cases). Accordingly, "a 'failure to investigate' is not independently cognizable as a stand-alone claim" under Section 1983. *McCaffrey v. City of New York*, No. 11-CV-1636 (RJS), 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) (collecting cases); *see also* Stokes v. City of New York, No. 05-CV-0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("[I]t is well-settled that there is no independent claim for a police officer's purported failure to investigate . . . ." (collecting cases)).

**B.  Application**

Buari has sufficiently pleaded a claim for denial of a fair trial based on an alleged fabrication of evidence. As discussed above, Buari alleges that Dets. Dietz and Tracy coerced Griffiths into stating falsely that Buari committed the Harris Murders and forwarded this information to the Bronx DA to secure the indictment. (Am. Compl. ¶¶ 76–80, 82–85.) He also alleges that Dets. Price, Gottwin, Neenan, and Fortune, despite having reason to believe that

Robinson committed the Harris Murders, coerced several witnesses into testifying falsely against Buari at trial, which resulted in Buari's conviction. (*Id.* ¶¶ 104, 108–20.) These assertions, taken as true, plausibly allege the elements of a Section 1983 fair trial claim. *See Benitez v. City of New York*, 17 CV 3827 (SJ) (SJB), 2018 WL 2973387, at *3 (E.D.N.Y. June 13, 2018) (denying motion to dismiss where defendants allegedly "manufactured false identification evidence . . . [and] gave this fabricated evidence to prosecutors, who then used this fabricated evidence to prosecute Plaintiff"); *Thorpe v. County of St. Lawrence*, No. 7:15-cv-736(GLS/TWD), 2016 WL 7053545, at *4 (N.D.N.Y. Dec. 5, 2016) (denying motion to dismiss where defendants allegedly "fabricated evidence by coercing false testimony from [a witness]," which "was then submitted at trial and misled the jury"); *Jovanovic*, 2006 WL 2411541, at *13 (denying motion to dismiss where plaintiff alleged, *inter alia*, that the defendant "prepared police reports containing false and misleading information about [plaintiff's] arrest and the evidence collected at [plaintiff's] apartment, which he then forwarded to prosecutors"); *cf. Thompson v. City of New York*, No. 18 Civ. 04105 (PAC), 2020 WL 2097622, at *4 (S.D.N.Y. May 1, 2020) (dismissing fair trial claim where plaintiff "d[id] not identify what evidence was fabricated; . . . what, if any, fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury"). Just as Buari's allegations state a claim for malicious prosecution, so too do they state a claim for denial of a fair trial. *See Morse*, 2012 WL 3202963, at *6 (noting that in cases alleging that "a police officer fabricated evidence and forwarded it to prosecutors *in order to provide probable cause* for an arrest or prosecution . . . a plaintiff's malicious prosecution and fair trial claims would rise or fall together").

Defendant's three arguments to the contrary are without merit. (*See* Mot. 18–20.) First, at the pleading stage, Buari need not provide actual proof of coercion or falsity; he need only make

specific factual allegations that, "if true, are plausibly sufficient to state a legal claim." *Doe*, 831

F.3d at 48 (noting that at the motion to dismiss stage a court "is not engaged in an effort to

determine the true facts").  Second, as previously discussed, Buari has plausibly alleged favorable

termination.  *See supra* Analysis, Section II.B.2; *see also Hincapie*, 434 F. Supp. 3d at 75.  Third,

Buari alleges personal involvement of each NYPD Defendant and does not, as Defendants suggest,

rely on group pleading.  (Mot. 19–20.)  Each material allegation in the Amended Complaint

specifies which Defendants were personally involved in the alleged constitutional violations.  (*See,

e.g.*, Am. Compl. ¶ 76 (alleging that Dets. Dietz and Tracy coerced Griffiths into falsely

implicating Buari); *id.* ¶¶ 112, 115 (alleging that Dets. Price, Gottwin, Neenan, and Fortune

coerced Connor, Seabrook, Johnson, and Holder to testify falsely against Buari).)  *See Goldring v.

Davidson*, No. 1:18-CV-06201 (ALC), 2020 WL 1547464, at \*5 (S.D.N.Y. Apr. 1, 2020) (rejecting

argument of group pleading where plaintiff alleged the individual defendants' "positions at [the

correctional facility] and their role in the alleged violations").  Defendants, in essence, argue that

Buari fails to specify which NYPD Defendants participated directly in the coercion of witnesses

and which NYPD Defendants were present and failed to intercede.  (*See* Mot. 19–20.)  *See infra*

note 7.  But such specificity as to each NYPD Defendant's individual actions is not required where,

as here, the complaint "give[s] each defendant 'fair notice of what the plaintiff's claim is and the

ground upon which it rests.'"  *Southerland v. N.Y.C. Hous. Auth.*, No. 10–CV–5243 (SLT), 2010

WL 4916935, at \*2 (E.D.N.Y. Nov. 23, 2010) (quoting *Atuahene v. City of Hartford*, 10 F. App'x

33, 34 (2d Cir. 2001) (summary order)); *see Breton v. City of New York*, 404 F. Supp. 3d 799, 815

(S.D.N.Y. 2019) (rejecting group pleading argument where the complaint alleged that specific

officers "each participated in the fabrication of evidence and the creation of police reports that

omitted exculpatory evidence . . . [and] that these defendants forwarded the misleading evidence

to the prosecutors"); *Serrata v. Givens*, No. 1:18-CV-2016, 2019 WL 1597297, *5 (E.D.N.Y. Apr. 15, 2019) (rejecting group pleading argument where "the complaint refers to all the defendants collectively because all the defendants were, it alleges, on the scene and actively involved in the complained-of conduct"); *Adamou v. County of Spotsylvania*, No. 1:12-cv-07789 (ALC) (SN), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (denying motion to dismiss despite "several instances of impermissible 'group pleading'" because "those allegations [we]re buttressed by specific allegations against [particular defendants]").

Because there is no constitutional right to an adequate investigation, and therefore a claim for failure to investigate is not independently cognizable under Section 1983, the Court dismisses Buari's claim for failure to conduct an adequate investigation. *See Antonetti v. City of New York*, 422 F. Supp. 3d 668, 671 (E.D.N.Y. 2017) (dismissing Section 1983 fair trial claim based on alleged failure to investigate); *Head v. Ebert*, No. 14-CV-6546W, 2017 WL 3017395, at *2 (W.D.N.Y. July 11, 2017) (same); *Ying Li*, 246 F. Supp. 3d at 633 (same); *Newton*, 566 F. Supp. 2d at 278 (same); *Blake v. Race*, 487 F. Supp. 2d 187, 212 n.18 (E.D.N.Y. 2007) (same); *see also Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming dismissal of claim that "officers violated [plaintiff's] fair trial right to have the police conduct an adequate investigation [because plaintiff] cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation"); *Harrington*, 607 F.3d at 35 (holding that there is no constitutional right to a police investigation); *Grega v. Pettengill*, 123 F. Supp. 3d 517, 537 (D. Vt. 2015) ("Because in this circuit failure to investigate is not a recognized basis for relief under the Due Process Clause, [plaintiff's] version of the proposed claim—while forceful—fails."). Accordingly, Buari's due process claim survives only insofar as it is based on the alleged fabrication of evidence.

## IV.     Failure to Intercede (Count III)

Buari brings a separate cause of action under Section 1983 against the NYPD Defendants for failure to intercede.  Buari alleges that the NYPD Defendants failed to intercede to prevent the alleged malicious prosecution and due process violations.  (Am. Compl. ¶¶ 285–86.)  Defendants argue that this claim fails because (1) Buari cannot establish an underlying constitutional violation and (2) Buari does not distinguish between NYPD Defendants who participated directly in the alleged constitutional violations and those who failed to intercede.  (Mot. 20 & n.17.)[7]

### A.  Applicable Law

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  A police officer can be liable for failure to intercede when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); and *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 395 (S.D.N.Y. 2005)).  "[A] failure to intervene claim is contingent only on the underlying claim." *Arbuckle v. City of New York*, 14-CV-10248 (ER), 2016 WL 5793741, at *14 (S.D.N.Y. Sept 30, 2016) (citing *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012)).  Accordingly, "there can be no failure to intervene claim without a primary constitutional

---

[7] Defendants' group pleading and failure-to-allege-personal-involvement arguments against Buari's fair trial claim overlap with their arguments against Buari's failure to intercede claim because Defendants attempted to tackle both claims together in their Motion. For clarity and precision, the Court analyzes Buari's failure to intercede claim separately.

violation." *Sanabria v. Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (quoting *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015)).

A police officer may be liable for failure to intercede only where he "observes or has reason to know that [other] officers violated someone's constitutional rights." *Fredricks v. City of New York*, No. 12 Civ. 3734(AT), 2014 WL 3875181, at *12 (S.D.N.Y. July 23, 2014) (citing *Anderson*, 17 F.3d at 557)). A police officer cannot be liable on a failure to intercede theory, however, if he participates directly in the alleged constitutional violation. *Ulerio v. City of New York*, No. 18 Civ. 2155 (GBD), 2018 WL 7082155, at *7 (S.D.N.Y. Dec. 20, 2018) (quoting *Sanabria*, 2016 WL 4371750, at *5). Put simply, "defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation." *Marom v. City of New York*, No. 15-cv-2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016).

### B.  Application

Buari has plausibly alleged a Section 1983 claim predicated on a failure to intercede. As a threshold matter, the Court has found that Buari has plausibly alleged constitutional violations. *See supra* Analysis, Sections II.B., III.B. And, Buari has pleaded personal involvement by the NYPD Defendants. Contrary to Defendants' argument, at this stage, Buari need not allege with particularity which NYPD Defendants coerced the identifying witnesses into testifying falsely and which NYPD Defendants failed to intercede. *See, e.g.*, *Paul v. City of New York*, No. 16-CV-1952 (VSB), 2017 WL 4271648, at *4–5 (S.D.N.Y. Sept. 25, 2017) (denying motion to dismiss where the complaint "d[id] not consistently specify exactly which officer did what, and instead, at various points, refers to the Individual Defendants as a group" because the "allegations impl[ied] that all of the Individual Defendants . . . were at least present" and failed to intercede). Where, as here, "a plaintiff has properly alleged a constitutional violation, he is 'entitled to discovery to determine

37

which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene.'" *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012)); *see Sullivan v. City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *13 (S.D.N.Y. July 10, 2018) (holding that "Plaintiff is entitled to discovery to determine which officers arrested and conducted the subsequent search, and which officers were present and failed to intervene"); *Matthews v. City of New York*, No. 15-CV-2311 (ALC), 2016 WL 5793414, at *8 (S.D.N.Y. Sept. 30, 2016) (noting that where a plaintiff has pleaded a constitutional violation and the presence of several officers, "courts have denied a motion to dismiss in order to allow greater clarification of the facts after discovery" (citing *Sanabria*, 2016 WL 4371750, at *6; and *Terebesi*, 764 F.3d at 244)); *Weaver v. City of New York*, No. 13–cv–20 (CBA)(SMG), 2014 WL 950041, at *7 (E.D.N.Y. Mar. 11, 2014) ("Although Weaver's complaint does not make clear which officers failed to intervene, she has properly alleged at least one constitutional violation and is entitled to discovery to determine which officers participated directly in the alleged constitutional violation and which officers were present and failed to intervene."). While the NYPD Defendants cannot be liable for both the underlying constitutional violations and failure to intercede, these claims may be pleaded in the alternative. *Amid v. Lamb*, No. 14-CV-3151, 2016 WL 1070814, at *5 (E.D.N.Y. Mar. 15, 2016); *see Lanorith v. Truscelli*, No. 15-CV-617 (NGG) (LB), 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017) ("Plaintiff is entitled to plead a failure to intervene claim as an alternative to direct liability." (citing *Guerrero v. City of New York*, No. 16-CV-516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017); and *Buchy v. City of White Plains*, No. 14 Civ. 1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015))).

At this stage of the litigation, the allegations are sufficient to withstand a motion to dismiss, and Buari is entitled to discovery to determine the precise involvement (if any) of each Defendant, specifically, who committed the violation and who failed to intercede.  The Court notes, however, that "at the time of trial, after having had the benefit of discovery, [Buari] will have to specifically identify which, if any, of the [NYPD] Defendants []he seeks to hold liable under a failure to intervene theory." *Amid*, 2016 WL 1070814, at *5; *see also Folk v. City of New York*, 243 F. Supp. 3d 363, 376 (E.D.N.Y. 2017) (permitting failure to intercede claim despite allegations of direct participation by all defendants but noting that plaintiff "will ultimately need to refine her allegations with regard to the roles played by each of the[m]" (citing *Cuellar v. Love*, No. 11–CV–3632, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014))).  Accordingly, the Court denies Defendants' Motion to Dismiss on Buari's failure to intercede claim.

## V.    Conspiracy (Count IV)

Buari brings a conspiracy claim against the NYPD Defendants under Section 1983.  (Am. Compl. ¶¶ 289–95.)  Buari alleges that the NYPD Defendants "agreed among themselves and with" ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor to deprive Buari of his constitutional rights by fabricating evidence and committing perjury.  (*Id.* ¶¶ 290–91.) Defendants argue that Buari has failed to allege a meeting of the minds, or agreement, to frame Buari.  (Mot. 21; Reply 8.)

### A.  Applicable Law

To state a claim for conspiracy under Section 1983, a plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (citing *Pangburn v.*

*Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  To survive a motion to dismiss, a plaintiff must allege more than "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights."  *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (collecting cases). Specifically, a plaintiff "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end," as well as "some details of time and place and the alleged effects of the conspiracy."  *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (quoting *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999); and citing *Hickey–McAllister v. British Airways*, 978 F. Supp. 133 (E.D.N.Y. 1997)).  While a plaintiff "need not produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective."  *Gordon v. Emmanuel*, No. 15-CV-2439 (CBA) (SJB), 2018 WL 4688935, at *9 (E.D.N.Y. Sept. 28, 2018) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996); and citing *Ricciuti*, 124 F.3d at 131).  The allegations must "reasonably lead to the inference that [the defendants] positively or tacitly came to mutual understanding to try to accomplish a common and unlawful plan."  *Id.* (quoting *Hinkle*, 81 F.3d at 421).

### B.  Application

The allegations in the Amended Complaint do not support one large conspiracy among the NYPD Defendants, ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor, as Buari alleges.[8]  Buari does not allege any contact or communication between (1) Dets. Dietz and Tracy and Dets. Price, Gottwin, Neenan, and Fortune, ADA Karen, or the witnesses who testified at trial; (2) Griffiths and Dets. Price, Gottwin, Neenan, and Fortune, ADA Karen, or the

---

[8] Having concluded that ADA Karen and the Investigator Defendants are entitled to absolute immunity, the Court does not address Buari's other conspiracy theory. (*See* Am. Compl. ¶¶ 292–93.)

witnesses who testified at trial; and (3) Effort and the other testifying witnesses.  The Court cannot infer that these individuals, without having spoken to one another, all acted in concert with the goal of depriving Buari of his constitutional rights.  To state a claim for conspiracy, "allegation[s] of parallel conduct and a bare assertion of conspiracy will not suffice."  *Twombly*, 550 U.S. at 556.  Read most generally, that is what Buari alleges here, and accordingly, Buari's conspiracy theory fails.

To the extent Buari alleges a "wheel," or "hub-and-spoke," conspiracy involving the NYPD Defendants, ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor, that theory also fails.  In a wheel conspiracy, "a single person or group (the 'hub') deal[s] individually with two or more other persons or groups (the 'spokes')."  *United States v. Evans*, 970 F.2d 663, 668 n.8 (10th Cir. 1992) (alteration in original).  But "'without the rim of the wheel to enclose the spokes,' a single, wheel conspiracy cannot exist but instead is a series of multiple conspiracies between the common defendant and each of the other defendants."  *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) (quoting *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)); *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002) (describing a rimless wheel conspiracy).  In addition, a wheel conspiracy cannot exist if the individual spokes are unaware of the existence of other spokes.  *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004) (quoting *United States v. Perez*, 489 F.2d 51, 60 n.11 (5th Cir. 1973)).

Here, the Amended Complaint plausibly could be read to suggest that the NYPD Defendants served as the hub and ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor each served as spokes.  (*See* Am. Compl. ¶ 290.)  But it is not clear how the NYPD Defendants can collectively serve as the hub despite no alleged communication between Dets. Dietz and Tracy and Dets. Price, Gottwin, Neenan, and Fortune.  The Amended Complaint

also plausibly suggests that ADA Karen may have been part of the hub because Buari alleges that he worked with Dets. Price, Gottwin, Neenan, and Fortune to induce the witnesses to testify falsely. (*Id.* ¶¶ 112–13, 116–17, 120.)  Importantly, however, there is no indication that each spoke was aware of the existence of the other spokes.  For example, Griffiths' involvement with Buari's prosecution ended after the indictment.  (*Id.* ¶ 87.)  *See Chandler*, 388 F.3d at 807; *see also United States v. Manarite*, 448 F.2d 583, 589–90 (2d Cir. 1971) (noting that "whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy" (collecting cases)).  There is also no indication that each spoke "intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy."  *Evans*, 970 F.2d at 670.  While the Amended Complaint suggests that Robinson and his drug-dealing associates would benefit financially from Robinson controlling the neighborhood drug trade (*see* Am. Compl. ¶ 113), there is no indication that Griffiths and Effort shared in such benefit.  Accordingly, Buari's conspiracy theory—however it is construed—fails, and the Court therefore grants Defendants' Motion to Dismiss on Buari's conspiracy claim.

## VI.     Qualified Immunity

Defendants argue that the NYPD Defendants are entitled to qualified immunity because there was probable cause to arrest and prosecute Buari, they acted on information from a complaining witness, and the Bronx DA decided to indict and prosecute Buari.  (Mot. 26–27.) Buari responds that qualified immunity is not appropriate by reason of his allegations that the NYPD Defendants manufactured probable cause by fabricating evidence.  (Opp. 27.)

### A.  Applicable Law

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  A claim of qualified immunity presents three issues: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 (2018).  A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (quoting *Reich v. Howards*, 566 U.S. 658, 664 (2012)).  Qualified immunity "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### B.  Application

The NYPD Defendants are not entitled to qualified immunity with respect to Buari's claims at this time.  Buari's surviving claims—malicious prosecution, denial of a fair trial based on fabrication of evidence, and failure to intercede—arise from the same factual allegations: the NYPD Defendants coerced witnesses to testify falsely and forwarded that evidence to prosecutors, causing a deprivation of Buari's liberty.

"The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."  *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1990).  Indeed, it is well-established that "[t]he right to a fair trial free of fabricated evidence is basic to our Constitution."  *Jovanovic*, 2006 WL 2411541, at *13.  In *Ricciuti*, the Second Circuit held that police officers who, in 1989, fabricated and forwarded to prosecutors a false confession were not entitled to qualified immunity because their "action[s] violate[d] [the] accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise."  124 F.3d at 130 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

*Ricciuti* is dispositive of Defendants' qualified immunity defense.  In 1993, when the alleged misconduct began, Buari's right not to be prosecuted based on fabricated evidence was clearly established such that every reasonable officer would understand that any actions to falsify evidence violated that right.  *See Ricciuti*, 124 F.3d at 130; *see also Zahrey*, 221 F.3d at 355 ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." (collecting cases)); *Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir. 1994) ("It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause." (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993); and *Golino*, 950 F.2d at 870)).  Indeed, Defendants make no attempt to argue that their alleged conduct was objectively reasonable despite Buari's clearly established right not to be prosecuted based on evidence fabricated by police officers.

Defendants' arguments in support of their qualified immunity defense are unavailing on a motion to dismiss.  First, Buari has pleaded sufficiently a lack of probable case.  *Supra* Analysis, Section II.B.  Second, the NYPD Defendants did not act on the basis of information from witnesses; rather, it is alleged that they coerced individuals to serve as witnesses and testify falsely

against Buari.  Finally, while the NYPD Defendants had no authority over the prosecution, their misconduct initiated and caused a continuation of Buari's prosecution.  *Id.*; *see Shabazz*, 201 F. Supp. 3d at 397 (collecting cases).  Accepting these allegations as true, as the Court must on a 12(b)(6) motion, the NYPD Defendants are not entitled to qualified immunity from claim at this time.

### VII.    Municipal Liability Under Section 1983 and *Monell* (Counts VI and VII)

Buari brings two Section 1983 claims against the City under *Monell*, one involving the NYPD and another involving the Bronx DA, and asserts three distinct theories of liability under each: (1) a *de facto* policy or custom through a widespread practice; (2) failure to train; and (3) failure to supervise and discipline.

Count VI of the Amended Complaint alleges, first, that the NYPD maintained an unofficial practice of initiating arrests and prosecutions without probable cause, coercing false testimony and statements for use in criminal proceedings, failing to correct inaccurate or misleading evidence and testimony, and failing to fulfill *Brady* obligations.  (Am. Compl. ¶ 305.a.)  Second, Count VI alleges that the NYPD demonstrated deliberate indifference in failing to train, supervise, and discipline employees with respect to these matters.  (*Id.* ¶¶ 303–19.)  To plead these theories, Buari relies on (1) the 1994 Report of the Mollen Commission, which documented corruption in the NYPD, *see* City of New York, Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, Commission Report (1994) ("Mollen Commission Report"); (2) a 1987 report of the Mayor's Advisory Committee on Police Management and Personnel Policy ("Mayor's Committee Report"); and (3) cases before the NYPD Civil Complaint Review Board ("CCRB").  (*Id.* ¶¶ 307–19.)

Similarly, Count VII alleges, first, that the Bronx DA maintained an unofficial practice of prosecuting cases without probable cause, using false or unreliable testimony in criminal proceedings, failing to correct such testimony, and failing to fulfill *Brady* obligations.  (*Id.* ¶ 326.a.)  Count VII alleges, second, that the Bronx DA failed to train, supervise, and discipline its employees with respect to these matters.  (*Id.* ¶ 326.b.)  For these theories, Buari relies on, *inter alia*, (1) a list of twenty-three judicial decisions finding prosecutorial misconduct in the Bronx DA's Office and (2) a law review article that summarizes discovery in three lawsuits concerning prosecutorial misconduct by the Bronx DA.  (*Id.* ¶¶ 328–45; *id.* Ex. A [ECF No. 58-1]; *id.* Ex. B [ECF No. 58-2].)

Defendants argue that Buari has failed to allege municipal policies or customs.  (Mot. 22–26.)  Specifically, Defendants argue that the Mollen Commission Report cannot support Buari's claims with respect to the NYPD and that the alleged number of similar incidents of misconduct by the Bronx DA is too statistically insignificant to demonstrate a pattern of misconduct.  (Mot. 24–25.)  Finally, Defendants argue that Buari has failed to allege a specific defect in the training programs of the NYPD and Bronx DA.  (Mot. 26.)

### A.  Applicable Law

Municipalities cannot be held vicariously liable for the acts of their employees under Section 1983.  *Monell*, 436 U.S. at 694; *see Reynolds v. Giuliani*, 506 F.3d 183, 190–91 (2d Cir. 2007) (noting that "*Monell* reasoned that § 1983 rejects the imposition of vicarious liability on a municipality for the torts of its employees" (collecting cases)).   Rather, municipalities may be liable only where "execution of a government's policy or custom" causes constitutional violations.  *Monell*, 436 U.S. at 694; *see Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002)

46

(noting that to determine municipal liability, courts must "conduct a separate inquiry into whether

there exists a 'policy' or 'custom'"), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (summary order).

A plaintiff can plead a "policy" or "custom" by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon*, 705 F.

Supp. 2d at 276–77); *see Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015)

(summary order); *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  In addition, to

prevail on a *Monell* claim, a plaintiff must also show "a direct causal link between a municipal

policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S.

378, 385 (1989); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("Governments

should be held responsible when, and only when, their official policies cause their employees to

violate another person's constitutional rights.").

A "policy" or "custom" can be demonstrated in a variety of ways.  One of the ways courts

have found allegations sufficient to establish a policy or custom is when "an act performed

pursuant to a 'custom' that has not been formally approved by an appropriate

decisionmaker . . . [but] is so widespread as to have the force of law."  *Bd. of Cty. Comm'rs v.*

*Brown*, 520 U.S. 397, 404 (1997) (citing *Monell*, 436 U.S. at 690–91); *see Kern v. City of*

*Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that "persistent and widespread" practices of city

officials may constitute a municipal custom (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d

864, 870–71 (2d Cir. 1992))).   A practice is "widespread" when it is "common or prevalent throughout the [entity]." *Gleeson v. County of Nassau*, No. 15-CV-6487 (AMD) (RL), 2019 WL 4754326, at \*16 (E.D.N.Y. Sept. 30, 2019) (alteration in original) (quoting *Fowler v. City of New York*, No. 13-CV-2372, 2019 WL 1368994, at \*14 (E.D.N.Y. Mar. 26, 2019)).   Under this category, "a policy maker indirectly cause[s] the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. County of Nassau*, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006) (citing *Monell*, 436 U.S. at 694; and *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000)).

To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citing *Sorlucco*, 971 F.2d at 870–71).   A plaintiff "may adequately plead the existence of *de facto* customs or policies based on governmental reports documenting constitutional deficiencies or misconduct," *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018) (collecting cases), if such reports are "sufficiently connected to the specific facts of the case," *Gomez v. City of New York*, No. 16-CV-1274 (NGG) (LB), 2017 WL 1034690, at \*11 (E.D.N.Y. Mar. 16, 2017).   A plaintiff may also plead the existence of *de facto* customs or policies "by citing to complaints in other cases that contain similar allegations." *Gaston v. Ruiz*, No. 17-CV-1252 (NGG) (CLP), 2018 WL 3336448, at \*6 (E.D.N.Y. July 6, 2018) (citing *Osterhoudt v. City of New York*, No. 10 CV 3173(RJD)(RML), 2012 WL 4481927, at \*2 (E.D.N.Y. Sept. 27, 2012)).   Such complaints must involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability. *See, e.g.*, *Isaac*, 2018 WL 5020173, at \*17 (finding that other court cases could not establish a *de facto*

policy or custom because they involved dissimilar misconduct, were resolved by settlement, or the city prevailed); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice.").

Municipal liability can also be based on a showing of "deliberate indifference" to a recurring situation likely to result in a constitutional violation.  In such circumstances, the policy or custom requirement is satisfied "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds*, 506 F.3d at 192 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); and *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006)).  Such a pattern may constitute a policy or custom "if sufficiently persistent or widespread as to acquire the force of law." *Id.* (collecting cases).  The need to act must be "so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Id.* (citing *Canton*, 489 U.S. at 390).  Three requirements must be met before a municipality's failure to act amounts to deliberate indifference: "defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Id.* (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

Liability for deliberate indifference can be based upon a failure to train or a failure to supervise or discipline. *Amnesty America*, 361 F.3d at 127.  Courts must analyze these theories

separately because they emphasize different facts and require different showings to establish deliberate indifference.  *Id.*

Under the failure to train theory, a municipality may be liable "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . [but] the policymakers choose to retain that program."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Brown*, 520 U.S. at 407).  Recurring civil rights complaints can put a municipality on notice of deficiencies in its training program.  *Breton*, 404 F. Supp. 3d at 818 (citing *Felix*, 344 F. Supp. 3d at 661–62)).  There is no bright-line rule for how many civil rights complaints there must be, or how recent the complaints must be, to put a municipality on notice.  *Tieman v. City of Newburgh*, No. 13 Civ. 4178(KMK), 2015 WL 1379652, at *20 (S.D.N.Y. Mar. 26, 2015).

Furthermore, the plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  *Alwan v. City of New York*, 311 F. Supp. 3d 570, 579 (E.D.N.Y. 2018) (quoting *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007)).  The Second Circuit has suggested that a plaintiff "need only plead that the city's failure to train caused the constitutional violation" because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage."  *Amnesty America*, 361 F.3d at 130 n.10.  But after *Twombly* and *Iqbal*, courts generally require that a plaintiff "provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train.'"  *Tieman*, 2015 WL 1379652, at *22 (collecting cases); *see Collins*, 923 F. Supp. 2d at 478 (noting that under *Iqbal*, a plaintiff "must allege, not only a viable [failure to train] theory, but facts that render the theory plausible").  Accordingly, a plaintiff must "allege

50

facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman*, 2015 WL 1379652, at *22 (collecting cases).

Under the failure to supervise or discipline theory, a plaintiff must show that "the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) . . . [and] that such a failure of supervision or discipline was tantamount to deliberate indifference." *Alwan*, 311 F. Supp. 3d at 578 (collecting cases). Deliberate indifference is shown when "the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Canton*, 489 U.S. at 390). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (citing *Ricciuti*, 941 F.2d at 123; and *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986)). "[T]here is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise." *Felix*, 344 F. Supp. 3d at 662 (citing *Manigault v. City of New York*, No. 11-CV-4307 (AJN), 2012 WL 13049173, at *8–9 (S.D.N.Y. Apr. 19, 2012)); *see Fiacco*, 783 F.2d at 328 ("The fact that none of the claims had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.").

### B. Application

#### 1. NYPD

With respect to the NYPD, the allegations in the Amended Complaint, accepted as true, plausibly suggest a *de facto* policy based on a widespread practice of unconstitutional investigative techniques and a causal link between that practice and Buari's alleged constitutional injuries. Quoting findings in the Mollen Commission Report, Buari alleges that at the time of his 1993 arrest and 1995 prosecution "there [wa]s a strong institutional incentive to allow corruption efforts to fray and lose priority"; "police perjury and falsification of official records [wa]s probably the most common form of police corruption"; the practice of police falsifications "[wa]s widely tolerated by corrupt and honest officers alike, as well as their supervisors"; and officers reported that "supervisors knew or should have known about falsified versions of searches and arrests and never questioned them." (Am. Compl. ¶ 308.) These allegations, which the Court is required to accept as true for purposes of Defendants' Motion to Dismiss, and the findings in the Mollen Commission Report, plausibly allege a practice so widespread that it may be inferred at this stage of the litigation that when the NYPD allegedly violated Buari's rights, policymakers were aware of "subordinate[s'] unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America*, 361 F.3d at 126 (citing *Sorlucco*, 971 F.2d at 870–71).[9]

Defendants' objection to Buari's reliance on the Mollen Commission Report is misplaced. (Mot. 24; *see* Reply 9–10.) Courts that have rejected reliance on government reports like the Mollen Commission Report have done so because such reports bore no connection to the specific

---

[9] Buari does not attach the Mollen Commission Report to the Amended Complaint as an exhibit or expressly incorporate it by reference, but it is readily apparent that Buari relied on it in alleging the NYPD *Monell* claim. Therefore, the Court may consider its contents. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (citing *Cortec Indus.*, 949 F.2d at 47–48); *see also, e.g.*, *Harrison v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 424, 431 (S.D.N.Y. 2006) (considering document outside the complaint to which plaintiff cited and from which plaintiff quoted).

factual allegations of the plaintiff's case. *See, e.g.*, *Gleeson*, 2019 WL 4754326, at *16 ("The cases in which other courts in this Circuit rejected the findings of a government report as evidence of a policy or practice involved events that were too far removed from the plaintiffs' case to be probative of a then-existing policy or practice." (collecting cases)); *Breton*, 404 F. Supp. 3d at 817 (recognizing that the Mollen Commission Report can support *Monell* claims, but rejecting plaintiff's reliance on it because "the plaintiff was arrested twenty-two years after the issuance of [the report]"); *Isaac v. City of New York*, No. 16-CV-4729 (KAM), 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (rejecting reliance on Mollen Commission Report because the "pleading in this case fails to make [a] connection"); *Yanez v. City of New York*, 29 F. Supp. 2d 100, 112 (E.D.N.Y. 1998) (finding that "the connection between the Mollen Commission's findings, and the events in the instant case are too remote for me to allow these *Monell* claims to proceed"). But where a report evidences a policy or custom directly related to the constitutional deprivation alleged by the plaintiff, reliance on the report is proper. *See, e.g.*, *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (affirming district court's reliance on investigative report as evidence of municipal policy); *Flores v. Nieva*, No. 14-cv-7960 (KPF), 2017 WL 899942, at *6 (S.D.N.Y. Mar. 6, 2017) (finding that report by United States Attorney's Office detailing pervasive use of excessive force at Riker's Island was sufficient to demonstrate a policy or custom); *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) (denying motion to dismiss where Justice Department report demonstrated a widespread practice at county jail).

Here, accepting his allegations as true, as the Court must, Buari has plausibly alleged a connection between the alleged misconduct by the NYPD Defendants in his case and the findings in the Mollen Commission Report. Buari's allegations of misconduct by the NYPD—*inter alia*, testifying falsely, coercing witnesses to do the same, and permitting Robinson to sell narcotics

without "heat" from the police if he and his associates provided evidence implicating Buari (Am. Compl. ¶¶ 6–7, 10–11, 13, 76–80, 84–85, 107–110)—are factually similar to findings in the relatively contemporaneous Mollen Commission Report. The Mollen Commission Report describes perjury and falsification of evidence, as well as police officers protecting and assisting narcotics traffickers. *See generally* Mollen Commission Report 31–34, 36–43. In addition, Buari alleges misconduct by the NYPD during the precise time of the Mollen Commission's investigation (1992–1994). Therefore, considering Buari's allegations together with the findings in the Mollen Commission Report, the allegations are sufficient at the pleading stage to support a reasonable inference of the existence of a *de facto* policy or custom and a link between the policy or custom and Buari's alleged constitutional deprivation.

Buari has also plausibly alleged a failure by the NYPD to train, supervise, and discipline. As a threshold matter, Buari plausibly has alleged deliberate indifference. (*See* Am. Compl. ¶¶ 306–07.) First, NYPD officials clearly knew that police officers would initiate arrests and prosecutions, speak with witnesses, and possess *Brady* material because these are basic aspects of a police officer's job. *See Bertuglia*, 839 F. Supp. 2d at 738 (citing *Walker*, 974 F.2d at 300). Second, Buari alleges that there is a history of NYPD officers mishandling arrests, witness interviews, and production of *Brady* materials (Am. Compl. ¶¶ 306–12), and similar misconduct is documented in the Mollen Commission Report. *See, e.g.*, Mollen Commission Report 36–43; *see also Walker*, 974 F.2d at 300 (allowing plaintiff to pursue discovery "to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth"). Third, it is reasonable to infer that the alleged failure to train, supervise, and discipline subordinate officers with respect to these matters could cause

frequent constitutional deprivations.   *See White-Ruiz v. City of New York*, No. 93CIV.7233(DLC)(MHD), 1996 WL 603983, at *10–11 (S.D.N.Y. Oct. 22, 1996) (finding deliberate indifference based on Mollen Commission Report).

With respect to his failure to train theory, Buari, relying on the Mollen Commission Report and the Mayor's Committee Report, alleges that "police perjury and falsification of official records [wa]s probably the most common form of police corruption" and that "the NYPD ha[d] been on notice [of] inadequate . . . police officers joining the force."  (Am. Compl. ¶¶ 308.b–309.)  These allegations, together with the findings in the Mollen Commission Report, accepted as true, plausibly allege a "pattern of similar constitutional violations" and that training was "deficient in a similar respect."  *Connick*, 563 U.S. at 62; *see, e.g.*, *Colon v. City of Rochester*, 419 F. Supp. 3d 586, 606 (W.D.N.Y. 2019) (collecting cases); *White v. City of New York*, No. 13 Civ. 7421(KPF), 2015 WL 4601121, at *8 (S.D.N.Y. July 31, 2015).

*Collins*, a strikingly similar case, is instructive.  923 F. Supp. 2d 462.  There, the plaintiff was released after sixteen years in prison when it was discovered that, in 1994, police officers coerced a witness to falsely implicate him and later threatened the witness not to recant the false statement.  *Id.* at 466–67.  The court held that the plaintiff, relying on the Mollen Commission Report, plausibly stated a claim for failure to train officers on *Brady* obligations and the impropriety of coercing witnesses to testify falsely.  *Id.* at 477–79.  The court noted that "[a]n entire section of the [Mollen Commission] Report is devoted to 'Perjury and Falsifying Documents,' which is described as 'a serious problem facing the Department,'" and that the Mollen Commission Report describes testimonial and documentary perjury as "probably the most common form of police corruption facing the criminal justice system today."  *Id.* at 479.

Here, like in *Collins*, the findings in the Mollen Commission Report "make it plausible that the type of misconduct that led to [Buari's] arrest and prosecution was endemic within the NYPD" during the relevant time period. *Id.* Therefore, Buari has plausibly alleged that NYPD officials "were aware of a serious risk of constitutional violations, and that the failure to take any action in response to the problem—whether through training or otherwise—was the result of deliberate indifference." *Id.*

Moreover, Buari has alleged specific deficiencies in the NYPD's training program: the failure to train officers not to initiate arrests and prosecutions without probable cause, not to coerce witnesses to testify falsely, to correct false testimony, and to disclose *Brady* material. (Am. Compl. ¶ 305.) When accepted as true, these alleged deficiencies, albeit general, plausibly state a claim. *See Felix*, 344 F. Supp. 3d at 661 (denying motion to dismiss and where plaintiff alleged that NYPD failed to incorporate crisis intervention in its training). As the Second Circuit has emphasized, at the pleading stage, Buari "cannot be expected to know the details of [the NYPD's] training programs prior to discovery." *Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (summary order) (quoting *Amnesty America*, 361 F.3d at 130 n.10). By alleging facts that could support an inference of a pattern of similar constitutional violations, Buari has satisfied *Iqbal*'s plausibility requirement. *Id.*; *Collins*, 923 F. Supp. 2d at 478. The Court notes, however, that after discovery, Buari "is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation." *Amnesty America*, 361 F.3d at 130 n.10.

With respect to Buari's failure to supervise and discipline theory, the alleged deficiencies in the NYPD's misconduct review procedures reasonably support an inference that the alleged failure to investigate complaints and discipline misconduct rise to the level of deliberate

indifference.  Buari alleges, *inter alia*, that between 1990 and 1992, the CCRB completely investigated 36 percent of complaints received, closed 40 percent of cases without completing full investigations, substantiated 3.3 percent of complaints received, and recommended disciplinary action in 7.5 percent of disposed cases.  (Am. Compl. ¶ 309.d.)  He also alleges that since 1988, victims of police misconduct were awarded damages in 300 to 400 cases annually despite the CCRB substantiating only approximately 100 complaints annually between 1988 and 1992.  (*Id.* ¶ 309.h.)  These allegations, among others, taken as true at this stage, *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283, plausibly suggest a consistent failure to investigate complaints of unconstitutional activity and discipline those involved.  *See Tieman*, 2015 WL 1379652, at *21; *see also Marlin v. City of New York*, No. 15 Civ. 2235 (CM), 2016 WL 4939371 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing"); *cf. Alwan*, 311 F. Supp. 3d at 584 (dismissing failure to supervise or discipline claim where plaintiff "ha[d] not identified any complaints to which the City simply failed to respond"); *Aguirre v. City of New York*, 15-CV-6043 (PKC), 2017 WL 4236552, at *7 (E.D.N.Y. Sept. 22, 2017) (dismissing failure to supervise or discipline claim where, *inter alia*, the complaint "d[id] not allege any [specific] facts regarding the number of filed complaints that the CCRB or NYPC [sic] Commissioner ignored"); *Walker v. City of New York*, No. 14-CV-808(ER), 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (finding that CCRB complaints did not demonstrate failure to supervise or discipline because "Plaintiff d[id] not allege any specific facts as to the contents of the complaints, how many were filed, and when they were filed").

While the misconduct underlying the uninvestigated complaints and undisciplined cases is unknown, it is at least plausible that it is similar to Buari's allegations and that the alleged failure

to supervise and discipline is causally related to Buari's alleged injuries. This inference is not unreasonable in light of the factual similarity and temporal proximity between Buari's alleged injuries and the alleged inadequate misconduct control measures of the NYPD outlined in the Mollen Commission Report's thirty-nine-page chapter titled "The Collapse of the Department's Corruption Controls." Mollen Commission Report 70–109. *See Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity. It characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.' The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes and that the City's handling of the Eppolito matter was reflective of that policy." (collecting cases)); *Gentile v. County of Suffolk*, 129 F.R.D.435, 446 (E.D.N.Y. 1990) (finding that investigative report "supports plaintiffs' allegation that the police . . . were likely . . . to consistently ignore evidence of misconduct on the part of the defendant officers and to sanction and cover up any wrongdoing"), *aff'd*, 926 F.2d 142 (2d Cir. 1991); *see also Felix*, 344 F. Supp. 3d at 662 ("Even if the precise factual circumstances of these cases vary . . . Plaintiffs' allegation that the cases illustrate NYPD officers' repeated failures to respond to emotionally disturbed persons is at least a plausible one."). Accordingly, the Court denies Defendants' Motion with respect to Buari's NYPD-related *Monell* claim.

### 2.Bronx DA

With respect to the Bronx DA, Buari has not plausibly alleged a policy or custom based on a widespread practice of similar prosecutorial misconduct. Buari alleges that the Bronx DA unofficially permitted prosecutors to initiate prosecutions without probable cause, use false or

unreliable testimony in court, fail to correct misconduct, and fail to fulfill *Brady* obligations.  (Am. Compl. ¶ 326.a.)  In his effort to plead a *de facto* policy or custom, Buari cites twenty-three cases where convictions were vacated due to misconduct by Bronx DA prosecutors.  (*Id.* Ex. A.)

Having carefully reviewed each case cited by Buari (*id.*),[10] the Court finds that Buari has not adequately pleaded a *de facto* policy or custom.  Buari correctly notes that the cases involve

---

[10] *See Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002) (granting writ of habeas corpus in connection with 1992 convictions where prosecution failed to disclose that a third party had confessed to hiring a hit man to kill the victim); *Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2002) (granting writ of habeas corpus in connection with 1990 conviction where prosecution failed to turn over statements in police officer's memobook); *Morales v. Portuondo*, 165 F. Supp. 2d 601 (S.D.N.Y. 2001) (granting writ of habeas corpus in connection with 1988 convictions where prosecution failed to investigate exculpatory evidence and the record reflected that prosecution was more intent on protecting a conviction than in seeing that justice was done); *People v. Garcia*, 46 A.D.3d 461, 848 N.Y.S.2d 137 (1st Dep't 2007) (vacating 2002 convictions where prosecution failed to disclose evidence that contradicted complainant's claim); *People v. Olivero*, 272 A.D.2d 174, 710 N.Y.S.2d 29 (1st Dep't 2000) (vacating 1997 conviction where prosecution misrepresented import of evidence); *People v. Mikel*, 274 A.D.2d 325, 710 N.Y.S.2d 70 (1st Dep't 2000) (vacating 1998 conviction where prosecution failed to disclose lead witness's criminal history, cooperation agreement with prosecution, and witness's failure to abide by prosecution agreement, which resulted in a new cooperation agreement); *People v. King*, 241 A.D.2d 329, 659 N.Y.S.2d 469 (1st Dep't 1997) (vacating 1994 conviction where prosecution failed to turn over affidavit of victim before victim testified); *People v. Ortega*, 241 A.D.2d 369, 659 N.Y.S.2d 883 (1st Dep't 1997) (vacating 1994 conviction where prosecution failed to turn over victim's grand jury testimony at independent source hearing); *People v. Lantigua*, 228 A.D.2d 213, 643 N.Y.S.2d 963 (1st Dep't 1996) (vacating 1992 conviction where prosecution failed to disclose evidence that impeached the credibility of the prosecution's witness); *People v. Ramos*, 201 A.D.2d 78, 614 N.Y.S.2d 977 (1st Dep't 1994) (vacating 1985 conviction where prosecution failed to turn over documents related to credibility of complaining witness); *People v. Rutter*, 202 A.D.2d 123, 616 N.Y.S.2d 598 (1st Dep't 1994) (vacating 1982 conviction where prosecution delayed in turning over polygraph transcript containing prior inconsistent statements of prosecution's principal witness); *People v. White*, 200 A.D.2d 351, 606 N.Y.S.2d 172 (1st Dep't 1994) (vacating 1986 conviction where prosecution failed to disclose police report that summarized interview with prosecution's principal witness); *People v. Banfield*, 194 A.D.2d 330, 599 N.Y.S.2d 227 (1st Dep't 1993) (vacating 1990 conviction where prosecution failed to disclose promises made to witness in exchange for witness's testimony); *People v. Byfield*, 194 A.D.2d 331, 599 N.Y.S.2d 227 (1st Dep't 1993) (vacating 1990 conviction where prosecution failed to disclose promises made to witness in exchange for witness's testimony); *People v. Lewis*, 174 A.D.2d 294, 580 N.Y.S.2d 6 (1st Dep't 1992) (vacating 1991 conviction where prosecution failed to correct witness's misstatement and to disclose promises made to witness in exchange for witness's testimony); *People v. Negron*, 161 A.D.2d 537, 556 N.Y.S.2d 41 (1st Dep't 1990) (vacating 1988 conviction where prosecution accused defendant of fabricating his defense during summation); *People v. Olmo*, 153 A.D.2d 544, 545 N.Y.S.2d 285 (1st Dep't 1989) (vacating 1985 conviction where prosecution failed to correct false testimony at 1985 suppression hearing); *People v. Velez*, 118 A.D.2d 116, 504 N.Y.S.2d 404 (1st Dep't 1986) (vacating 1984 conviction where prosecution failed to disclose evidence that may have impeached the complaining witness); *People v. Gonzalez*, 120 A.D.2d 464, 502 N.Y.S.2d 468 (1st Dep't 1986) (vacating 1983 conviction where prosecution failed to disclose exculpatory grand jury testimony); *People v. Johnson*, No. 8428/98, 2001 WL 1263380 (N.Y. Sup. Ct., Bronx Cnty. 2001) (vacating 2000 conviction where prosecution failed to turn over recordings of statements of eyewitnesses); *People v. Collins*, 228 A.D.2d 213, 643 N.Y.S.2d 963 (N.Y. Sup. Ct., Bronx Cnty. 1996) (vacating 1995 conviction where prosecution failed to disclose the existence of a witness to the crime and correct false testimony); *People v. Nikollaj*, 155 Misc.2d 642, 589 N.Y.S.2d 1013 (N.Y. Sup. Ct., Bronx Cnty. 1992) (vacating 1991 conviction where prosecution failed to turn over pretrial statements of prosecution's witnesses); *People v. Bruno*, Ind. No. 0027/97, N.Y. L.J., Apr. 23, 2003, at 19 (vacating conviction where prosecutor withheld information casting doubt on voluntariness of confession). (*See* Am. Compl. Ex. A ¶ 22.)

findings of similar prosecutorial misconduct, but the convictions—and therefore the prosecutorial misconduct—in these cases span from 1982 to 2002, a twenty-year period.  Citing twenty-three cases, Buari alleges only slightly more than one case of similar prosecutorial misconduct each year.  Even drawing reasonable inferences in Buari's favor, such a relatively small number of cases over the course of two decades in such a large municipality does not plausibly suggest that the alleged practice is "so widespread as to have the force of law," *Brown*, 520 U.S. at 404 (citing *Monell*, 436 U.S. at 690–91), or "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco*, 971 F.2d at 871 (citing *Praprotnik*, 485 U.S. at 130; and *Krulik v. Bd. of Educ.*, 781 F.2d 15, 23 (2d Cir. 1986)); *see Jones*, 691 F.3d at 85 (finding that evidence of "two instances, or at most three instances, over a period of several years . . . fell far short of showing a policy, custom, or usage"); *Felix*, 344 F. Supp. 3d at 659 (finding that ten civil rights complaints over the course of thirty years was insufficient to plead a widespread practice); *Calderon*, 138 F. Supp. 3d at 613 (finding that sixteen lawsuits over twelve years in such a large municipality (New York) were inadequate to plead a municipal custom); *Tieman*, 2015 WL 1379652, at *17 (finding that "allegations of thirteen instances of excessive force during arrests over four years . . . during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate" a widespread practice); *Walker v. City of New York*, No. 12 Civ. 5902(PAC), 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014) (finding that ten complaints of similar conduct, "spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim").  *But see Osterhoudt*, 2012 WL 4481927, at *1.  The decisions on which Buari relies (Opp. 25) are not relevant to this inquiry because they involved *Monell* claims pleaded under deliberate indifference

theories.  *See Walker*, 2014 WL 1259618, at *3 (noting that failure to train cases are inapposite to claims alleging a widespread practice).

Buari, however, has sufficiently pleaded a failure by the Bronx DA to train, discipline, and supervise, relying on a plausibly alleged deliberate indifference theory.  First, Bronx DA officials plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire *Brady* material "because these are basic facets of an ADA's job."  *Bertuglia*, 839 F. Supp. 2d at 738 (citing *Walker*, 974 F.2d at 300).  Second, as discussed below, Buari plausibly alleges a history of ADAs mishandling these matters.  Third, it is reasonable to infer that the failure to train, supervise, and discipline prosecutors in connection with these matters likely would cause recurrent constitutional violations.  *See Walker*, 974 F.2d at 300 ("[W]ithholding *Brady* material will virtually always lead to a substantial violation of constitutional rights.");  *Bertuglia*, 839 F. Supp. 2d at 739 ("[W]here an assistant district attorney commits misconduct before a grand jury that results in an indictment based on insufficient evidence, or violates their obligations under *Brady*, those actions will frequently result in the violation of citizens' constitutional rights.").

With respect to his failure to train theory, drawing reasonable inferences in Buari's favor, as the Court must, *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283, Buari's list of judicial decisions finding similar prosecutorial misconduct plausibly permits a reasonable inference that Bronx DA policymakers should have been aware or were on notice of training deficiencies with respect evidence presentation and *Brady* obligations.  (Am. Compl. Ex. A.)  The list of decisions Buari cites include five vacated convictions in 1993 and 1994, the two years before Buari's prosecution, and several others before then.  *Supra* note 10; *see Fiacco*, 783 F.2d at 329–32 ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice . . . .");

*Vasconcellos v. City of New York*, No. 12 Civ. 8445(CM), 2014 WL 4961441, at *13 (S.D.N.Y. Oct. 2, 2014); *see also Felix*, 344 F. Supp. 3d at 662 (denying motion to dismiss where plaintiff pointed to "lawsuits *and* corroborating reports"); *Tieman*, 2015 WL 1379652, at *22 (finding that thirteen claims alleged in nine lawsuits in five years plausibly suggested City was on notice); *Edwards v. City of New York*, 14-CV-10058, 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (denying motion to dismiss deliberate indifference claim where complaint cited eighteen lawsuits over twelve-year period); *McCants v. City of Newburgh*, No. 14–CV–556, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (finding that "seventeen excessive force claims made against the City in the seven-year time period prior to" the challenged misconduct "evidence[d] the City was on notice to the possible use of excessive force by its police" (citing *Fiacco*, 783 F.2d at 328)), *clarified on denial of reconsideration*, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014); *Farrow v. City of Syracuse*, No. 12–CV–1401, 2014 WL 1311903, at *8 n.7 (N.D.N.Y. Mar. 31, 2014) (noting that fifteen cases in five years would survive motion to dismiss).

In addition, Buari identifies specific areas where training in the Bronx DA's Office allegedly was deficient: initiating prosecutions without probable cause, using false or unreliable testimony or statements in criminal proceedings, failing to correct such testimony or statements, and failing to fulfill *Brady* obligations. (*Id.* ¶ 326.a.) Buari further alleges that the Bronx DA "trained prosecutors in blatantly unlawful practices to prevent disclosure of evidence favorable to criminal defendants under *Brady*." (Am. Compl. ¶ 334.) Since Buari cannot be expected to know particulars of Bronx DA training policies prior to discovery, *see Amnesty America*, 361 F.3d at 130 n.10, the Court finds that these allegations, accepted as true at the 12(b)(6) stage, plausibly state a claim, *see supra* Analysis, Section VII.B.1. Finally, it is plausible that the alleged training deficiencies led to Buari's injury given the factual similarities in the judicial decisions Buari cites

and the temporal proximity of Buari's prosecution to the alleged training deficiencies. Accordingly, the Court denies Defendants' Motion with respect to Buari's Bronx DA *Monell* claim based on a failure to train theory.

Buari has also sufficiently pleaded a *Monell* claim based on a failure to supervise and discipline theory. As discussed above, Buari has plausibly alleged that the Bronx DA was on notice of prosecutorial misconduct similar to what Buari has alleged. He has also alleged a failure to investigate and discipline the misconduct. Specifically, Buari alleges that the Bronx DA's Office failed to "conduct internal disciplinary investigations; discipline the prosecutors who were known to engage in such misconduct . . . ; or refer such individuals for possible discipline." (Am. Compl. ¶ 329.) More specifically, he alleges that "in approximately 72 cases where courts had found prosecutorial misconduct occurred (including the use of and failure to correct false or misleading testimony and *Brady* violations), officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect." (*Id.* ¶ 334.) Furthermore, Buari alleges that "personnel files for [Bronx DA] cases where prosecutor misconduct had been found from between 1989 through 2006 . . . [revealed no] documentary evidence of disciplinary action ever being taken against the prosecutors." (*Id.* ¶ 335.) In short, Buari plausibly alleges a conscious disregard for prosecutorial misconduct and an absence of disciplinary action. Accepting these allegations as true, Buari has plausibly stated a claim for failure to supervise and discipline "tantamount to deliberate indifference." *Alwan*, 311 F. Supp. 3d at 578 (collecting cases); *see Bertuglia*, 839 F. Supp. 2d at 738 (finding deliberate indifference where plaintiff "pleaded that the City has a longstanding, *de facto* policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct"); *cf. Walker*, 974 F.2d at 298 (noting that the absence of a policy can

provide a basis for deliberate indifference).[11]   The Court does not consider or rely on the law review article cited by Buari because his allegations plausibly plead a *Monell* claim based on failure to supervise and discipline without the aid of the article.  (*See* Mot. 25.)  Finally, the Court may reasonably infer that the constitutional deprivations of which Buari complains were directly linked to the alleged failure by the Bronx DA to supervise and disciple prosecutors committing violations.

In sum, Buari's *Monell* claim relating to the Bronx DA fails under a widespread practice theory but survives under a theory of failure to train, supervise, and discipline.

## VIII.   Remaining State Law Claims (Counts X and XI)

Buari brings a due process claim under the New York State Constitution against the NYPD Defendants (Count XI).  (Am. Compl. ¶¶ 359–63).  Separately, he seeks to hold the City liable for his state law malicious prosecution and state constitutional due process claims under a theory of *respondeat superior* (Count X).  (*Id.* ¶¶ 357, 363.)  Buari alleges that the NYPD Defendants acted as agents of the City, within the scope of their employment, and in furtherance of the City's law enforcement functions.  (*Id.* ¶ 356.)  Defendants argue that Buari's state claims are duplicative of his federal claims and should therefore be dismissed.  (Mot. 28 & n.20.)  Buari responds that these claims should proceed because Section 1983 does not provide an adequate alternative remedy. (Opp. 27–28.)

---

[11] Although Buari does not allege a failure to *investigate* complaints—indeed, he only alleges substantiated instances of misconduct and the failure to discipline that misconduct—his failure to supervise theory is plausible. The Second Circuit has explained that while the failure to respond to repeated civil rights complaints would constitute deliberate indifference claim for a failure to supervise, that showing is not required. *Amnesty America*, 361 F.3d at 128 (citing *Vann*, 72 F.3d at 1049). At the motion to dismiss stage, Buari need only plausibly allege that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct . . . and the policymaker's failure to investigate *or rectify* the situation evidences deliberate indifference." *Id.* (emphasis added) (noting that the "means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing"). Buari has plausibly alleged a failure to rectify prosecutorial misconduct.

### A. Applicable Law

Courts in this Circuit have "uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Alwan*, 311 F. Supp. 3d at 586 (collecting cases); *see also Gounden v. City of New York*, No. 14 Civ. 7411(BMC), 2015 WL 5793625, at *5 n.3 (E.D.N.Y. Oct. 2, 2015) (noting the "common view" in this Circuit "that there is no right of action under the New York State Constitution for claims that can be brought under § 1983" (citing *Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439 (S.D.N.Y. 1999))). These courts "rely on the premise that § 1983 provides an 'adequate' alternative remedy for violations of the New York State Constitution." *Alwan*, 311 F. Supp. 3d at 586. Thus, "where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 171–72 (S.D.N.Y. 2019) (collecting cases).

"[U]nlike cases brought under § 1983, municipalities may be liable for the common law torts, like . . . malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." *Mesa v. City of New York*, No. 09 Civ. 10464(JPO), 2013 WL 31002, at *34 (S.D.N.Y. Jan. 3, 2013) (quoting *L.B. v. Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002)). In addition, courts in this Circuit have concluded that "§ 1983 is not an adequate alternative remedy for state-constitutional claims that rely on a theory of *respondeat superior*." *Alwan*, 311 F. Supp. 3d at 587 (emphasis added) (collecting cases). Indeed, the New York Court of Appeals has recognized that "[a] plaintiff seeking to recover on the basis of *respondeat superior* simply does not come within the terms of section 1983." *Brown v. State*, 89 N.Y.2d 172, 194, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996) (emphasis added); *accord Alwan*, 311 F. Supp. 3d at 587.

### B. Application

Buari cannot maintain his state constitutional due process claim (Count XI) against the NYPD Defendants because Section 1983 provides an adequate remedy. *See Talarico*, 367 F. Supp. 3d at 172; *see also Lee v. Corneil*, No. 1:13-cv-8359, 2016 WL 1322444, at *5 (S.D.N.Y. Apr. 1, 2016) (finding no private right of action for due process claim under New York State Constitution because Section 1983 provides adequate remedy); *Krug v. County of Rensselaer*, 559 F. Supp. 2d 223, 248 (N.D.N.Y. 2008) (dismissing state constitutional law claims that mirrored Section 1983 claims).

Buari's state constitutional due process claim survives, however, insofar as he seeks to hold the City liable under the doctrine of *respondeat superior*. *See Logan v. City of Schenectady*, 1:18-cv-01179 (BKS/CFH), 2019 WL 3803631, at *9 (N.D.N.Y. Aug. 13, 2019) (dismissing state constitutional claims against individual defendants because Section 1983 provided remedy but declining to dismiss those claims against the municipality); *Brown v. City of New York*, No. 13-CV-6912, 2017 WL 1390678, at *15 (S.D.N.Y. Apr. 17, 2017) (dismissing state constitutional claims against individual defendants but not municipality because claims were asserted under *respondeat superior*); *Espinoza v. City of New York*, 194 F. Supp. 3d 203, 208 (E.D.N.Y. 2016) (same). Moreover, Buari's state-law malicious prosecution claim asserted against the City under the doctrine of *respondeat superior* also survives. *See Mesa*, 2013 WL 31002, at *34 (holding that "where Plaintiffs' state law claims survive, so too do their *respondeat superior* claims against the City"); *Reyes v. City of New York*, 992 F. Supp. 2d 290, 299 (S.D.N.Y. 2014) (allowing state law claims to proceed against municipality due to potential for vicarious liability for actions of police officers (citing *L.B.*, 232 F. Supp. 2d at 239)). Accordingly, Buari's state constitutional due process claim against the NYPD Defendants is dismissed and his state law malicious prosecution and state

constitutional due process claims against the City survive to the extent they are based on a *respondeat superior* theory.

## IX.    Leave to Amend

In his opposition to the Motion to Dismiss, Buari requests leave to amend further to correct any deficiencies identified by the Court in ruling on the Motion.  (Opp. 28.)

### A.    Applicable Law

The Second Circuit has stated, "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)).  Nevertheless, "a district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the complaint that a valid claim might be stated."  *Perri v. Bloomberg*, No. 11–CV–2646, 2012 WL 3307013, at *4 (E.D.N.Y. Aug. 13, 2012) (citing *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).  In other words, leave to amend may be denied if an amendment would be futile—that is, "a proposed claim could not withstand a motion to dismiss pursuant to 12(b)(6)."  *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti*, 941 F.2d at 123); *see also Hayden*, 180 F.3d at 53 ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." (citing *Pani*, 152 F.3d at 76)).  A plaintiff's "failure to cure deficiencies by amendments previously allowed" weighs against granting leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### B.    Application

As a preliminary matter, Buari asserts claims, many against similar groupings of Defendants, on alternate theories.  In addition, the Court has given the Amended Complaint a

liberal reading and where clams are dissimilar, it has confirmed that leave to replead particular claims would be futile. For example, the Court considered Buari's supervisory liability claim against DA Clark despite Buari's failure to name DA Clark as a party to the action. *See supra* notes 1, 5. The Court also presumed ADA Karen's involvement in Buari's indictment despite Buari's failure to specify which ADA was involved. *See supra* note 4.

Buari's claims, in significant measure, survive the Motion to Dismiss. However, certain claims, assuming all factual allegations to be true, nonetheless fail as a matter of law. Further amendment therefore would be largely futile. First, further amendment will not result in liability of the ADA Defendants, the Investigator Defendants, or DA Clark in light of the fact that, as a matter of law, they have absolute immunity with respect to Buari's claims. *See Johnson v. N.Y.C. Police Dep't*, 651 F. App'x 58, 61 (2d Cir. 2016) (summary order); *Contreras v. Perimenis*, 562 F. App'x 50 (2d Cir. 2014) (summary order); *Ying Li*, 246 F. Supp. 3d at 646; *Levesque v. Does*, No. 2:15–cv–17, 2015 WL 1412204, at *1 (D. Vt. Mar. 26, 2015). Second, further amendment likely would not enable Buari to plead a *Monell* claim against the City with respect to the Bronx DA's Office under a widespread practice theory because he clearly has already attempted to amass and marshal what information he had, and his allegations, even when taken as true, do not plausibly suggest liability. *See Molina v. County of Westchester*, No. 16 CV 3421 (VB), 2017 WL 1609021, at *6 (S.D.N.Y. Apr. 28, 2017); *Pluma v. City of New York*, No. 13 Civ.2017(LAP), 2015 WL 1623828, at *13 (Mar. 31, 2015); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 258 (2d Cir. 2018) (noting that "a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim" (quoting *State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990))). Third, the problem with Buari's

state constitutional claim against the NYPD Defendants "is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

It bears noting, moreover, that Buari has already amended his claims. His first amendment followed Defendants' pre-motion letter, which noted specific deficiencies in the Complaint, and the pre-motion conference. (*See* Letter Mot. Conference [ECF No. 55].) Having failed to remedy pertinent pleading deficiencies of which he received notice, Buari should not be given "yet another bite at the proverbial apple." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007); *see Nat'l Credit Union Admin. Bd.*, 898 F.3d at 257–58 (alteration in original) ("When a plaintiff was aware 'of the deficiencies in his complaint when he first amended,' he 'clearly has no right to a second amendment [even if] the proposed second amended complaint in fact cures the defects of the first.'" (quoting *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978); and citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890–91 (9th Cir. 2014))).

Buari's conspiracy claim, however, could benefit from further amendment. The factual allegations may suggest a conspiracy, but not one all-encompassing conspiracy, as Buari pleads. Furthermore, Defendants' pre-motion letter did not address the conspiracy claim, so Buari was not on notice of pleading deficiencies when he filed the Amended Complaint. Accordingly, the Court grants Buari leave to amend only for the purpose of repleading and clarifying his conspiracy claim. *See Rivera v. City of New York*, No. 1:16-cv-9709-GHW, 2019 WL 252019, at *9 (S.D.N.Y. Jan. 17, 2019) (granting "leave to amend only with respect to [specific] claims and only to cure the deficiencies identified"); *Gonzalez v. City of New York*, No. 1:18-cv-02197-GHW, 2018 WL 10323053, at *9 (S.D.N.Y. Dec. 18, 2018) (same); *Davis v. United States*, 430 F. Supp. 2d 67, 81 (D. Conn. Apr. 28, 2006) (granting leave to amend only for purpose of setting forth specific claim against particular defendant).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.  To summarize:

- Defendants' Motion is GRANTED insofar as it seeks dismissal of all claims against Defendants Karen, Lung, Coddington, Mignola, Wall, Schiffmann, and Viggiano on absolute immunity grounds;

- DENIED with respect to Count I;

- GRANTED IN PART (failure to investigate) and DENIED IN PART (fabrication of evidence) with respect to Count II;

- DENIED with respect to Count III;

- GRANTED with respect to Count IV;

- GRANTED with respect to Count V;

- DENIED with respect to Count VI;

- GRANTED IN PART (widespread practice theory) and DENIED IN PART (failure to train, supervise, and discipline theory) with respect to Count VII;

- DENIED with respect to Count VIII;

- GRANTED with respect to Count IX (claim withdrawn (Opp. 27 n.4.));

- DENIED with respect to Count X as it relates to Counts VIII and XI;

- GRANTED with respect to Count XI as against Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Does #1–10, and Roes #1–10; and

- GRANTED IN PART (NYPD Defendants) and DENIED IN PART (Defendant City of New York) with respect to Count XI.

IT IS HEREBY ORDERED that Buari shall file a Second Amended Complaint and a redline version showing differences between that document and the Amended Complaint on or before April 7, 2021.  The remaining Defendants shall answer or otherwise respond to the Second Amended Complaint within 14 days after service of the Second Amended Complaint.

The Clerk of Court is respectfully requested to terminate the case as against Defendants Karen, Lung, Coddington, Mignola, Wall, Schiffmanm, and Viggiano and close docket entry 61.

**SO ORDERED.**

**Date:  March 30, 2021**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**